KENT MARKUS, OH Bar #16005
Enforcement Director
LAURA SCHNEIDER, NY Bar #2715449
(Phone: 202-435-7311)
(Email: Laura.Schneider@cfpb.gov)
CRYSTAL R. SUMNER, CA Bar #261435
(Phone: 202-435-7549)
(Email: Crystal.Sumner@cfpb.gov)
JAMES MEADE, DC Bar #414732
(Phone: 202-435-9202)
(Email: James.Meade@cfpb.gov)
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

KENT KAWAKAMI, CA Bar #149803 – Local Counsel
(Phone: 213-894-4858)
(Email: Kent.Kawakami@usdoj.gov)
United States Attorney's Office
Central District of California - Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: (213) 894-2380

Attorneys for Plaintiff
Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Consumer Financial Protection Bureau,

Plaintiff,

v.

Chance Edward Gordon, et al.,

Defendants.

Case No. CV12-6147-RSWL-MRW

**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF THE ISSUES**

**Hon. Percy Anderson**

## Table of Contents

**KEY TO SUMMARY JUDGMENT EXHIBITS ....... 26**

**STATEMENT OF UNCONTROVERTED FACTS....... 29**

OVERVIEW OF DEFENDANTS ....... 29

Chance Edward Gordon ("Gordon") ....... 29

The Gordon Law Firm, P.C. ("Gordon Law Firm")....... 30

Abraham Michael Pessar ("Pessar")....... 30

Division One Investment and Loan, Inc. ("Division One Investment") ....... 31

Processing Division, L.L.C. ("Processing Division") ....... 31

DAE Holdings, L.L.C. ("DAE") ....... 32

COMMON ENTERPRISE....... 32

Organization of Defendants' Operation....... 32

Sharing of Profits ....... 37

DEFENDANTS' MORTGAGE ASSISTANCE RELIEF SERVICES....... 40

DEFENDANTS' MARKETING ....... 46

Mail Solicitations....... 46

Defendants' Websites and Name Changes....... 48

Sale of Services....... 54

Defendants' Sales Representatives Were Provided Substantial Incentives for Selling Defendants' Services ....... 58

Defendants' Mailers, Websites, and Sales Representatives Implied That They Were the Government or Were Affiliated with the Government....... 60

Defendants Promised Consumers Loan Modifications That Would Substantially Reduce Consumers' Mortgage Payments and Interest Rates....... 66

Defendants Misrepresented That They Would Obtain a Loan Modification as a Result of a Forensic Audit Performed by Defendants ....... 69

Other Misrepresentations by Defendants....... 71

OTHER VIOLATIONS .......... 74
Defendants Charged Consumers an Upfront Fee for Mortgage Assistance Relief Services .......... 74
Defendants Instructed Consumers to Cease Communications with Their Lenders .......... 77
Defendants Encouraged Consumers to Stop Making Mortgage Payments and Failed to Provide Appropriate Disclosure .......... 79
Defendants Failed to Provide Appropriate Disclosures on Mail Solicitations and on Websites .......... 81
FAILURE TO DELIVER PROMISED SERVICES .......... 82
Defendants Failed to Deliver Promised Services .......... 82
Consumer Complaints .......... 84
Consumer Injury .......... 88
Final Judgments and Orders .......... 89
DEFENDANT GORDON'S ADMISSIONS .......... 90
**CONCLUSIONS OF LAW .......... 114**

## KEY TO SUMMARY JUDGMENT EXHIBITS

| SJ Ex. Number: | Abbreviation: | Refers to: |
|---|---|---|
| **Pleadings, Filings and Discovery Responses** | | |
| SJ Ex. 1 | Gordon Opp. to PI | Defendant Gordon's Opposition to Entry of Preliminary Injunction, DE #19, Declaration of Chance Gordon #19-2, filed on July 27, 2012 |
| SJ Ex. 2 | Rec. Rep. I | Temporary Receiver's Report, DE #28, filed on August 2, 2012 |
| SJ Ex. 3 | Gordon Answer | Defendant Gordon's Answer to Plaintiff's Complaint, DE #40, filed on August 16, 2012, and corresponding pages of Complaint, DE #1, filed on July 18, 2012 |
| SJ Ex. 4 | Rec. Rep. II | Temporary Receiver's Second Supplemental Report, DE #45, filed on September 11, 2012 |
| SJ Ex. 5 | Rec. Rep. III | Temporary Receiver's Motion for Approval of Final Report, DE #93, filed on January 4, 2013 |
| SJ Ex. 6 | Gordon RFA Response | Defendant Gordon's Responses to Plaintiff's Request for Admissions[1] |
| SJ Ex. 7 | Gordon Interrog. | Defendant Gordon's Responses to Plaintiff's First Set of Interrogatories[2] |
| **Consumer Affidavits and Declarations** | | |
| SJ Ex. 8 | DuBiel Decl. | Randy DuBiel Declaration, also filed on August 3, 2012 as Attach. B in support of Preliminary Injunction |
| SJ Ex. 9 | Garrido Decl. | Gilbert Garrido Declaration and Attachments (TRO Ex. 5), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 10 | Hagy Decl. | Ervin Hagy Declaration and Attachments (TRO Ex. 6), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 11 | Johnson Decl. | Darren Johnson Declaration and Attachments (TRO Ex. 7), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |

[1] Authenticated in Schneider Decl. (SJ Ex. 34).
[2] Authenticated in Schneider Decl. (SJ Ex. 34).

| | | |
|---|---|---|
| SJ Ex. 12 | Johnston Decl. | John Johnston Declaration and Attachments, also filed on August 3, 2012 as Attach. C in support of Preliminary Injunction |
| SJ Ex. 13 | Nuval Decl. | Gloria Nuval Declaration and Attachments (TRO Ex. 8), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 14 | Stephens Decl. | Anita Stephens Declaration and Attachments (TRO Ex. 9), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 15 | Wesolowski Decl. | Arlette Wesolowski Declaration and Attachments (TRO Ex. 10), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 16 | Wobig Decl. | Kenneth Wobig Declaration and Attachments (TRO Ex. 11), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 17 | I. Yoo Decl. | Insok Yoo Declaration and Attachments (TRO Ex. 12), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 18 | J. Yoo Decl. | Julie Yoo Declaration and Attachments (TRO Ex. 13), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| | **Consumer Depositions**[3] | |
| SJ Ex. 19 | Aull Dep. | Deposition of Gustavus Aull, taken by Plaintiff on March 19, 2013 |
| SJ Ex. 20 | Johnston Dep. | Deposition of John C. Johnston, II, taken by Plaintiff on April 25, 2013 |
| SJ Ex. 21 | Oden Dep. | Deposition of Theresa Oden, taken by Plaintiff on March 21, 2013 |
| | **Other Depositions**[4] | |
| SJ Ex. 22 | Gearries Dep. | Deposition of John Gearries, taken by Plaintiff on May 7-8, 2013 |

[3] All depositions are authenticated in Schneider Decl. (SJ Ex. 34).
[4] All depositions are authenticated in Schneider Decl. (SJ Ex. 34).

| | | |
|---|---|---|
| SJ Ex. 23 | Gordon Dep. I | Deposition of Defendant Gordon, taken by California State Bar on June 28-29, 2012 |
| SJ Ex. 24 | Gordon Dep. II | Deposition of Defendant Gordon, taken by Plaintiff on October 10, 2012 |
| **Other Affidavits and Declarations** | | |
| SJ Ex. 25 | Cal. SOS Aff. | California Secretary of State Affidavit and Attachments (TRO Ex. 1), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 26 | Burge Decl. | Kim Burge Declaration and Attachments (TRO Ex. 14), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 27 | Godard Decl. | Michael Godard Declaration and Attachments |
| SJ Ex. 28 | Hanson Decl. | Timothy Ryan Hanson Declaration and Attachments |
| SJ Ex. 29 | Kane Decl. | Brick Kane Declaration and Attachments |
| SJ Ex. 30 | Pessar Aff. I | Abraham Michael Pessar Affidavit and Attachments I |
| SJ Ex. 31 | Pessar Aff. II | Abraham Michael Pessar Affidavit and Attachments II |
| SJ Ex. 32 | Piesik Aff. | Don Piesik Declaration and Attachments (TRO Ex. 16), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| SJ Ex. 33 | Ranney Decl. | Bowen Ranney Declaration and Attachments |
| SJ Ex. 34 | Schneider Decl. | Laura Schneider Declaration and Attachments |
| SJ Ex. 35 | Van Beek Decl. | Allison Van Beek Declaration and Attachments |
| SJ Ex. 36 | Van Dyke Decl. | Noah Van Dyke Declaration and Attachments |
| SJ Ex. 37 | von Freymann Decl. | Craig von Freymann Declaration and Attachments (TRO Ex. 15), also filed on July 18, 2012 in support of Plaintiff's Application for a Temporary Restraining Order |
| **Final Judgments and Orders** | | |
| SJ Ex. 38 | Pessar Judgment | Stipulated Final Judgment and Order for Permanent Injunction and Settlement of Claims as to Defendants Pessar, Division One Investment, and Processing Division, DE #102, filed on February 1, 2013 |

## STATEMENT OF UNCONTROVERTED FACTS

| | Uncontroverted Fact ("UF") | Citation[5] |
|---|---|---|
| | **OVERVIEW OF DEFENDANTS** | |
| | **Chance Edward Gordon ("Gordon")** | |
| 1. | Between January 1, 2010 and July 19, 2012, Gordon was the sole owner and officer of The Gordon Law Firm, P.C. ("Gordon Law Firm"). | Gordon RFA (SJ Ex. 6) Response 1; Cal. SOS Aff. (SJ Ex. 25) |
| 2. | Between January 1, 2010 and July 19, 2012, Gordon provided mortgage assistance relief services, including "loan modifications [and] workouts," and "loan modification work." | Gordon Answer (SJ Ex. 3) ¶ 7; Gordon Opp. to PI (SJ Ex. 1) 1:12-15, 12:23-25 |
| 3. | Gordon personally incorporated the Gordon Law Firm in July 2009. | Cal. SOS Aff. (SJ Ex. 25) |
| 4. | Gordon owned, directed, and/or controlled The Gordon Law Firm. | Gordon Answer (SJ Ex. 3) ¶ 8; Pessar Aff. II (SJ Ex. 31) ¶ 3, PX 26; Van Beek Decl. (SJ Ex. 35) ¶¶ 5, 6, PX 26 |
| 5. | Gordon personally registered numerous fictitious business names, including National Legal Source, Resource Law Center, Resource Law Group, Resource Legal Group, Gordon & Associates, The Law Offices of Chance E. Gordon, The Law Offices of C. Edward Gordon, and The C.E.G. Law Firm (collectively the "Gordon Entities"). | Gordon Answer (SJ Ex. 3) ¶ 51; Ranney Decl. (SJ Ex. 33) ¶ 4, Attach. A |
| 6. | Gordon registered the fictitious business names Gordon & Associates, The Law Offices of Chance E. Gordon, The Law Offices of C. Edward Gordon, and The C.E.G. Law firm on October 6, 2010. | Gordon Answer (SJ Ex. 3) ¶ 51; Ranney Decl. (SJ Ex. 33) ¶ 4, Attach. A |

[5] *See* Key to Summary Judgment Exhibits, *supra*, page 26, for an explanation of abbreviations.

| | | |
|---|---|---|
| 7. | Gordon personally registered the fictitious business name National Legal Source on October 7, 2011. | Gordon Answer (SJ Ex. 3) ¶ 51; Ranney Decl. (SJ Ex. 33) ¶ 4, Attach. A |
| 8. | Gordon personally registered the fictitious business name Resource Law Center on December 20, 2011. | Gordon Answer (SJ Ex. 3) ¶ 51; Ranney Decl. (SJ Ex. 33) ¶ 4, Attach. A |
| 9. | Gordon & Associates, National Legal Source, and Resource Law Center were all located at 5455 Wilshire Boulevard, Los Angeles, California. | **Consumer Declaration and Depos:** Johnson Decl. (SJ Ex. 11) ¶ 17<br><br>**Other Declaration and Depos:** Gordon Dep. II (SJ Ex. 24) 16:25-19:17; Ranney Decl. (SJ Ex. 33) ¶ 4, Attach. A |
| 10. | Gordon transacts or has transacted business in the Central District of California. | Gordon Answer (SJ Ex. 3) ¶ 7 |
| 11. | Gordon was an authorized signatory on each of the Gordon Law Firm's or Gordon Entities bank accounts, except for two US Bank accounts that Adriana Macias was the authorized signatory. | Gordon Answer (SJ Ex. 3) ¶ 52; Hanson Decl. (SJ Ex. 28) ¶¶ 6, 7, 11, 12, 16, 17, 18, 20, 21, 22, 23 |
| 12. | From January 1, 2010 through July 19, 2012, Gordon was licensed to practice law in the state of California only. | Gordon RFA (SJ Ex. 6) Response 108; Gordon Answer (SJ Ex. 3) ¶ 53; Van Dyke Decl. (SJ Ex. 36) ¶ 15, Attach. G |
| **The Gordon Law Firm, P.C. ("Gordon Law Firm")** | | |
| 13. | Gordon Law Firm is a California professional corporation. | Gordon Answer (SJ Ex. 3) ¶ 8 |
| 14. | Gordon Law Firm was located at 5455 Wilshire Boulevard, Suite 2010, Los Angeles, CA 90036. | Gordon Answer (SJ Ex. 3) ¶ 8 |
| 15. | Gordon Law Firm transacts or has transacted business in the Central District of California. | Gordon Answer (SJ Ex. 3) ¶ 8 |
| **Abraham Michael Pessar ("Pessar")** | | |
| 16. | Pessar is the sole shareholder and officer of Division One Investment and Loan, Inc. ("Division One Investment"). | Pessar Aff. I (SJ Ex. 30) ¶ 3; Cal. SOS Aff. (SJ Ex. 25) |

| | | |
|---|---|---|
| 17. | Pessar is the authorized signatory for Division One Investment bank accounts. | Hanson Decl. (SJ Ex. 28) ¶ 14 |
| 18. | Pessar is the sole owner, member and manager of Processing Division, L.L.C. ("Processing Division"). | Pessar Aff. I (SJ Ex. 30) ¶ 4; Cal. SOS Aff. (SJ Ex. 25) |
| 19. | Pessar is the authorized signatory for Processing Division bank accounts. | Hanson Decl. (SJ Ex. 28) ¶¶ 8, 9, 15 |
| 20. | Pessar is the authorized signatory for DAE Holdings, L.L.C. ("DAE") bank accounts. | Hanson Decl. (SJ Ex. 28) ¶ 10 |
| | **Division One Investment and Loan, Inc. ("Division One Investment")** | |
| 21. | Pessar incorporated Division One Investment in January 2006 in California. | Pessar Aff. I (SJ Ex. 30) ¶ 3; Cal. SOS Aff. (SJ Ex. 25) |
| 22. | On behalf of Division One Investment, Pessar registered the fictitious business names Division One Business Solutions and D1 Companies on April 4, 2008. | Pessar Aff. I (SJ Ex. 30) ¶ 3; Ranney Decl. (SJ Ex. 33) ¶ 5, Attach. B |
| 23. | On behalf of Division One Investment, Pessar registered the fictitious business names Home Savers National and D1 Marketing Solutions on March 16, 2009. | Pessar Aff. I (SJ Ex. 30) ¶ 3; Ranney Decl. (SJ Ex. 33) ¶ 5, Attach. B |
| 24. | On behalf of Division One Investment, Pessar registered the fictitious business names Division One and Division 1 on February 24, 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 3; Ranney Decl. (SJ Ex. 33) ¶ 5, Attach. B |
| 25. | Division One Investment was located at 5455 Wilshire Boulevard, Suite 2005, Los Angeles, California 90036. | Pessar Aff. I (SJ Ex. 30) ¶ 8; Cal. SOS Aff. (SJ Ex. 25) |
| 26. | Division One Investment was located within the same building as the Gordon Law Firm and the Gordon Entities. | Cal. SOS Aff. (SJ Ex. 25) |
| | **Processing Division, L.L.C. ("Processing Division")** | |
| 27. | Pessar formed Processing Division in California in January 2010. | Pessar Aff. I (SJ Ex. 30) ¶ 4; Cal. SOS Aff. (SJ Ex. 25) |

| | | |
|---|---|---|
| 28. | On behalf of Processing Division, Pessar registered the fictitious business names Qualification Intake Department and Division One on March 29, 2010. | Pessar Aff. I (SJ Ex. 30) ¶ 4; Ranney Decl. (SJ Ex. 33) ¶ 5, Attach. B |
| 29. | On behalf of Processing Division, Pessar registered the fictitious business names The Relief Network and Relief Network on October 7, 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 4 |
| 30. | Processing Division is located at 5455 Wilshire Boulevard, Suite 1814, Los Angeles, California. | Cal. SOS Aff. (SJ Ex. 25) |
| 31. | Processing Division is located within the same building as the Gordon Law Firm and the Gordon Entities. | Cal. SOS Aff. (SJ Ex. 25) |
| **DAE Holdings, L.L.C. ("DAE")** | | |
| 32. | Pessar formed DAE in January 2012 in California. | Pessar Aff. I (SJ Ex. 30) ¶ 6 |
| 33. | Pessar is the sole owner, member, and manager of DAE. | Pessar Aff. I (SJ Ex. 30) ¶ 6 |
| **COMMON ENTERPRISE** | | |
| **Organization of Defendants' Operation** | | |
| 34. | In or around June 2009, Pessar and Gordon agreed to start an attorney-based loan modification business to sell Gordon's services. | Pessar Aff. I (SJ Ex. 30) ¶¶ 14, 16, Ex. A; Gearries Dep. (SJ Ex. 22) 28:22-29:10 |
| 35. | Pessar engaged in business operations with Gordon. | Gordon Interrog. (SJ Ex. 7) 5:4-11; Pessar Aff. I (SJ Ex. 30) ¶¶ 14, 16 |
| 36. | Gordon was the designated attorney for Defendants' operation. | Pessar Aff. I (SJ Ex. 30) ¶ 16 |
| 37. | Pessar was the Marketing & Business Development manager for Gordon & Associates. | Gearries Dep. (SJ Ex. 22) 38:17-20; Pessar Aff. II (SJ Ex. 31) ¶ 3, PX 26; Van Beek Decl. (SJ Ex. 35) ¶¶ 5, 6, PX 26 |
| 38. | Pessar was responsible for marketing for Defendants' operation. | Pessar Aff. I (SJ Ex. 30) ¶ 16 |

| | | |
|---|---|---|
| 39. | The operation included a "front-end" sales side, and a "back-end" processing side. | Pessar Aff. I (SJ Ex. 30) ¶¶ 19, 72, Ex. Q; Pessar Aff. II (SJ Ex. 31) ¶ 5, PX 35; Van Dyke Decl. (SJ Ex. 36) ¶ 34, Attach. S |
| 40. | The "front-end" sales side and "back-end" processing side were referred to as a single "operation." | Pessar Aff. I (SJ Ex. 30) ¶ 19; Gearries Dep. (SJ Ex. 22) 223:7-25, PX 58; Pessar Aff. II (SJ Ex. 31) ¶¶ 4, 7, PX 38, PX 40 |
| 41. | The sales side worked hand-in-hand with the processing side. | Gearries Dep. (SJ Ex. 22) 302:13-16 |
| 42. | Gordon's instructions, orders, and demands superseded anyone else's within the organization, including Pessar, with respect to every aspect of the operation, including marketing and processing. | Godard Decl. (SJ Ex. 27) ¶¶ 5-7, Attachs. A, B, C, D; Gearries Dep. (SJ Ex. 22) 106:5-8, 361:24-362:5; Pessar Aff. II (SJ Ex. 31) ¶ 12, PX 112 |
| 43. | Gordon was ultimately responsible for the representations that sales representatives and processors made to consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 31; Gearries Dep. (SJ Ex. 22) 106:5-8 |
| 44. | Gordon was ultimately responsible for the mailers the operation sent out. | Pessar Aff. I (SJ Ex. 30) ¶ 31 |
| 45. | In referring to consumers that had purchased pre-litigation services, Gordon admits that these are his clients and that he is the one liable for the sales representatives' representations. | Gearries Dep. (SJ Ex. 22) 117:13-121:16, PX 41 |
| 46. | Within the operation, Pessar oversaw day-to-day human resource operations, including management, and hiring and firing of the processing staff. | Gordon Interrog. (SJ Ex. 7) 5:5-9; Gordon Dep. II (SJ Ex. 24) 193:5-12 |
| 47. | Pessar provided all accounting services related to the sale of Gordon's "custom legal products" or services. | Gordon Interrog. (SJ Ex. 7) 5:9-11; Pessar Aff. I (SJ Ex. 30) ¶ 23; Pessar Aff. II (SJ Ex. 31) ¶ 10, PX 110 |
| 48. | In 2011, Gordon and Pessar hired a bookkeeper to assist with accounting for the entire operation. | Pessar Aff. I (SJ Ex. 30) ¶ 73 |
| 49. | Pessar oversaw all banking related issues for the operation. | Gordon Interrog. (SJ Ex. 7) 5:11 |

| | | |
|---|---|---|
| 50. | Gordon prepared contracts and retainer agreements used by the operation. | Pessar Aff. I (SJ Ex. 30) ¶¶ 17, 25, 27, 40; Gearries Dep. (SJ Ex. 22) 426:22-427:3, 448:17-21 |
| 51. | Gordon reviewed and approved all contracts and retainer agreements used by the operation. | Gearries Dep. (SJ Ex. 22) 42:16-43:3, 426:24-427:5, 448:17-21, 451:2-4 |
| 52. | Gordon prepared the templates for the "custom legal products." | Gordon Interrog. (SJ Ex. 7) 4:8-9; Gearries Dep. (SJ Ex. 22) 467:1-468:10 |
| 53. | Gordon was the signatory on contracts and fee agreements executed with many consumers. | Gordon Answer (SJ Ex. 3) ¶ 52 |
| 54. | Pessar marketed the operation's services through his company Processing Division d/b/a Qualification Intake Department. | Pessar Aff. I (SJ Ex. 30) ¶ 32 |
| 55. | Gordon discussed marketing policies and procedures with Pessar approximately two or three times per week. | Gearries Dep. (SJ Ex. 22) 43:4-20 |
| 56. | Gordon had final decision-making authority for all marketing used by the operation. | Godard Decl. (SJ Ex. 27) ¶¶ 5-7, Attachs. A, B, C, D; Pessar Aff. I (SJ Ex. 30) ¶ 19; Pessar Aff. II (SJ Ex. 31) ¶ 12, PX 112 |
| 57. | Gordon provided instructions to sales representatives and sales managers regarding the sale of his services to consumers. | Gearries Dep. (SJ Ex. 22) 50:2-25, 66:22-67:13, 125:10-126:17, PX 42; Pessar Aff. I (SJ Ex. 30) ¶ 49 |
| 58. | Gordon reviewed and approved all marketing material used by the operation. | Pessar Aff. I (SJ Ex. 30) ¶ 17; Gearries Dep. (SJ Ex. 22) 262:15-24, 273:19-275:8, PX 68; Van Dyke Decl. (SJ Ex. 36) ¶ 45, Attach. AA |
| 59. | Gordon spoke with the sales representatives about what the representatives were telling consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 49; Gearries Dep. (SJ Ex. 22) 66:22-67:8, 106:5-8 |
| 60. | Gordon reviewed and approved all scripts used by the operation. | Pessar Aff. I (SJ Ex. 30) ¶¶ 17, 51; Gearries Dep. (SJ Ex. 22) 262:15-24, 289:7-290:20, 310:2-5 |

| | | |
|---|---|---|
| 61. | Gordon was responsible for ensuring that the operation was in compliance with the law. | Pessar Aff. I (SJ Ex. 30) ¶ 18; Gearries Dep. (SJ Ex. 22) 105:21-106:3 |
| 62. | Gordon reviewed all of the operation's policies and marketing materials and oversaw the sales representatives, processors, and office staff. | Pessar Aff. I (SJ Ex. 30) ¶ 19 |
| 63. | Gordon wrote memoranda that went to the sales representatives and processors approximately once a month. | Gearries Dep. (SJ Ex. 22) 125:10-126:17, PX 42 |
| 64. | Gordon and Pessar both used John Gearries as an office manager. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 11, Attach. C<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 17; Gearries Dep. (SJ Ex. 22) 31:2-6, 258:6-259:12, PX 65 |
| 65. | Gordon placed Pessar in charge of hiring the processors. | Pessar Aff. I (SJ Ex. 30) ¶ 22 |
| 66. | Pessar provided recommendations to Gordon regarding the organization and functioning of the processing department. | Pessar Aff. I (SJ Ex. 30) ¶ 72, Ex. Q; Gearries Dep. (SJ Ex. 22) 74:15-76:17, PX 35 |
| 67. | At times, Pessar paid the salaries of processing employees. | Pessar Aff. I (SJ Ex. 30) ¶ 73; Pessar Aff. II (SJ Ex. 31) ¶ 8, PX 108 |
| 68. | Gordon and Pessar worked together to "supervise and nurture" the processing department. | Gearries Dep. (SJ Ex. 22) 72:6-13 |
| 69. | Gordon and Pessar commonly discussed issues relating to the processing department. | Gearries Dep. (SJ Ex. 22) 80:5-7 |
| 70. | Every Friday, Pessar held team meetings in Suite 2005 for sales representatives. | Pessar Aff. I (SJ Ex. 30) ¶ 63 |
| 71. | Gordon attended the sales representatives' team meetings at least once a month. | Pessar Aff. I (SJ Ex. 30) ¶ 63 |

| | | |
|---|---|---|
| 72. | After meetings, Pessar drafted and sent out to the sales representatives "Friday Meeting Recaps" that summarized the sales activities for the week and the content of the meeting, and provided updates on the operation. | Pessar Aff. I (SJ Ex. 30) ¶ 63, Ex. M; Gearries Dep. (SJ Ex. 22) 109:6-25, PX 39; Van Dyke Decl. (SJ Ex. 36) ¶ 35, Attach. T |
| 73. | The February 27, 2012 written meeting recap states that "[Gordon] has put his license on the line so that we can all make money so out of respect we must abide by any request he might have." | Pessar Aff. I (SJ Ex. 30) ¶ 63, Ex. M |
| 74. | The operation held monthly meetings for both sales representatives and processors. | Gearries Dep. (SJ Ex. 22) 61:18-63:7 |
| 75. | Gordon and Pessar attended the monthly meetings for both sales representatives and processors. | Gearries Dep. (SJ Ex. 22) 62:22-25 |
| 76. | At various times, Pessar and Gordon both have paid for the facsimile number (866) 835-1162. | Van Dyke Decl. (SJ Ex. 36) ¶ 20, Attach. J |
| 77. | The facsimile number (866) 835-1162 was used by both Gordon's National Legal Source and Gordon & Associates to communicate with consumers. | Wobig Decl. (SJ Ex. 16) ¶ 7 (faxed documents to National Legal Source at (866) 835 -1162); Wesolowski Decl. (SJ Ex. 15) ¶ 9, Attach. C (Gordon & Associates fax number listed as same). |
| 78. | Both Gordon & Associates and the Relief Council (a Pessar-related entity) provided consumers the fax number (877) 733-5557. | Garrido Decl. (SJ Ex. 9) ¶ 7, Attach. C (Gordon & Associates fax number listed as (877) 773-5557); Hagy Decl. (SJ Ex. 10) ¶ 6, Attach. A (Relief Council fax number listed as same) |
| 79. | The telephone number (866) 904-1900 was paid for by Division One Investment. | Van Dyke Decl. (SJ Ex. 36) ¶ 19, Attach. I |
| 80. | Both National Legal Source (a fictitious business name registered by Gordon) and the Relief Council (a Pessar-related entity) provided consumers the telephone number (866) 904-1900. | Hagy Decl. (SJ Ex. 10) ¶ 6, Attach. A (Relief Council phone number listed as (866) 904-1900); Nuval Decl. (SJ Ex. 13) ¶ 7, Attach. B (Intake Department/National Legal Source listed as same) |

| | | |
|---|---|---|
| 81. | The phone number listed on paperwork for Gordon & Associates was answered by representatives for the Relief Council (a Pessar-related entity). | Stephens Decl. (SJ Ex. 14) ¶ 14 |
| 82. | The phone number provided by an employee of The Relief Network (a Pessar-related entity) to a consumer was answered by employees working for National Legal Source (a fictitious business name registered by Gordon) | Johnson Decl. (SJ Ex. 11) ¶ 13 |
| 83. | Defendants created and used phone lists that included both sales representatives and processer's telephones on one page. | Gearries Dep. (SJ Ex. 22) 63:13-65:11, PX 27 |
| 84. | The operation shared files and a computer network that was accessible to certain employees. | Gearries Dep. (SJ Ex. 22) 91:7-24 |
| 85. | In or around, November 13, 2010, Defendants held seminar that provided a general overview of the foreclosure market and solicited consumers to purchase Defendants' services. | Gearries Dep. (SJ Ex. 22) 162:5-167:11, PX 47 |
| 86. | Gordon attended the seminar held in or around November 13, 2010 by Defendants to sell Defendants' services. | Gearries Dep. (SJ Ex. 22) 163:13-16 |
| | **Sharing of Profits** | |
| 87. | In or around the first quarter of 2010, Gordon and Pessar agreed that to set the allocation of consumers' fees so that approximately one third of the incoming consumers' fees would be paid to Gordon to cover processing and his salary, and the remaining two thirds of the fees were paid through Gordon's entity to Processing Division to pay for the operation's marketing expenses, sales representatives' commission, and Pessar's share of the proceeds. | Pessar Aff. I (SJ Ex. 30) ¶ 22; Pessar Aff. II (SJ Ex. 31) ¶ 8, PX 108 |

| | | |
|---|---|---|
| 88. | Gordon and Pessar's business entities frequently transferred consumer funds among accounts. | Gordon Dep. II (SJ Ex. 24) 148:2-149:19; Hanson Decl. (SJ Ex. 28) ¶¶ 27, 31, 32, 34, 38, 39, 41 |
| 89. | Incoming consumers' checks were deposited into one of Gordon's business checking accounts, and then Gordon would write a check weekly to Processing Division to pay Pessar's share of the fees. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 12, Attach. D (copy of checks); Stephens Decl. (SJ Ex. 14) ¶¶ 11, 13, Attachs. C, E.<br><br>**Other Declaration and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 23; Hanson Decl. (SJ Ex. 28) ¶ 27 |
| 90. | Pessar would provide Gordon with a weekly statement outlining the portion of the fees that should be paid to Processing Division to cover the operation's sales and marketing expenses. | Gordon Interrog. (SJ Ex. 7) 7:15-19; Gordon Dep. II (SJ Ex. 24) 148:2-149:19; Pessar Aff. I (SJ Ex. 30) ¶ 23; Pessar Aff. II (SJ Ex. 31) ¶ 9, PX 109 |
| 91. | After receiving a weekly statement from Pessar outlining the portion of the fees that should be paid to Processing Division to cover the operation's sales and marketing expenses, Gordon would write a check to Processing Division d/b/a Qualification Intake Department, which would be deposited into Processing Division's bank account. | Pessar Aff. I (SJ Ex. 30) ¶ 23; Hanson Decl. (SJ Ex. 28) ¶¶ 31, 32 |
| 92. | From the Processing Division bank account, Pessar would pay the sales representatives' commissions, the marketing expenses for the operation, and his own share of the proceeds. | Pessar Aff. I (SJ Ex. 30) ¶ 23 |
| 93. | Beginning in approximately June 2010, Gordon did not deposit any of the funds obtained from consumers for loan modification services into an attorney client trust account. | Pessar Aff. I (SJ Ex. 30) ¶ 24; Gordon Dep. I (SJ Ex. 23) 33:16-21; von Freymann Decl. (SJ Ex. 37) ¶¶ 16-17; Hanson Decl. (SJ Ex. 28) ¶ 43 |
| 94. | Gordon told Pessar that Gordon was not required to hold consumers' funds in a trust account. | Pessar Aff. I (SJ Ex. 30) ¶ 24 |

| | | |
|---|---|---|
| 95. | Gordon-controlled bank accounts received a significant sum of money each month, and the majority of these deposits came from consumer payments and checks from other attorneys and entities. | Hanson Decl. (SJ Ex. 28) ¶¶ 26, 29 |
| 96. | From January 13, 2010 through April 30, 2012, Gordon-controlled JP Morgan Accounts received approximately $9,772,007.02 from consumer payments and other attorneys. | Hanson Decl. (SJ Ex. 28) ¶ 27 |
| 97. | From January 13, 2010 through April 30, 2012, Gordon-controlled JP Morgan Accounts transferred $4,582,012.81 to Pessar-controlled JP Morgan Accounts. | Hanson Decl. (SJ Ex. 28) ¶ 27 |
| 98. | Records from Pessar-controlled bank accounts reveal that funds deposited were used to pay employees, many of which were the same employees paid by Gordon Law Firm. | Hanson Decl. (SJ Ex. 28) ¶ 32; Pessar Aff. II (SJ Ex. 31) ¶ 8, PX 108 |
| 99. | The following twenty individuals were paid by both Gordon-controlled and Pessar-controlled accounts during April 2012: Adriana Macias, Adriana Rodriguez, Alex Alvarez, Archie Cordova, Carl Dockery, Courtney Harper, Evelyn Sanchez, Jorge Ochoa, Karen Ruano, Lorena Mendez, Maria Cruz, Maria Fernandez, Maria Lobato, Nicole Boyd, Noelle Nonaka, Ricardo Barraza, Sean Freelon, Sendy Hurtado, Soagdia Chacon, and Tamyra White. | Hanson Decl. (SJ Ex. 28) ¶ 32 |
| 100. | Records from Gordon Law Firm bank account XXX805 reveal that this account was used extensively for personal expenditures, including dining, nail services, shopping, movie rentals, gym memberships, and match.com and weightwatchers subscriptions. | Hanson Decl. (SJ Ex. 28) ¶ 41 |

| | | |
|---|---|---|
| 101. | Records from Pessar's Processing Division d/b/a Qualification Intake bank account XXX166 reveal that this account is used for extensive personal expenditures, including dining, haircuts, bowling and shopping | Hanson Decl. (SJ Ex. 28) ¶ 36 |
| 102. | Defendants' consumer files and business and accounting records were inconsistent, unreliable, and inaccurate. | Rec. Rep. I (SJ Ex. 2), at pp. 133, 135, 138; Rec. Rep. III (SJ Ex. 5), at p. 160. |
| 103. | Gordon has not an individual tax return since at least 2010. | Gordon Dep. II (SJ Ex. 24) 154:13-155:22 |
| 104. | Gordon has not filed any tax returns on behalf of the Gordon Law Firm. | Gordon Dep. II (SJ Ex. 24) 156:3-12 |
| 105. | Over the course of 2011, Defendants' operation took in over $5 million from consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 64 |
| 106. | From January 2010 through July 2012, Defendants' operation earned $11,403,338.63. | Hanson Decl. (SJ Ex. 28) ¶ 26 |
| **DEFENDANTS' MORTGAGE ASSISTANCE RELIEF SERVICES** | | |
| 107. | Defendants' marketing materials directed to consumers offered assistance in negotiating and obtaining loan modifications and preventing or delaying foreclosure. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶¶ 2, 28, Attachs. A, I; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A; I. Yoo Decl. (SJ Ex. 17) ¶ 4, Attach. A; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 31, 36, 39, 41, 42, 43, 45, 46, Exs. B, E, F, G, H, I, J, K; Van Dyke Decl. (SJ Ex. 36) ¶¶ 6-11, Attachs. A, B, C, D, E, F; Gearries Dep. (SJ Ex. 22) 273:19-274:23, 280:12-281:9, 283:15-284:2, 286:21-287:15, 295:14-23, 477:19-478:7, PX 68, PX 107 |

| | | |
|---|---|---|
| 108. | Defendants' sales representatives told consumers orally and in written email communications that Defendants would help them obtain loan modifications. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶¶ 6, 7, Attach. B ("[Defendants' telemarketer] stated that he could do a modification that would lower our interest rate to 2% and lower our monthly mortgage payment."); Hagy Decl. (SJ Ex. 10) ¶ 3 (consumer told interest rate would be reduced to at least 2%); Wobig Decl. (SJ Ex. 16) ¶ 4 (Defendant promised to lower interest rate to 2% and payments to $650 per month or less); Wesolowski Decl. (SJ Ex. 15) ¶ 3 (consumer told that Defendants would be able to reduce interest rate by 3%); Johnston Decl. (SJ Ex. 12) ¶¶ 7, 9, 25, Attach. C; I. Yoo Decl. (SJ Ex. 17) ¶¶ 5, 9, Attach. C (consumer told payment could be reduced from $3100 to $2200 per month); DuBiel Decl. (SJ Ex. 8) ¶¶ 4, 5, 15 (consumer told payment could be reduced by almost $1000 and interest rate lowered to 2%); Aull Dep. (SJ Ex. 19) 15:22-16:16; Oden Dep. (SJ Ex. 21) 17:8-13, 25:1-15, 27:16-23 (consumer told payment would be reduced by approximately $800 per month and interest rate reduced to 2%); Johnston Dep. (SJ Ex. 20) 19:14-20 (told modification with fixed interest rate of 2% and possible principal reduction)<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 57, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:6, 319:7-20, PX 69 |

| | | |
|---|---|---|
| 109. | For approximately two months in 2009, the written Attorney/Client(s) Fee Agreement that Defendants provided to consumers stated that an attorney would attempt to negotiate with the consumer's lender to modify, restructure and/or reduce the consumer's loan, including negotiating changes in interest rates, principal balance, or monthly payment amount, or obtaining a forbearance or a deed-in-lieu of foreclosure. | Gearries Dep. (SJ Ex. 22) 424:14-427:7, PX 90 |
| 110. | In October 2009, after the passage of California's Senate Bill 94 ("SB 94"), Gordon came up with the idea of the Pre-Litigation Monetary Claims Program. | Pessar Aff. I (SJ Ex. 30) ¶ 25 |
| 111. | Gordon created the Pre-Litigation Monetary Claims Program to avoid the requirements of Regulation O and SB 94. | **Pleadings, Filings, and Discovery:** Gordon RFA (SJ Ex. 6) Response 121; Gordon Opp. to PI (SJ Ex. 1) 19:22-27, Ex. 2 (Gordon Decl.) ¶ 7<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 25; Gearries Dep. (SJ Ex. 22) 254:20-255:11 |
| 112. | Gordon explained to Pessar that their business would continue to operate in exactly the same manner, but that the sales representatives would have the customer sign a "pro bono" agreement for the loan modification services the operation would sell. | Pessar Aff. I (SJ Ex. 30) ¶ 25 |
| 113. | In late 2009, Gordon revised his retainer agreement to create an Attorney/Client(s) Fee Agreement for the Pre-Litigation Monetary Claims Program. | Pessar Aff. I (SJ Ex. 30) ¶ 25; Gearries Dep. (SJ Ex. 22) 427:14-428:13, PX 91 |

| | | |
|---|---|---|
| 114. | Sometime after 2009, Gordon also prepared an Attorney/Client(s) Pro Bono Legal Agreement. | Pessar Aff. I (SJ Ex. 30) ¶ 25; Gearries Dep. (SJ Ex. 22) 434:21-438:9, PX 93 |
| 115. | The services listed under the Attorney/Client(s) Pro Bono Legal Agreement were substantially the same services that were listed under the 2009 Attorney/Client(s) Fee Agreement, described in UF 109, with the addition of "trial modification" as a potential outcome of negotiations with the lender. | Gearries Dep. (SJ Ex. 22) 424:14-427:7, 434:21-438:9, PX 90, PX 93. |
| 116. | The Attorney/Client(s) Fee Agreements used in approximately December 2010 and April 2011, describe the scope of employment of the attorney as follows: "CLIENT(s) retains and employs ATTORNEY to perform legal services in the following matter: 1) Review and analyze any and all documents related to the subject property, 2) conduct factual and legal research in conjunction with these; 3) determine whether any of the entities or individuals involved in originating or servicing the loan on the subject property are liable to CLIENT(s) for monetary damages; and 4) prepare these findings in the form of a legal memorandum." | Gearries Dep. (SJ Ex. 22) 432:12-434:13, 440:24-441:25, PX 92, PX 94 |

| | | |
|---|---|---|
| 117. | At some point after April 2011, Defendants changed the Attorney/Client(s) Fee Agreement, also called the "Pre-Litigation Agreement," to describe the scope of the attorney's employment as follows: "CLIENTS contracts with NATIONAL LEGAL SOURCE for the purpose of preparing the following products; 1) a draft demand letter which references CLIENTS(s) property address as well as the terms of their loan, 2) a qualified written request which pertains to CLIENT(s) property and the loan which encumbers as the property; and 3) a draft lawsuit which contains CLIENT(s) property address as well as the terms of the loan…" | I. Yoo Decl. (SJ Ex. 17) ¶ 11, Attach. E; Johnson Decl. (SJ Ex. 11) ¶ 12, Attach. A |
| 118. | Defendants claimed to provide "custom legal products," which included a qualified written request, demand letter, and draft complaint. | Pessar Aff. I (SJ Ex. 30) ¶ 25; Gearries Dep. (SJ Ex. 22) 463:2-9, 465:6-468:10, 471:8-472:5, PX 101, PX 103 |
| 119. | The "custom legal products" provided by Defendants were generic fill-in-the-blank template documents. | Pessar Aff. I (SJ Ex. 30) ¶ 26; Gearries Dep. (SJ Ex. 22) 463:2-9, 465:6-468:10, 471:8-472:5, PX 101, PX 102, PX 103; Rec. Rep. I (SJ Ex. 2), at p. 137 |
| 120. | In some cases, the "custom legal products" were never prepared or sent to consumers. | **Consumer Declarations and Depos:** Johnson Decl. (SJ Ex. 11) ¶ 30; Aull Dep. (SJ Ex. 19) 58:20-59:8; Oden Dep. (SJ Ex. 21) 84:9-15<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 26 |
| 121. | Initially, processors, who were not attorneys, created the "custom legal products" by inputting consumers' basic information into the form documents using "find" and "replace" tools. | Pessar Aff. I (SJ Ex. 30) ¶ 26 |

| | | |
|---|---|---|
| 122. | During the last year, each document was automatically generated by a computer database macro, which took the consumer's individual information (name, property, address, and mortgage amount) and inserted it into the form "custom legal product" documents. | Pessar Aff. I (SJ Ex. 30) ¶ 26 |
| 123. | Typically, these "custom legal products" were not used by the consumers or processors to obtain loan modifications. | Pessar Aff. I (SJ Ex. 30) ¶ 26 |
| 124. | Typically, the "custom legal products" were prepared after the loan modification package was submitted and the outcome was determined. | Gearries Dep. (SJ Ex. 22) 458:21-459:17 |
| 125. | The purpose of providing the "custom legal products" was to avoid the advance fee prohibitions of SB 94. | Pessar Aff. I (SJ Ex. 30) ¶ 26 |
| 126. | Despite the changes to the retainer agreement, the operation continued to sell consumers loan modification services. | Pessar Aff. I (SJ Ex. 30) ¶ 28 |
| 127. | The value of the services sold was the ability of Defendants to obtain a loan modification for the consumer, not the "custom legal products" prepared. | Pessar Aff. I (SJ Ex. 30) ¶ 29; Gearries Dep. (SJ Ex. 22) 296:8-19, 416:25-417:18, 419:6-420:4, 468:16-471:2, 472:12-475:8, PX 102, PX 104, PX 105 |
| 128. | Defendants' "Closing the Deal" sales scripts states "RE-ITERATE THE VALUE. **(Note: if the client could re-finance then the fees would total to four times what they are paying for the modification plus they could never be approved for this interest rate…)**" (emphasis in original) | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:18, PX 69 |
| 129. | Defendants' "Closing the Deal" script does not mention any pro bono or free services. | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:18, PX 69 |

| | | |
|---|---|---|
| 130. | Defendants' "Closing the Deal" script does not include the term "custom legal product." | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:18, PX 69 |
| 131. | In emails to consumers, Defendants told consumers the "Pre-Litigation Monetary Claims Program is a great way for you to obtain the mortgage assistance you rightfully deserve." | Johnston Decl. (SJ Ex. 12) ¶ 9, Attach. C |
| 132. | Pessar knew that consumers would not pay $2,500 to $4,500 for the generic "custom legal products." | Pessar Aff. I (SJ Ex. 30) ¶ 28 |
| 133. | Consumers thought they were purchasing loan modification services. | Johnson Decl. (SJ Ex. 11) ¶ 9; Wesolowski Decl. (SJ Ex. 15) ¶ 6; Aull Dep. (SJ Ex. 19) 22:22-25; Oden Dep. (Ex. 21) 24:21-25,114:22-115:6; Johnston Dep. (SJ Ex. 20) 19:14-20, 66:6-67:9, 68:9-13 |
| 134. | On their checks to Defendants, numerous consumers wrote "Loan Modification," "Mortgage Modification," or some variation thereof. | Hanson Decl. (SJ Ex. 28) ¶ 30, Attach. A |
| **DEFENDANTS' MARKETING** | | |
| **Mail Solicitations** | | |
| 135. | In late 2009, the Defendants sent out their first direct mail solicitation to distressed homeowners located in California. | Pessar Aff. I (SJ Ex. 30) ¶ 29 |

| | | |
|---|---|---|
| 136. | Beginning in early 2010, Defendants advertised their mortgage assistance relief services by sending direct mail solicitations to distressed homeowners located throughout the United States. | **Consumer Declarations and Depos:** Garrido Decl. (SJ Ex. 9) ¶ 3 (California consumer received postcard); Hagy Decl. (SJ Ex. 10) ¶ 2 (Virginia consumer received postcard); Stephens Decl. (SJ Ex. 14) ¶¶ 1, 3, Attach. A (Nevada consumer received postcard); I. Yoo Decl. (SJ Ex. 17) ¶ 4, Attach. A (New Jersey consumer received postcard); DuBiel Decl. (SJ Ex. 8) ¶ 3 (Minnesota consumer received postcard); Oden Dep. (SJ Ex. 21) 6:21-7:2, 12:8-13:4, Ex. Oden 8 (Virginia consumer received postcard)<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 30; Gearries Dep. (SJ Ex. 22) 151:7-25 |
| 137. | Gordon told Pessar and the sales representatives that one of the perks of the "loophole" was that the operation could sell "products" to consumers in other states, similar to LegalZoom, because selling legal products was different from the practice of law. | Pessar Aff. I (SJ Ex. 30) ¶ 30 |
| 138. | Pessar purchased a mailing list from a lead generator that identified potentially distressed homeowners. | Pessar Aff. I (SJ Ex. 30) ¶ 29 |
| 139. | In early 2010, the operation started sending out a postcard mailer that referenced a "Notice of HUD Rights" ("Notice of HUD Rights" mailer). | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B; Gearries Dep. (SJ Ex. 22) 138:7-21, PX 19 |

| | | |
|---|---|---|
| 140. | Gordon reviewed the "Notice of HUD Rights" mailer and approved it to be sent out. | Pessar Aff. I (SJ Ex. 30) ¶ 31 |
| 141. | Defendants discontinued use of the "Notice of HUD Rights" mailer in approximately June 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 35 |
| 142. | Beginning in approximately June 2011, Defendants sent out a direct mail solicitation to consumers nationwide that stated "Program: Making Homes Affordable" ("Making Homes Affordable" mailer). | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 28, Attach. I; I. Yoo Decl. (SJ Ex. 17) ¶ 4 Attach. A; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 36; Gearries Dep. (SJ Ex. 22) 168:11-22, PX 20 |
| 143. | Gordon reviewed the "Making Homes Affordable" mailer and approved it to be sent out. | Pessar Aff.I (SJ Ex. 30) ¶¶ 17, 19 |
| 144. | In a memorandum to all sales representatives and processors, Gordon states that "the mailers that are being sent to prospective clients are sponsored by my office." | Gearries Dep. (SJ Ex. 22) 125:10-131:25, PX 42; Van Dyke Decl. (SJ Ex. 36) ¶ 33, Attach. R |
| **Defendants' Websites and Name Changes** | | |
| 145. | Throughout the years, Defendants changed the names and websites used by the operation repeatedly to avoid negative press and poor Better Business Bureau ("BBB") ratings associated with Gordon. | Pessar Aff. I (SJ Ex. 30) ¶ 38; Gearries Dep. (SJ Ex. 22) 177:20-179:5, 180:23-181:7 |
| 146. | The first name change occurred when Gordon changed the name used in sales pitches and documents from The Gordon Law Firm to Gordon & Associates. | Pessar Aff. I (SJ Ex. 30) ¶ 38; Gearries Dep. (SJ Ex. 22) 177:20-178:13 |
| 147. | In mid-2010, Defendants started using websites to solicit consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 37 |

| | | |
|---|---|---|
| 148. | The first website used by Defendants was www.reliefcouncil.org. | Pessar Aff. I (SJ Ex. 30) ¶ 37 |
| 149. | Defendant Pessar purchased the domain name www.reliefcouncil.org from Wild West Domain, LLC on or about April 14, 2010. | Pessar Aff. I (SJ Ex. 30) ¶ 37 |
| 150. | Gearries provided the written content for the website www.reliefcouncil.org. | Pessar Aff. I (SJ Ex. 30) ¶ 37; Gearries Dep. (SJ Ex. 22) 179:11-180:9 |
| 151. | Gordon reviewed the written content of www.reliefcouncil.org before the website was activated. | Pessar Aff. I (SJ Ex. 30) ¶ 37; Gearries Dep. (SJ Ex. 22) 180:8-9 |
| 152. | Gordon approved the use of the written content for www.reliefcouncil.org. | Gearries Dep. (SJ Ex. 22) 180:13-17 |
| 153. | In fall of 2011, Defendants changed the name of their operation to National Legal Source. | Pessar Aff. I (SJ Ex. 30) ¶ 39 |
| 154. | Gordon directed Pessar and Gearries to change the name from Gordon & Associates to National Legal Source. | Pessar Aff. II (SJ Ex. 31) ¶ 11, PX 111 |
| 155. | Defendants changed the name to National Legal Source to avoid negative BBB complaints and negative press relating to Gordon. | Pessar Aff. I (SJ Ex. 30) ¶¶ 38, 39; Gearries Dep. (SJ Ex. 22) 201:16-203:2 |
| 156. | Gordon purchased the domain name www.nationallegalsource.com from GoDaddy.com on or about April 2, 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 39; Van Dyke Decl. (SJ Ex. 36) ¶ 21, Attach. K |
| 157. | Gordon and Gearries prepared the written content for www.nationallegalsource.com. | Pessar Aff. I (SJ Ex. 30) ¶ 39; Gearries Dep. (SJ Ex. 22) 181:25-182:20 |
| 158. | Gordon reviewed the written content for www.nationallegalsource.com. | Gearries Dep. (SJ Ex. 22) 182:23-25, 183:7-24, PX 49 |
| 159. | Gordon approved the use of the written content for www.nationallegalsource.com. | Gearries Dep. (SJ Ex. 22) 183:1-2 |

| | | |
|---|---|---|
| 160. | Defendants began using the website www.nationallegalsource.com in approximately May 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 39, Ex. F |
| 161. | In or around May 2011, Gordon and Gearries also prepared new revised retainer agreements using the name National Legal Source and removed all mention of Gordon's name from those documents. | Pessar Aff. I (SJ Ex. 30) ¶ 40 |
| 162. | Although Gordon's name was removed from all marketing materials and agreements in or around May 2011, the operation still consisted of the same services provided by a law firm controlled by Gordon. | Pessar Aff. I (SJ Ex. 30) ¶ 40; Gearries (SJ Ex. 22) 201:16-203:2, 256:13-257:4, PX 50 |
| 163. | Defendants changed the name of their operation from National Legal Source to Resource Law Center after the BBB discovered that Gordon was associated with National Legal Source and provided an alert on the BBB website. | Pessar Aff. I (SJ Ex. 30) ¶ 41; Gearries Dep. (SJ Ex. 22) 205:11-15 |
| 164. | Gordon purchased the domain name www.resourcelawcenter.com from GoDaddy.com LLC on or about July 6, 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 41; Van Dyke Decl. (SJ Ex. 36) ¶ 21, Attach. K |
| 165. | Gordon and Gearries prepared the content for www.resourcelawcenter.com by using the content from www.nationallegalsource.com and changing the name of the law firm. | Pessar Aff. I (SJ Ex. 30) ¶ 41; Gearries Dep. (SJ Ex. 22) 205:16-207:24 |
| 166. | Gordon and Gearries altered the testimonials used on the www.resourcelawcenter.com website by substituting the new name of the company into each testimonial. | Gearries Dep. (SJ Ex. 22) 207:9-24 |
| 167. | Gordon reviewed the content for www.resourcelawcenter.com. | Gearries Dep. (SJ Ex. 22) 205:1-22 |
| 168. | Gordon approved the use of the content for www.resourelawcenter.com. | Gearries Dep. (SJ Ex. 22) 205:1-22 |

| | | |
|---|---|---|
| 169. | Defendants began using the website www.resourcelawcenter.com in July 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 41, Ex. G; Gearries Dep. (SJ Ex. 22) 203:13-204:8, PX 51 |
| 170. | Defendants changed the operation's name to Resource Law Group in February 2012. | Gearries Dep. (SJ Ex. 22) 209:3-6 |
| 171. | Defendants changed the name of the operation from Resource Law Center to Resource Law Group after the BBB discovered that Gordon was associated with Resource Law Center and provided an alert on the BBB website. | Gearries Dep. (SJ Ex. 22) 208:5-209:19, PX 53 |
| 172. | Gordon purchased the domain name www.resourcelawgroup.com from GoDaddy.com LLC on or about February 1, 2012. | Pessar Aff. I (SJ Ex. 30) ¶ 42; Van Dyke Decl. (SJ Ex. 36) ¶ 21, Attach. K |
| 173. | Gordon and Gearries prepared the content for www.resourcelawgroup.com by using the content from www.nationallegalsource.com and changing the name of law firm. | Pessar Aff. I (SJ Ex. 30) ¶ 42; Gearries Dep. (SJ Ex. 22) 210:24-211:16 |
| 174. | Gordon and Gearries altered the testimonials used on the www.resourcelawgroup.com website by substituting the new name of the company into each testimonial. | Gearries Dep. (SJ Ex. 22) 212:7-17 |
| 175. | Gordon reviewed the content for www.resourcelawgroup.com. | Gearries Dep. (SJ Ex. 22) 212:2-4 |
| 176. | Gordon approved the use of the content for www.resourcelawgroup.com | Gearries Dep. (SJ Ex. 22) 212:5-6 |
| 177. | Defendants began using the website www.resourcelawgroup.com in February 2012. | Pessar Aff. I (SJ Ex. 30) ¶ 42, Ex. H |
| 178. | Defendants changed the operation's name to Resource Legal Group in March 2012. | Gearries Dep. (SJ Ex. 22) 214:13-17 |

| | | |
|---|---|---|
| 179. | Gordon purchased the domain name www.resourcelegalgroup.com from GoDaddy.com LLC on or about March 23, 2012. | Pessar Aff. I (SJ Ex. 30) ¶ 43; Van Dyke Decl. (SJ Ex. 36) ¶ 21, Attach. K |
| 180. | Gordon and Gearries prepared the content for www.resourcelegalgroup.com by using the content from www.nationallegalsource.com and changing the name of company. | Pessar Aff. I (SJ Ex. 30) ¶ 43; Gearries Dep. (SJ Ex. 22) 215:2-217:7 |
| 181. | Gordon reviewed the content for www.resourcelegalgroup.com. | Gearries Dep. (SJ Ex. 22) 218:18-20 |
| 182. | Gordon approved the use of the content for www.resourcelegalgroup.com. | Gearries Dep. (SJ Ex. 22) 218:21-22 |
| 183. | Defendants started using the website www.resourcelegalgroup.com in March 2012. | Pessar Aff. I (SJ Ex. 30) ¶ 43, Ex. I; Gearries Dep. (SJ Ex. 22) 213:2-214:17, PX 55 |
| 184. | The websites www.nationallegalsource.com, www.resourcelawcenter.com, www.resourcelawgroup.com, and www.resourcelegalgroup.com contained substantially identical content, including the same client testimonials, with only the name of the company changed. | Pessar Aff. I (SJ Ex. 30) ¶¶ 39, 41-44, Exs. F, G, H, I; Van Dyke Decl. (SJ Ex. 36) ¶¶ 7-10 Exs. B, C, D, E; Gearries Dep. (SJ Ex. 22) 217:8-17 |
| 185. | In July 2012, Defendants began the process of launching the name Resource Legal Team for the operation and were developing a website for this name. | Pessar Aff. I (SJ Ex. 30) ¶¶ 44, 63, Ex. M (July 16, 2012 meeting recap); Gearries Dep. (SJ Ex. 22) 219:5-225:14, PX 57, PX 58 |
| 186. | Gordon also purchased the domain name www.prelitlaw.com from GoDaddy.com LLC on or about October 7, 2010. | Pessar Aff. I (SJ Ex. 30) ¶ 45; Van Dyke Decl. (SJ Ex. 36) ¶ 21, Attach. K |
| 187. | Gordon and Gearries prepared the written content for www.prelitlaw.com. | Pessar Aff. I (SJ Ex. 30) ¶ 45; Gearries Dep. (SJ Ex. 22) 239:8-240:6 |
| 188. | Gordon reviewed the content for www.prelitlaw.com. | Gearries Dep. (SJ Ex. 22) 240:7-9 |

| | | |
|---|---|---|
| 189. | Gordon approved the use of the content for www.prelitlaw.com. | Gearries Dep. (SJ Ex. 22) 240:10-11 |
| 190. | Defendants started using the website www.prelitlaw.com in October 2010. | Pessar Aff. I (SJ Ex. 30) ¶ 45, Ex. J |
| 191. | Pessar purchased the domain name www.thereliefnetwork.org from Domain by Proxy on or about September 28, 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 46; Van Dyke Decl. (SJ Ex. 36) ¶ 22, Attach. L |
| 192. | Gearries created the content for www.thereliefnetwork.org. | Pessar Aff. I (SJ Ex. 30) ¶ 46; Gearries Dep. (SJ Ex. 22) 240:18-241:20 |
| 193. | Gordon reviewed the content for www.thereliefnetwork.org before the website was activated. | Pessar Aff. I (SJ Ex. 30) ¶ 46; Gearries Dep. (SJ Ex. 22) 241:23-24 |
| 194. | Gordon approved the use of the content for www.thereliefnetwork.org. | Gearries Dep. (SJ Ex. 22) 241:25-242:1 |
| 195. | Defendants started using the website www.thereliefnetwork.org in October 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 46, Ex. K |
| 196. | Defendants' website www.thereliefnetwork.org contained a page titled "Making Homes Affordable" that detailed the federal government's Home Affordable Modification Program. | Pessar Aff. I (SJ Ex. 30), ¶ 46, Ex. K |
| 197. | Defendants created a "virtual office" in San Diego to avoid negative BBB ratings in Los Angeles. | Gearries Dep. (SJ Ex. 22) 245:9-251:17, PX 62, PX 63 |
| 198. | Gordon began using the name "Edward Gordon" in an attempt to improve his online reputation. | Gearries Dep. (SJ Ex. 22) 258:6-260:5, PX 65 |
| 199. | None of the websites used the term "custom legal products." | Pessar Aff. I (SJ Ex. 30) ¶¶ 39, 41, 42, 43, 45, 46, Exs. F, G, H, I, J, K; Van Dyke Decl. (SJ Ex. 36) ¶¶ 6-11, Exs. A, B, C, D, E, F |

| Sale of Services | | |
|---|---|---|
| 200. | Pessar was responsible for managing the operation's day-to-day sales and marketing activities, which included hiring, directing, monitoring, and assisting in training sales representatives. | Pessar Aff. I (SJ Ex. 30) ¶ 49; Pessar Aff. II (SJ Ex. 31) ¶ 6, PX 38 |
| 201. | Sales representatives were located in Suite 2005 at 5455 Wilshire Boulevard, Los Angeles, California 90036. | Pessar Aff. I (SJ Ex. 30) ¶ 49 |
| 202. | Defendants' sales team was responsible for selling loan modification services to distressed homeowners. | Pessar Aff. I (SJ Ex. 30) ¶ 20 |
| 203. | Gordon stopped by Suite 2005 several times a week to chat with sales representatives and discuss the operation with Pessar. | Pessar Aff. I (SJ Ex. 30) ¶ 49 |
| 204. | Gordon would often provide guidance or answer sales representatives' legal questions. | Pessar Aff. I (SJ Ex. 30) ¶ 49 |
| 205. | Defendants' sales representatives used loan modification leads purchased mainly by Pessar, and occasionally by Gordon, to cold call consumers and solicit the operation's services. | **Consumer Declarations and Depos:** Wobig Decl. (SJ Ex. 16) ¶ 3; Johnston Decl. (SJ Ex. 12) ¶ 3<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 52 |
| 206. | Defendants also received direct calls from consumers resulting from the direct mail and website advertising. | Pessar Aff. I (SJ Ex. 30) ¶ 52 |
| 207. | Defendants' sales representatives were provided computers and telephones to solicit consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 52 |
| 208. | Defendants' sales representatives were given sales scripts to use when calling potential clients. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 50, 53, Ex. C |
| 209. | Gearries primarily drafted the sales scripts. | Pessar Aff. I (SJ Ex. 30) ¶ 51 |
| 210. | Pessar helped draft and edit some sales scripts. | Pessar Aff. I (SJ Ex. 30) ¶ 51 |

| | | |
|---|---|---|
| 211. | Defendants' sales scripts were designed to convince consumers that Defendants could negotiate with lenders and obtain loan modifications that would result in interest rates as low as 2% and sizeable reductions in their mortgage payments. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 50, 53, Ex. C |
| 212. | Defendants' sales representatives were trained to use these sales scripts. | Pessar Aff. I (SJ Ex. 30) ¶ 50 |
| 213. | At times, Defendants' sales representatives would improvise and create their own embellished versions of the sales scripts, incorporating lines that worked best for them | Pessar Aff. I (SJ Ex. 30) ¶¶ 50, 58; Gearries Dep. (SJ Ex. 22) 272:8-273:5 |
| 214. | Gordon was aware and approved that sales representatives embellished and edited the scripts. | Gearries Dep. (SJ Ex. 22) 273:3-273:18, 391:22-392:2 |
| 215. | The sales representatives used a three-part closing strategy in selling the operation's services to consumers. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 53, Ex. C |
| 216. | The first step was for intake and the "qualification" of the consumer. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 53, Ex. C |
| 217. | Initially, Defendants' sales representatives would obtain the consumer's mortgage information. | **Consumer Declaration and Depos:** Johnson Decl (SJ Ex. 11) ¶ 6; Stephens Decl. (SJ Ex. 14) ¶ 4; Johnston Decl. (SJ Ex. 12) ¶ 7; Aull Dep. (SJ Ex. 19) 14:15-15:14<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 53, Ex. C |
| 218. | Subsequently, Defendants would tell consumers that they "qualified" for their services or relief. | **Consumer Declaration and Depos:** Johnson Decl. (SJ Ex. 11) ¶ 6; Stephens Decl. (SJ Ex. 14) ¶ 4; Johnston Decl. (SJ Ex. 12) ¶ 7; Aull Dep. (SJ Ex. 19) 15:22-16:16; 17:5-13; 83:3-7<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 53, Ex. C |

| | | |
|---|---|---|
| 219. | In some instances, Defendants also told consumers that they qualified for a government program. | **Consumer Declaration and Depos:** Stephens Decl. (SJ Ex. 14) ¶ 6<br><br>**Other Declarations and Depos:** Gearries Dep. (SJ Ex. 22) 368:3-15 |
| 220. | In Defendants' "Closing the Deal" script, it states: "CONGRATULATE THE CLIENT ON BEING APPROVED FOR THE PROGRAM. YOU'RE PRE-APPROVED FROM THE HAM PROGRAM (Home Affordable Modification)" | Gearries Dep. (SJ EX. 22) 328:2-329:11, PX 70; Van Dyke Decl. (SJ Ex. 36) ¶ 32, Attach. Q |
| 221. | Gordon approved the use of the "Closing the Deal" script. | Gearries Dep. (SJ EX. 22) 329:5-8 |
| 222. | The basic parameters used by the operation to qualify a consumer for a loan modification were for the consumer to be delinquent on his or her home loan, have mortgage payments over 31% of their gross income, and no equity in the house. | Pessar Aff. I (SJ Ex. 30) ¶ 54 |
| 223. | Each sales representative was responsible for determining whether a consumer was qualified. | Pessar Aff. I (SJ Ex. 30) ¶ 54 |
| 224. | There was no immediate oversight or quality control of the sales representatives' decision to qualify a consumer. | Pessar Aff. I (SJ Ex. 30) ¶ 55 |
| 225. | There were several instances when a consumer should not have been taken on because there was no chance that they could qualify for a loan modification, but they were nevertheless signed up by a sales representative and referred to a processor. | Pessar Aff. I (SJ Ex. 30) ¶ 55 |
| 226. | Gordon instructed Defendants' sales representatives that "with custom legal products everyone qualifies." | Pessar Aff. I (SJ Ex. 30) ¶ 56 |

| | | |
|---|---|---|
| 227. | Thus, even those consumers who did not qualify for a loan modification would often still be "qualified" by a sales representative. | Pessar Aff. I (SJ Ex. 30) ¶ 56 |
| 228. | Defendants' sales scripts also directed sales representatives to create a sense of urgency with consumers by providing a 72 hour deadline to purchase Defendants' services. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 36, 63, Ex. C (72 hour deadline to make a decision), Ex. E ("Making Homes Affordable" mailer includes an expiration date); Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O; Gearries Dep. (SJ Ex. 22) 290:3-295:1, 300:23-301:6, PX 69 |
| 229. | In the second step, Defendants' sales representatives would tell the consumer that they "do qualify for a loan modification with a 2% interest rate" and a new lower mortgage payment. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 57, Ex. C |
| 230. | Defendants' "Call #2" sales script states: "After running your application we were able to determine that you do qualify for a loan modification with a 2% interest rate (which would make your new payment as low as $_____, saving your approximately $________ a month…)." | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:6, PX 69; Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O |
| 231. | In the second or third step, the sales representatives also would tell consumers that they found a law firm, which was one of the best at obtaining loan modifications, to take their case. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 57, Ex. C |
| 232. | Also in the third step, the sales representatives would tell consumers about the advance fee for the operation's services. | Pessar Aff. I (SJ Ex. 30) ¶ 59 |
| 233. | At times, Defendants' sales representatives showed consumers a PowerPoint presentation to explain Defendants' services. | Gearries Dep. (SJ Ex. 22) 273:19-300:16, 477:19-478:7, PX 68, PX 107 |
| 234. | Gordon reviewed and approved the PowerPoint presentation. | Gearries Dep. (SJ Ex. 22) 276:6-11 |

| | | |
|---|---|---|
| 235. | The PowerPoint presentation referenced government programs and contained government logos. | Gearries Dep. (SJ Ex. 22) 277:14-19, 280:7-11, PX 68 |
| 236. | The PowerPoint presentation did not mention any pro bono or free services. | Gearries Dep. (SJ Ex. 22) 287:16-20, PX 68 |
| 237. | The PowerPoint presentation did not mention the term "custom legal product." | Gearries Dep. (SJ Ex. 22) 287:21-288:2, PX 68 |
| **Defendants' Sales Representatives Were Provided Substantial Incentives for Selling Defendants' Services** | | |
| 238. | Defendants' sales representatives were paid on a commission basis, with the possibility of significant earnings. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 62, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-308:24, PX 69 |
| 239. | For example, the most successful sales representatives made more than $200,000 in a given year. | Pessar Aff. I (SJ Ex. 30) ¶¶ 62, 63, Ex. M (December 12, 2011 meeting recap); Gearries Dep. (SJ Ex. 22) 308:16-20 |
| 240. | Under the operation's payment structure, a sales representative made an increasingly larger percentage of commission based on the price sold to consumers. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 62, Exs. C, L; Gearries Dep. (SJ Ex. 22) 286:3-13, 300:23-305:17, PX 69 |
| 241. | A sales representative that sold the operation's services at $0-$999.99 would receive a 10% commission. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 62, Exs. C, L; Gearries Dep. (SJ Ex. 22) 300:23-306:3, PX 69 |
| 242. | A sales representative that sold the Defendants' services at more than $3,000 would receive up to a 30% commission. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 62, Exs. C, L; Gearries Dep. (SJ Ex. 22) 300:23-306:3, PX 69 |
| 243. | Defendants' sales representatives that collected a consumer's fee in full upfront would receive a bonus. | Gearries Dep. (SJ Ex. 22) 304:13-305:4, PX 69 |
| 244. | Defendants provided the sales representatives with frequent incentives for signing up consumers, including cash incentives for each closing and expensive dinners for the biggest sellers. | Pessar Aff. I (SJ Ex. 30) ¶ 62; Van Dyke Decl. (SJ Ex. 36) ¶ 36, Attach. U. |

| | | |
|---|---|---|
| 245. | The commission structure incentivized Defendants' sales representatives to sign up as many consumers as possible because their pay depended on their ability to sign up consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 62; Gearries Dep. (SJ Ex. 22) 300:23-308:24, PX 69 |
| 246. | The commission structure incentivized Defendants' sales representatives to charge more for Defendants' services because sales representatives would receive greater compensation. | Gearries Dep. (SJ Ex. 22) 305:22-306:3 |
| 247. | Defendants' sales representatives were also told, "the higher your fee, the higher your check" to encourage them to convince consumers to pay higher fees. | Pessar Aff. I (SJ Ex. 30) ¶ 63, Ex. M (July 16, 2012 meeting recap) |
| 248. | One of the Defendants' processors submitted an anonymous letter to Pessar stating that "most of the files are all junk," and that "[t]he majority of the Bar complaints [Gordon] receives all come from sales agents selling clients the stars and the moon just to get a sale," and that "[a]ll I'm saying is Karma is a b[****], especially when you tell someone who is unemployed or only receiving about $1,000 in SSI benefits with a $2,000 mortgage you can help them out just to put some money in your pocket." | Pessar Aff. I (SJ Ex. 30) ¶ 65, Ex. N; Gearries Dep. (SJ Ex. 22) 475:15-23, PX 106 |

| Defendants' Mailers, Websites, and Sales Representatives Implied That They Were the Government or Were Affiliated with the Government | | |
|---|---|---|
| 249. | In their mail solicitations, Defendants imply that they are part of, or affiliated with, the government or a government program. | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A; Wesolowski Decl. (SJ Ex. 15) ¶¶ 2-3; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 31, 36 Exs. B, E |
| 250. | On the "Notice of HUD Rights" mailer, it prominently states on both sides "Notice of HUD Rights." | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 251. | On one side of the "Notice HUD Rights" mailer, it states "Pursuant to HUD ML 2000-05," and "As of January 19, 2001 the U.S. Department of Housing and Urban Development (HUD) mandated that all borrowers who had loans governed by their loss mitigation guidelines be informed as to their rights to Repayment Programs." | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 252. | On the "Notice HUD Rights" mailer, the return address is listed the as Qualification Intake Department, 1718 M Street, NW #221, Washington, DC 20036. | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 253. | Defendants did not have any connection with and did not receive mail at the Washington, D.C. address in the "Notice of HUD Rights" mailer. | Pessar Aff. I (SJ Ex. 30) ¶ 31 |

| | | |
|---|---|---|
| 254. | Defendants thought that they would get a better response from the "Notice of HUD Rights" mailer if they used a Washington D.C. address. | Pessar Aff. I (SJ Ex. 30) ¶ 31 |
| 255. | The Washington D.C. address provided in the "Notice of HUD Rights" mailer is actually the address of a UPS Store. | Van Dyke Decl. (SJ Ex. 36) ¶ 25 |
| 256. | The "Notice of HUD Rights" mailer urges consumers to call the listed toll-free number before the deadline for the "Stimulus Program" occurs and references "Stimulus Programs HAM or HARP." | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 257. | The "Notice of HUD Rights" mailer includes the Equal Opportunity Housing Symbol. | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A.<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 258. | The "Notice of HUD Rights" mailer includes a fine-print disclosure that Defendants is unaffiliated with any government agency. | Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 259. | On March 29, 2010, Pessar registered "Qualification Intake Department" as a fictitious business name of Processing Division, because that was the name used on the "Notice of HUD Rights" mailer. | Pessar Aff. I (SJ Ex. 30) ¶ 32 |
| 260. | After Pessar registered the name, Defendants' sales team began identifying themselves as employees of Qualification Intake Department in their sales pitches to consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 32 |

| | | |
|---|---|---|
| 261. | Defendants stopped using the "Notice of HUD Rights" mailer because consumers complained once they learned that Defendants' company was a private business and not the Department of Housing and Urban Development (HUD). | Pessar Aff. I (SJ Ex. 30) ¶ 33 |
| 262. | On both sides of the "Making Homes Affordable" mailer, it states "Program: Making Homes Affordable." | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 28, Attach. I; I. Yoo Decl. (SJ Ex. 17) ¶ 4, Attach. A; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 36, Ex. E |
| 263. | On the Making Homes Affordable mailer, "Program: Making Homes Affordable" was intended to be a reference to the Department of Treasury and HUD's Making Home Affordable Program. | Pessar Aff. I (SJ Ex. 30) ¶ 36 |
| 264. | The "Making Homes Affordable" mailer provides a reference code and lists the recipient's property address and loan amount. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 28, Attach. I; I. Yoo Decl. (SJ Ex. 17) ¶ 4, Attach. A; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 36, Ex. E |
| 265. | The "Making Homes Affordable" mailer includes a fine-print disclosure that Qualification Intake Department is not sponsored by or affiliated with the United States Government. | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 28, Attach. I; I. Yoo Decl. (SJ Ex. 17) ¶ 4, Attach. A; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 36, Ex. E |

| | | |
|---|---|---|
| 266. | Consumers that received Defendants' mailers believed that the mailer was sent by the government and that they would be connected to the government or a government-affiliated entity. | **Consumer Declaration and Depos:** Garrido Decl. (SJ Ex. 9) ¶ 3; Nuval Decl. (SJ Ex. 13) ¶¶ 2, 4; Stephens Decl. (SJ Ex. 14) ¶¶ 3-5, 9; Oden Dep. (SJ Ex. 21) 12:8-13:21<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 36, Ex. E; Gearries Dep. (SJ Ex. 22) 158:5-159:16, PX 45 |
| 267. | Consumers who called Defendants would ask "Is this HUD?" at times. | Gearries Dep. (SJ Ex. 22) 152:7-9 |
| 268. | As a result of consumer confusion, Defendants provided the processors with a document titled "Frequently Asked Processing Questions" that gave the processors the following response to the frequently asked question "My service rep at HUD told me this was guaranteed?": "I apologize if you feel mislead but the entire reason for a retainer agreement is to explain the scope of our services…" | Pessar Aff. I (SJ Ex. 30) ¶ 34, Ex. D; Gearries Dep. (SJ Ex. 22) 398:2-402:1, PX 85; Van Dyke Decl. (SJ Ex. 36) ¶ 40, Attach. W |
| 269. | Some sales representatives encouraged consumers to believe that Defendants' operation was a part of HUD, or otherwise affiliated with the government, or did not discourage this assumption. | **Consumer Declarations and Depos:** Wesolowski Decl. (SJ Ex. 15) ¶ 3<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 33 |
| 270. | Some of Defendants' sales scripts did not discourage consumer's assumption that Defendants were part of HUD. | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Gearries Dep. (SJ Ex. 22) 152:10-153:9, 155:9-13, PX 44 |

| | | |
|---|---|---|
| 271. | For example, Defendants' "Mail Opening" sales script provides the following response when consumers asked "What company is this?" or "Is this HUD": "Under HUD (Housing and Urban Development) you have rights as a homeowner. During this conversation, I would like to go over those rights with you. The Relief Network is an intake agency for homeowner education and qualification. Are you currently behind on your mortgage payments?" | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O; Gearries Dep. (SJ Ex. 22) 297:2-300:6, 300:23-301:6, 319:21-320:20, PX 68, PX 69 |
| 272. | Defendants' sales representatives used the "Mail Opening" sales script. | Gearries Dep. (SJ Ex. 22) 297:2-300:6, 297:22-300:4, 300:23-301:6, 319:21-320:20, PX 68, PX 69 |
| 273. | Gordon approved the use of the "Mail Opening" sales script. | Gearries Dep. (SJ Ex. 22) 297:2-300:6, 300:23-301:6, 319:21-320:20, PX 68, PX 69 |
| 274. | Defendants' received multiple complaints from consumers that one of their top sellers was making representations relating to the government or HUD. | Gearries Dep. (SJ Ex. 22) 156:8-25 |
| 275. | Defendants' "Internet Lead Opening" provides the following opening for when leaving a message: "Hi my name is ________ and I'm calling in reference to the Making Homes Affordable Program…" | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O; Gearries Dep. (SJ Ex. 22) 297:2-21, PX 68 |
| 276. | Defendants' sales representatives used "Internet Lead Opening" script and left the instructed message. | Gearries Dep. (SJ Ex. 22) 297:2-21, PX 68 |
| 277. | Defendants' "Opener Pre-Qualification" script states "The reason for the call is we have you on President Obama's Stimulus list." | Gearries Dep. (SJ Ex. 22) 263:5-267:13, PX 67; Kane Decl. (SJ Ex. 29) ¶ 6, PX 67; Van Beek Decl. (SJ Ex. 35) ¶ 8, PX 67 |
| 278. | Defendants' sales representatives used the "Opener Pre-Qualification" script. | Gearries Dep. (SJ Ex. 22) 266:4-12, PX 67; Kane Decl. (SJ Ex. 29) ¶ 6, PX 67; Van Beek Decl. (SJ Ex. 35) ¶ 8, PX 67 |

| | | |
|---|---|---|
| 279. | Sales representatives also represented that due to a new law passed by President Obama, they would be able to obtain a loan modification for consumers. | I. Yoo Decl.(SJ Ex. 17) ¶ 5; Hagy Decl. (SJ Ex. 10) ¶ 3; Wesolwoski Decl. (SJ Ex. 15) ¶ 4 |
| 280. | As the sales team grew larger, it became harder for Pessar and Gearries to monitor Defendants' sales representatives' representations in responses to consumers' questions. | Pessar Aff. I (SJ Ex. 30) ¶ 35 |
| 281. | Gordon came up with the idea to create a website titled myhud.org, in which the initials "HUD" stood for "Homeowners United Defense." | Pessar Aff. I (SJ Ex. 30) ¶ 48 |
| 282. | Gordon purchased the domain name myhud.org from GoDaddy.com LLC on or about February 3, 2011. | Pessar Aff. I (SJ Ex. 30) ¶ 48; Van Dyke Decl. (SJ Ex. 36) ¶ 21, Attach. K |
| 283. | Gordon set up Homeowner United Defense as a not-for-profit charitable corporation and was an officer. | Gordon Dep. II (SJ Ex. 24) 158:8-12 |
| 284. | Gordon included the myhud.org logo and a reference to the website myhud.org on the following websites: www.nationallegalsource.com, www.resourcelawcenter.com, www.resourcelawgroup.com, and www.resourcelegalgroup.com. | Pessar Aff. I (SJ Ex. 30) ¶¶ 39, 41, 42, 43, 44, 48, Exs. F, G, H, I; Van Dyke Decl. (SJ Ex. 36) ¶¶ 7, 8, 9, 10 Exs. B, C, D, E |

| Defendants Promised Consumers Loan Modifications That Would Substantially Reduce Consumers' Mortgage Payments and Interest Rates | | |
|---|---|---|
| 285. | From January 2010 through July 2012, Defendants promised consumers that Defendants would substantially reduce consumers' interest rates and mortgage payments, quoting specific reductions in the consumer's mortgage payments with hundreds of dollars in monthly savings. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 6 ("[Defendants' telemarketer] stated that he could do a modification that would lower our interest rate to 2% and lower our monthly mortgage payment."); Hagy Decl. (SJ Ex. 10) ¶ 3 (consumer told that interest rate would be reduced to at least 2%); Wobig Decl. (SJ Ex. 16) ¶ 4 (defendant promised to lower interest rate to 2% and payments to $650 per month or less); Wesolowski Decl. (SJ Ex. 15) ¶ 3 (consumer told that Defendants would be able to reduce interest rate by 3%); I. Yoo Decl. (SJ Ex. 17) ¶ 5 (consumer told payment could be reduced from $3100 to $2200 per month); DuBiel Decl. (SJ Ex. 8) ¶¶ 5, 15 (consumer told payment could be reduced by almost $1000 and interest rate lowered to 2%); Johnston Decl. (SJ Ex. 12) ¶¶ 7, 25; Aull Dep. (SJ Ex. 19) 15:22-16:16; Oden Dep. (SJ Ex. 21) 17:8-13, 25:1-15, 27:16-23 (consumer told payment would be reduced by approximately $800 per month and their interest rate reduced to 2%); Johnston Dep. (SJ Ex. 20) 19:14-20 (consumer told modification with fixed interest rate of 2% and possible principal reduction)<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 57, Ex. C; Gearries Dep. (SJ Ex. 22) 295:8-23 |

| | | |
|---|---|---|
| 286. | Defendants expressly told consumers that their services would result in a reduced mortgage interest rate to 2% and a new lower mortgage payment. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 6 ; Hagy Decl. (SJ Ex. 10) ¶ 3; I. Yoo Decl. (SJ Ex. 17) ¶ 5; Wobig Decl. (SJ Ex. 16) ¶ 4; DuBiel Decl. (SJ Ex. 8) ¶¶ 4, 5, 15; Oden Dep. (SJ Ex. 21) 17:8-13, 25:1-15; 27:16-23<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 57, Ex. C; Gearries Dep. (SJ Ex. 22) 295:8-23 |
| 287. | As required by the sales scripts, the sales representatives heavily marketed the 2% interest rate. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 57, Ex. C |
| 288. | Defendants' "Closing the Deal" sales script states: "GO OVER THE DETAILS TO THE Home Affordable Modification Program (HAMP) PAYMENT"and "[l]ower their interest rate to 2% or 31% of their gross income." | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O; Gearries Dep. (SJ Ex. 22) 295:2-13, PX 68 |
| 289. | Defendants' "Closing the Deal" sales script also states: "Make sure the client is aware of how much they will be saving them a month. Ask the homeowner, "**Aren't you excited about saving $_______ a month you mortgage?'"** (emphasis in original) | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O; Gearries Dep. (SJ Ex. 22) 295:14-23, PX 68 |
| 290. | Defendants provided consumers with purported examples of successfully obtained modifications, including substantial reductions in mortgage payments and interest rates. | Garrido Decl, (SJ Ex. 9) ¶ 5, Attach. A; Hagy Decl. (SJ Ex. 10) ¶ 8, Attach. C |

| | | |
|---|---|---|
| 291. | In emails to consumers, Defendants represented that that it was "highly possible for [the consumer's] household to obtain an interest rate as low as 2%, past due payments capitalized, late fees forgiven and sometimes even a loan balance reduction." | **Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 7, Attach. B; I. Yoo Decl. (SJ Ex. 17) ¶ 9, Attach. C<br><br>**Other Declaration and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Gearries Dep. (SJ Ex. 22) 319:7-20, PX 69 |
| 292. | Gordon reviewed and approved the use of the emails described in UF 291. | Gearries Dep. (SJ Ex. 22) 319:7-20, PX 69 |
| 293. | In emails to consumers, Defendants provided specific monthly mortgage payment reductions. | Nuval Decl. (SJ Ex. 13) ¶ 7, Attach. B. |
| 294. | The "Notice of HUD Rights" mailer states: "It's a fact: 84% OF ALL HOME MORTGAGES MAY QUALIFY even if you think your situation is hopeless." | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14), ¶ 3, Attach. A<br><br>**Other Declaration and Depos** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 295. | The "Notice of HUD Rights" mailer states that "Your rights may include but are not limited to . . . [i]nterest rates qualify at 2% and DTI at 31%." | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 2, Attach. A; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A<br><br>**Other Declaration and Depos** Pessar Aff. I (SJ Ex. 30) ¶ 31, Ex. B |
| 296. | The "Making Homes Affordable" mailer states that a consumer was "pre-qualified" and provides an estimated reduction amount. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 28, Attach. I; I. Yoo Decl. (SJ Ex. 17) Attach. A; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declaration and Depos** Pessar Aff. I (SJ Ex. 30) ¶ 36, Ex. E |

| Defendants Misrepresented That They Would Obtain a Loan Modification as a Result of a Forensic Audit Performed by Defendants | | |
|---|---|---|
| 297. | On the websites www.nationallegalsource.com, www.resourcelawcenter.com, www.resourcelawgroup.com, www.resourcelegalgroup.com, Defendants represented that the "Pre-Litigation Research & Investigation Program will provide homeowners with a prepared, detailed legal documents of illegal conduct engaged in by their particular lender." | Pessar Aff. I (SJ Ex. 30) ¶¶ 39, 41, 42, 43, Exs. F, G, H, I; Van Dyke Decl. (SJ Ex. 36) ¶¶ 7, 8, 9, 10, Exs. B, C, D, E |
| 298. | On the websites www.prelitlaw.com and www.thereliefnetwork.org, Defendants represent that "The Pre-Litigation Monetary Claims program will provide homeowners with a detailed legal analysis of illegal conduct engaged in by their particular lender." | Pessar Aff. I (SJ Ex. 30) ¶¶ 45, 46, Exs. J, K; Van Dyke Decl. (SJ Ex. 36) ¶¶ 6, 11, Exs. A, F |
| 299. | On the websites , www.nationallegalsource.com, www.resourcelawcenter.com, www.resourcelawgroup.com, www.resourcelegalgroup.com, www.prelitlaw.com and www.thereliefnetwork.org, Defendants also represented that an "attorney will create a legal memorandum focusing on these claims and judgments and utilize them to construct a [lawsuit] against your lender, and that "[t]he prepared lawsuit will be utilized as an instrument of leverage to improve the outcome of negotiating with a mortgage lender." | Pessar Aff. I (SJ Ex. 30) ¶¶ 39, 41, 42, 43, 45, 46, Exs. F, G, H, I, J, K; Van Dyke Decl. (SJ Ex. 36) ¶¶ 6-11, Exs. A, B, C, D, E, F |
| 300. | Gordon stated "applicable laws and regulations… do not prohibit charging for a forensic audit" and subsequently stated that his paid services include "legal and audit work." | Gordon Opp. to PI (SJ Ex. 1) 12:9-25 |

| | | |
|---|---|---|
| 301. | In some instances, Defendants' sales representatives promised consumers a forensic audit. | **Consumer Declarations and Depos:** Garrido Decl. (SJ Ex. 9) ¶ 4<br><br>**Other Declaration and Depos** Gearries Dep. 379:10-381:6, PX 83 |
| 302. | In numerous instances, Defendants' sales representatives told consumers that Defendants would review their loan contracts with lenders to find something wrong in order to help the consumer obtain a loan modification. | DuBiel Decl. (SJ Ex. 8) ¶ 6; Johnston Decl. (SJ Ex. 12) ¶¶ 5, 6; Johnson Decl. (SJ Ex. 11) ¶¶ 7, 10; Wobig Decl. (SJ Ex. 16) ¶ 4; Garrido Decl. (SJ Ex. 9) ¶ 4 |
| 303. | A sales script found at the desk of one of Defendants' sales representative states: "Well you see these lawyers are going to want to find weakness in your file and do a forensic investigation on your file to make sure that ever letter and decimal was recorded properly." | Gearries Dep. (SJ Ex. 22) 370:7-16, PX 80; Kane Decl. (SJ Ex. 29) ¶ 11, PX 80; Van Beek Decl. (SJ Ex. 35) ¶ 19, PX 80 |
| 304. | In numerous instances, after being promised a forensic audit, consumers were told that Defendants did not provide forensic audits. | Gearries Dep. (SJ Ex. 22) 372:15-373:13, 376:18-377:2, 398:3-402:21, PX 81, PX 82, PX 85 |
| 305. | Defendants provided the processors with a document titled "Frequently Asked Processing Questions" that gave the processors the following response to the frequently asked question "What is the status of my forensic audit?": "I'm sorry; we do not provide the service of a forensic audit." | Gearries Dep. (SJ Ex. 22) 398:3-402:21, PX 85 |

| Other Misrepresentations by Defendants | | |
|---|---|---|
| 306. | Defendants represented that the law firm that would help consumers had successfully obtained a large number of modifications in the past and is one of the best firms at obtaining loan modifications. | **Consumer Declarations and Depos:** Hagy Decl. (SJ Ex. 10) ¶¶ 3, 8; Wesolowski Decl. (SJ Ex. 15) ¶ 4; Wobig Decl. (SJ Ex. 16) ¶ 4; I. Yoo (SJ Ex. 17) ¶ 5; Garrido Decl. (SJ Ex. 9) ¶ 4; Nuval Decl. (SJ Ex. 13) ¶ 5; Stephens Decl. (SJ Ex. 14) ¶ 9; Johnston Decl. (SJ Ex. 12) ¶ 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 57 |
| 307. | Defendants referenced the law firm when selling Defendants' services to add legitimacy. | Gearries Dep. (SJ Ex. 22) 288:3-24, 451:10-457:6, PX 98, PX 99 |
| 308. | Defendants' use of a law firm and legal sounding fictitious business names gave consumers the impression that the consumers would be working with lawyers. | Oden Dep. (SJ Ex. 21) 21:4-11; Johnston Decl. (SJ Ex. 12) ¶ 6; Garrido Decl. (SJ Ex. 9) ¶ 6 |
| 309. | Defendants represented that the Defendants specifically worked with the consumer's mortgage lenders. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 5; Stephens Decl. (SJ Ex. 14) ¶ 7; Wobig Decl. (SJ Ex. 16) ¶ 4 |
| 310. | Defendants' "Call 3" sales script "Let me give you some history on the firm, they… complete over 100 cases a year and they were one of the firms involved in the huge $26 Billion Dollar national banks case that recently settled. What I love about the firm is... not just their excellent track record but the fact that they don't sugar coat anything." | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 58, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:6, 312:10-23, PX 69 |
| 311. | Defendants' "Rebuttals" sales script states that the operation was a "consumer advocate membership organization." | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 53, Ex. C, 22, 29; Gearries Dep. (SJ Ex. 22) 300:23-301:6, PX 69; Rec. Rep. I (SJ Ex. 2), at pp. 133-4 |

| | | |
|---|---|---|
| 312. | Gordon approved sales representatives' telling consumers that the operation was a "consumer advocate membership organization." | Pessar Aff. I (SJ Ex. 30) ¶ 53 |
| 313. | A sales script found at the desk of one of Defendants' sales representative states: "[W]hen I sent over your file they stated to me that once they are done you will be received an modification at 2% because [consumer's lender] is currently being sued the state attorney general for wrongful foreclosure. They said you were qualified under federal guidelines and they are 100% confident you are a perfect case for them." | Kane Decl. (SJ Ex. 29) ¶ 7, PX 72; Van Beek Decl. (SJ Ex. 35) ¶ 9, PX 72 |
| 314. | A sales script found at the desk of one of Defendants' sales representative states: "What I like about this firm is that they have their own mortgage underwriting department that reverse engineers your mortgage to understand the true value of your mortgage to your lender. They explained to me that after your case was thoroughly analyzed they were able to locate deceptive practices as reasons to belief fraudulent activities took place on your mortgage. They ran their Net Present Value Test and found out that there was more value for them to foreclosure on you rather than modify your loan." | Gearries Dep. (SJ Ex. 22) 342:5-344:25, PX 75; Kane Decl. (SJ Ex. 29) ¶ 8, PX 75; Van Beek Decl. (SJ Ex. 35) ¶ 10, PX 75 |

| | | |
|---|---|---|
| 315. | A sales script found at the desk of one of Defendants' sales representative states: "they got back to me within the hour and said you were in qualified under federal guidelines and they would take on your case. This was great news for your case because law firms in such a scrutinized industry will only take on case they feel they feel 100% confident on." | Gearries Dep. (SJ Ex. 22) 365:10-366:10, PX 79 |
| 316. | Sales representatives orally made the statement in UF 315 to consumers. | Gearries Dep. (SJ Ex. 22) 368:3-22 |
| 317. | Some of Defendants' sales representatives would tell consumers that Bank of America was down the street from the operation, and thus they were in a unique situation to negotiate the consumer's loan. | **Consumer Declarations and Depos:** Stephens Decl. (SJ Ex. 14) ¶ 7<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 58 |
| 318. | Defendants never worked with the Bank of America branch located down the street from the office to negotiate loans. | Pessar Aff. I (SJ Ex. 30) ¶ 58 |
| 319. | In numerous instances, Defendants' sales representatives told consumers that the law firm could prevent foreclosures. | **Consumer Declarations and Depos:** Wesolowski Decl. (SJ Ex. 15) ¶ 5; Oden Dep. (SJ Ex. 21) 20:7-17<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) |
| 320. | A sales script found at the desk of one of Defendants' sales representative, and used by Defendants' sales representatives, states: "As long as you are under active legal review with the firm, you DO NOT have to worry about losing your property because all foreclosure proceedings are postposed." | Gearries Dep. (SJ Ex. 22) 345:11-349:5, PX 76; Kane Decl. (SJ Ex. 29) ¶ 9, PX 76; Van Beek Decl. (SJ Ex. 35) ¶ 11, PX 76 |

| | | |
|---|---|---|
| **OTHER VIOLATIONS** | | |
| **Defendants Charged Consumers an Upfront Fee for Mortgage Assistance Relief Services** | | |
| 321. | Sales representatives generally sold the Defendants' mortgage assistance relief services to consumers for anywhere between $2500 to $4500 per property. | **Consumer Declarations and Depos:** Garrido Decl. (SJ Ex. 9) ¶ 7; Hagy Decl. (SJ Ex. 10) ¶ 5; Johnson Decl. (SJ Ex. 11) ¶ 8; Nuval Decl. (SJ Ex. 13) ¶12; Wesolowski Decl. (SJ Ex. 15) ¶ 6; Wobig Decl. (SJ Ex. 16) ¶ 6; I. Yoo Decl. (SJ Ex. 17) ¶ 7; DuBiel Decl. (SJ Ex. 8) ¶ 10; Johnston Decl. (SJ Ex. 12) ¶ 12; Aull Dep. (SJ Ex. 19) 20:24-21:5; Oden Dep. (SJ Ex. 21) 23:4-24:25<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 20, 33, 59, Ex. C; Gearries (SJ Ex. 22) 286:14-20 |
| 322. | In numerous instances, sales representatives told consumers the fee was the for the loan modification service. | **Consumer Declarations and Depos:** I. Yoo Decl. (SJ Ex. 17) ¶ 7; Hagy Decl. (SJ Ex. 10) ¶ 5; Johnson Decl. (SJ Ex. 11) ¶ 8; Nuval Decl. (SJ Ex. 13) ¶ 12; Wesolowski Decl. (SJ Ex. 15) ¶ 6; Wobig Decl. (SJ Ex. 16) ¶ 6; DuBiel Decl. (SJ Ex. 8) ¶ 10 |
| 323. | The fee was typically collected in three or four installments. | **Consumer Declarations and Depos:** Wobig Decl. (SJ Ex. 16) ¶ 6; DuBiel Decl. (SJ Ex. 8) ¶ 10; Johnson Decl. (SJ Ex. 11) ¶ 8; Aull Dep. (SJ Ex. 19) 20:24-21:5; Oden Dep. (SJ Ex. 21) 23:4-17<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 59 |
| 324. | Defendants told some consumers that if they paid in full upfront, their mortgage modification would be fast-tracked and would be put ahead of other consumers making monthly payments. | Hagy Decl. (SJ Ex. 10) ¶ 5 |

| | | |
|---|---|---|
| 325. | Defendants informed consumers that they must pay all or a portion of the upfront fee before Defendants would begin work on the consumer's loan modification. | **Consumer Declarations and Depos:** Garrido Decl. (SJ Ex. 9) ¶ 7; Stephens Decl. (SJ Ex. 14) ¶ 10; Wobig Decl (SJ Ex. 16) ¶ 6; Johnson Decl. (SJ Ex. 11) ¶ 11; Johnston Dep. (SJ Ex. 20) 57:23-58:1<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 59, 63, Ex. M (October 31, 2011 meeting recap states, "make sure you have client control by notifying them that the firm doesn't activate their case until the first payment goes in") |
| 326. | Defendants told consumers that if they do not pay all or a portion of the fee, Defendants would not process the consumer's loan modification paperwork or submit documents to the consumer's lender or servicer. | **Consumer Declarations and Depos:** Stephens Decl. (SJ Ex. 14) ¶ 10; Garrido Decl. (SJ Ex. 9) ¶ 6; Oden Dep. (SJ Ex. 21) 24:17-20<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 59 |
| 327. | Defendants instructed consumers to write checks or transfer funds to the Gordon Law Firm or to one of the Gordon Entities. | **Consumer Declarations and Depos:** Wobig Decl. (SJ Ex. 16) ¶ 6; I. Yoo Decl. (SJ Ex. 17) ¶ 7; Garrido Decl. (SJ Ex. 9) ¶ 7, Attach. B; Hagy Decl. (SJ Ex. 10) ¶ 12, Attach. H; Johnson Decl. (SJ Ex. 11) ¶¶ 12, 14; Nuval Decl. (SJ Ex. 13) ¶ 12, Attach. D; Stephens Decl. (SJ Ex. 14) ¶¶ 11, 13; Attachs. C, E; Wesolowski Decl. (SJ Ex. 15) ¶ 6; DuBiel Decl. (SJ Ex. 8) ¶ 11; Johnston Decl. (SJ Ex. 12) ¶ 14, Attach. E; Aull Dep. (SJ Ex. 19) 21:5-8; Ex. A1; Oden Dep. (SJ Ex. 21) 23:24-24:6<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 20, 33, Ex. C; Gearries Dep. (SJ Ex. 22) 56:19-57:2 |

| | | |
|---|---|---|
| 328. | Typically, after consumers agreed to purchase Defendants' services, Defendants sent "Step 1" paperwork, which included an "Attorney/Client Fee Agreement" or "Pre-Litigation Agreement" that indicated that consumer's upfront payment was for pre-litigation services. | **Consumer Declarations and Depos:** I. Yoo Decl. (SJ Ex. 17) ¶ 11, Attach. E; Hagy Decl. (SJ Ex. 10) ¶ 11 Attach. G; Stevens Decl. (SJ Ex. 14) ¶ 11, Attach. B; Aull Dep. (SJ Ex. 19) 24:21-28:10, Ex. A2; Oden Dep. (SJ Ex. 21) 31:7-35:17, Ex. Oden. 9<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) 20; Gearries Dep. (SJ Ex. 22) 423:20-23, 432:12-434:13, 438:10-14, PX 92 |
| 329. | Consumers frequently learned for the first time about "pre-litigation services" after receiving the "Step 1" paperwork. | **Consumer Declaration and Depos** Hagy Decl. (SJ Ex. 10) ¶¶ 3-8, 10; Oden Dep. (SJ Ex. 21) 34:12-20 |
| 330. | Typically, after consumers made their first payment and signed the "Attorney/Client Fee Agreement" or "Pre-Litigation Agreement," they were sent the "Step 2" paperwork, which consisted of the "Attorney/Client(s) Pro Bono Legal Agreement." | **Consumer Declaration and Depos:** Hagy Decl. (SJ Ex.11) ¶ 13, Attach. I; Aull Dep. (SJ Ex. 19) 31:17-34:18, Ex. A3; Oden Dep. (SJ Ex. 21) 45:21-60:1, Exs. Oden 12, 13<br><br>**Other Declaration and Depos:** Gearries Dep. (SJ Ex. 22) 271:8-12; 434:21-438:7, 447:17-449:3, 450:6-451:3, PX 93, PX 96, PX 97 |
| 331. | In numerous instances, Defendants sent the Step 2 paperwork to the consumer without providing any explanation as to the "Attorney/Client(s) Pro Bono Legal Agreement." | Aull Dep. (SJ Ex. 19) 34:22-36:5 |
| 332. | Only consumers that paid for the pre-litigation monetary claims services, which included "custom legal products," were eligible for the purported pro bono modification services. | **Pleadings, Filings, and Discovery:** Gordon Opp. to PI (SJ Ex. 1) 12:22-25<br><br>**Consumer Declaration and Depos:** Nuval Decl. (SJ Ex. 13) ¶ 14<br><br>**Other Declaration and Depos:** Gearries Dep. (SJ Ex. 22) 271:8-12 |

| | | |
|---|---|---|
| 333. | Defendants' sales scripts do not mention any pro bono or free services. | Gearries Dep. (SJ Ex. 22) 287:16-20, 296:20-22, 300:23-301:6, 327:12-21, 338:5-7, 415:24-416:4, 420:6-8, PX 68, PX 69 |
| 334. | During the sales pitch, Defendants' sales representatives never mention pro bono or free services. | **Consumer Declaration and Depos:** Aull Dep. (SJ Ex. 19) 35:17-36:2<br><br>**Other Declaration and Depos:** Gearries Dep. (SJ Ex. 22) 270:2-271:12 |
| 335. | Defendants' sales scripts do not use the term "custom legal products". | Gearries Dep. (SJ Ex. 22) 287:21-288:2, 296:23-297:1; 300:23-301:6, 327:12-328:1, 338:8-10, 415:24-416:7, PX 68, PX 69 |
| **Defendants Instructed Consumers to Cease Communications with Their Lenders** | | |
| 336. | The sales representatives told consumers not to contact their lenders. | **Consumer Declarations and Depos:** Hagy Decl. (SJ Ex. 10) ¶ 4; Nuval Decl. (SJ Ex. 13) ¶ 15; Stephens Decl. (SJ Ex. 14) ¶ 12, Attach. D; Garrido Decl. (SJ Ex. 9) ¶ 8; Johnson Decl. (SJ Ex. 11) ¶ 11; DuBiel Decl. (SJ Ex. 8) ¶ 8; Johnston Decl. (SJ Ex. 12) ¶ 10; Aull Dep. (SJ Ex. 19) 17:21-23; 41:10-42:5; Oden Dep. (SJ Ex. 21) 22:6-23, 26:18-24, 28:16-21; 49:15-17<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 61; Gearries Dep. (SJ Ex. 22) 449:4-6 |
| 337. | Defendants' "Call #3" sales script states "During that 3 month time period you will not be in contact or be contacted by your bank because the attorney will inform them you now have legal representation; you are going to be in communications with only the law firm and myself." | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O |

| | | |
|---|---|---|
| 338. | Sales representatives told consumers that the law firm assigned to consumers' case would handle all communications with the lender. | **Consumer Declarations and Depos:** DuBiel Decl. (SJ Ex. 8) ¶ 8; Aull Dep. (SJ Ex. 19) 20:19-23; Oden Dep. (SJ Ex. 21) 22:6-16, 26:18-24<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 61 |
| 339. | Defendants sent to consumers a list of "Do'& Dont's" that states: "DON'T CONTACT YOUR LENDER," "DON'T ANSWER INCOMING CALLS FROM YOUR LENDER," "DON'T ANSWER ANY WRITTEN LETTERS FROM YOUR LENDER," and "DON'T HAVE ANY TYPE OF TELEPHONIC COMMUNICATION WITH YOUR LENDER (NOTE: All telephone communication with your lender must be on a conference call that will include your assigned negotiator, yourself and the lender's representative.)" | Gearries Dep. (SJ Ex. 22) 447:17-449:3, PX 96 |
| 340. | As a result of Defendants' instructions to consumers, in numerous instances, consumers did stop communicating with their lenders. | Hagy Decl. (SJ Ex. 10) ¶ 13; Johnston Dep. (SJ Ex. 20) 65:15-22 |
| 341. | In numerous instances, Defendants did not contact or attempt to negotiate with the consumer's lender. | Wesolowski Decl. (SJ Ex. 15) ¶ 11 (lender told her that Defendants never contacted the bank); Stephens Decl. (SJ Ex. 14) ¶¶ 16, 17; Wobig Decl. (SJ Ex. 16) ¶ 12; Garrido Decl. (SJ Ex. 9) ¶ 12 |

| Defendants Encouraged Consumers to Stop Making Mortgage Payments and Failed to Provide Appropriate Disclosure | | |
|---|---|---|
| 342. | Sales representatives told consumers that they did not need to make mortgage payments while participating in Defendants' program. | **Consumer Declarations and Depos** Wobig Decl. (SJ Ex. 16) ¶ 5; Garrido Decl. (SJ Ex. 9) ¶ 6; Hagy Decl. (SJ Ex. 10) ¶ 4; Stephens Decl. (SJ Ex. 14) ¶ 8; Wesolowski Decl. (SJ Ex. 15) ¶ 5; I. Yoo Decl. (SJ Ex. 17) ¶ 6; DuBiel Decl. (SJ Ex. 8) ¶ 7; Johnston Decl. (SJ Ex. 12) ¶¶ 15, 16; Aull Dep. (SJ Ex. 19) 17:14-18:14; Oden Dep. (SJ Ex. 21) 19:18-21, 21:12-17, 28:2-6 |
| 343. | Frequently, sales representative would tell consumers that if they were current on their mortgage payments, they would be unable to demonstrate the requisite hardship for a modification. | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 60, Ex. C |
| 344. | Defendants' "Call #3" sales script states "**NOW**, most of my clients cannot afford the attorney service and pay their mortgage at the same time; legally I cannot tell you to miss your mortgage payments, but I will tell you that about 90% of our clients strategically fall behind on their mortgage payments to afford the attorney service and once this is settled all the late fees will be either wiped off completely or put back at the end of your loan." | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Van Dyke Decl. (SJ Ex. 36) ¶ 30, Attach. O |
| 345. | Defendants' sales scripts provided the following rebuttal to the question "How can I afford to make my mortgage payment and pay the law firm?": "If you make your mortgage payments while you're paying the law firm then it will be difficult for the law firm to display your hardship. The lender will be willing to help if you are behind." | Pessar Aff. I (SJ Ex. 30) ¶¶ 33, 60, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:6, PX 69 |

| | | |
|---|---|---|
| 346. | Defendants' "Rebuttals" script provides the following rebuttal to the statement "I feel it's unethical to fall behind on my mortgage.": "We don't make the rules the bank makes the rules and no one receives modification assistance that is current on their loan. A homeowner must show hardship in order to receive assistance and being current on the mortgage loan is not a good display of the need of hardship assistance." | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C; Gearries Dep. (SJ Ex. 22) 300:23-301:6, 315:25-316:13, PX 69 |
| 347. | Gordon reviewed and approved the use of Defendants' "Rebuttals" script. | Gearries Dep. (SJ Ex. 22) 300:23-301:6, 315:25-316:13, PX 69 |
| 348. | Sales representatives would also tell consumers if they had to choose between paying their mortgage payments and paying to get help from Defendants' operation, they should pay to get help. | **Consumer Declarations and Depos:** Johnston Decl. (SJ Ex. 12) ¶ 15<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 60 |
| 349. | Sales representatives did not instruct consumers that their failure to pay their mortgage could affect their credit or result in them losing their homes. | **Consumer Declarations and Depos:** Stephens Decl. (SJ Ex. 14) ¶ 8; Wobig Decl. (SJ Ex. 16) ¶ 5; Hagy Decl. (SJ Ex. 10) ¶ 4; Wesolowski Decl. (SJ Ex. 15) ¶ 5; I. Yoo Decl. (SJ Ex. 17) ¶ 6; DuBiel Decl. (SJ Ex. 8) ¶ 7; Johnston Decl. (SJ Ex. 12) ¶ 15; Aull Dep. (SJ Ex. 19) 17:14-18:14; Oden Dep. (SJ Ex. 21) 21:23-22:5, 28:7-9; Johnston Dep. (SJ Ex. 20) 73:15-18<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 60 |

| Defendants Failed to Provide Appropriate Disclosures on Mail Solicitations and on Websites | | |
|---|---|---|
| 350. | Defendants' mail solicitations fail to disclose in a clear and prominent manner that: (1) Defendants are not associated with the government, nor approved by the government or consumer's lender; (2) the consumer can stop doing business with Defendants and reject any offer obtained by Defendants; and (3) even if the consumer uses the entity's service the consumer's lender may not agree to modify the loan. | **Consumer Declarations and Depos:** Nuval Decl. (SJ Ex. 13) ¶¶ 2, 28, Attachs, A, I; Stephens Decl. (SJ Ex. 14) ¶ 3, Attach. A; I. Yoo Decl. (SJ Ex. 17) ¶ 4, Attach. A; Oden Dep. (SJ Ex. 21) 12:8-13:4, Ex. Oden 8<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶¶ 31, 36 Exs. B, E |
| 351. | Defendants' websites also fail to disclose in a clear and prominent manner, as required by Regulation O, that: (1) Defendants are not associated with the government, nor approved by the government or consumer's lender; and (2) even if the consumer uses the entity's service, the consumer's lender may not agree to modify the loan. | Pessar Aff. I (SJ Ex. 30) ¶¶ 39, 41, 42, 43, 45, 46, Exs. F, G, H, I, J, K; Van Dyke Decl. (SJ Ex. 36) ¶¶ 6-11, Exs. A, B, C, D, E, F |

| FAILURE TO DELIVER PROMISED SERVICES | | |
|---|---|---|
| **Defendants Failed to Deliver Promised Services** | | |
| 352. | In numerous instances, Defendants failed to obtain mortgage loan modifications. | **Consumer Declarations and Depos:** Garrido Decl. (SJ Ex. 9) ¶ 13 (found himself in no better position than when he started); Wobig Decl. (SJ Ex. 16) ¶14 (never received modification); I. Yoo Decl. (SJ Ex. 17) ¶ 19 (failed to obtain loan modification); Hagy Decl. (SJ Ex. 10) ¶ 27 (did not receive loan modification through Defendants' services); Wesolowski Decl. (SJ Ex. 15) ¶ 18 (same); Nuval Decl. (SJ Ex. 13) ¶ 29; Stephens Decl. (SJ Ex. 14) ¶¶ 18, 20, 24; Johnston Decl. (SJ Ex. 12) ¶ 25; Aull Dep. (SJ Ex. 19) 58:7-10; 61:11-14; Oden Dep. (SJ Ex. 21) 80:19-22; 84:4-15; Johnston Dep. (SJ Ex. 20) 48:16-21<br><br>**Other Declarations and Depos:** Pessar Aff. I (SJ Ex. 30) ¶ 68; Gearries Dep. (SJ Ex. 22) 122:14-17 |
| 353. | Any mortgage modifications or forbearances obtained were for a small percentage of consumers and a significant portion were not on terms as favorable as the terms promised to consumers. | Rec. Rep. II (SJ Ex. 4), at p. 154 (based on defendant's data, defendant's successful completion rate is 30% or less) |
| 354. | Defendants' processors, who were responsible for providing the loan modification services sold to consumers, were frequently overwhelmed by the number of consumer files. | Pessar Aff. I (SJ Ex. 30) ¶ 65 |

| | | |
|---|---|---|
| 355. | Defendants' processors used fictitious names on consumers' bank authorization forms to allow anybody from the firm to speak on behalf of any consumer. | Gearries Dep. (SJ Ex. 22) 387:24-390:19 |
| 356. | Defendants' processors frequently failed to return consumers' phone calls. | Wobig Decl. (SJ Ex. 16) ¶ 11; Hagy Decl. (SJ Ex. 10) ¶¶ 16, 19; Johnson Decl. (SJ Ex. 11) ¶ 23; Stephens Decl. (SJ Ex. 14) ¶ 15; Wesolowski Decl. (SJ Ex. 15) ¶ 10; DuBiel Decl. (SJ Ex. 8) ¶ 13; Johnston Decl. (SJ Ex. 12) ¶¶ 18, 19; Oden Dep. (SJ Ex. 21) 76:13-16 |
| 357. | The operation received many complaints from consumers who stated that processors had not returned their calls or would only return calls after the consumers left multiple messages. | Pessar Aff. I (SJ Ex. 30) ¶ 66 |
| 358. | On several occasions, Pessar told Gordon that the operation needed more processors to handle the number of files taken in by the operation. | Pessar Aff. I (SJ Ex. 30) ¶ 71 |
| 359. | In numerous instances, consumers' accounts were closed by the operation without any benefit having been provided to the consumers. | Hagy Decl. (SJ Ex. 10) ¶ 25; Nuval Decl. (SJ Ex. 13) ¶ 21; I. Yoo Decl. (SJ Ex. 17) ¶ 19 |
| 360. | Processors were provided incentives for "closing" consumer files. | Pessar Aff. I (SJ Ex. 30) ¶ 67, Ex. O; Van Dyke Decl. (SJ Ex. 36) ¶ 38, Attach. V |
| 361. | "Closing a file" was a way to end Gordon's involvement in the case. | Pessar Aff. I (SJ Ex. 30) ¶ 67 |
| 362. | A consumer's file would be closed for many reasons, including obtaining a trial modification, establishment of a repayment plan by the lender, a loan modification, forbearance, referral to another attorney for litigation or bankruptcy, client cancellation, or nonpayment. | Pessar Aff. I (SJ Ex. 30) ¶ 67, Ex. O; Van Dyke Decl. (SJ Ex. 36) ¶ 41, Attach. X |

| | | |
|---|---|---|
| 363. | Of the loan modifications obtained, a significant portion did not provide terms as favorable as those terms initially represented to consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 68 |
| 364. | In some instances, Defendants' services caused their clients' mortgage payments to increase. | Nuval Decl. (SJ Ex. 13) ¶ 21;<br>Stephens Decl. (SJ Ex. 14) ¶ 20 |
| 365. | Consumers did not receive forensic audits. | **Consumer Declarations and Depos:**<br>Wobig Decl. (SJ Ex. 16) ¶ 12;<br>Johnson Decl. (SJ Ex. 11) ¶ 30<br><br>**Other Declarations and Depos:**<br>Gearries Dep. (SJ Ex. 22) 372:15-373:5, 376:18-377:2, 398:3-402:21, PX 81, PX 82, PX 85 |
| 366. | In many cases, if Defendants failed to provide a consumer with the promised loan modification, Defendants would attempt to sell the consumer additional services. | Johnson Decl. (SJ Ex. 11) ¶¶ 25-28;<br>Nuval Decl. (SJ Ex. 13) ¶ 25;<br>Stephens Decl. (SJ Ex. 14) ¶ 18. |
| 367. | Defendants' "Processing Protocols" provides that "[i]f a sales rep signed up a client for Pre-Litigation and the client retains for an additional service the original sales rep is entitled to an opener commission." | Pessar Aff. I (SJ Ex. 30) ¶ 33, Ex. C;<br>Gearries Dep. (SJ Ex. 22) 300:23-301:6, PX 69 |
| | **Consumer Complaints** | |
| 368. | Consumers regularly complained that they had not received the services promised by Defendants' sales representatives. | **Consumer Declarations and Depos:**<br>Aull Dep. (SJ Ex. 19) 59:9-13<br><br>**Other Declarations and Depos:**<br>Burge Decl. (SJ Ex. 26) ¶¶ 10, 11, Attach. A; von Freymann Decl. (SJ Ex. 37) ¶¶ 3-6; Van Dyke Decl. (SJ Ex. 36) ¶ 17; Gearries Dep. (SJ Ex. 22) 71:19-72:5 |

| | | |
|---|---|---|
| 369. | Consumers, including those whose files were closed, frequently complained that they did not receive the loan modifications or the terms that they were promised. | Pessar Aff. I (SJ Ex. 30) ¶ 68; Gearries Dep. (SJ Ex. 22) 72:3-72:5 |
| 370. | The Better Business Bureau received 56 written complaints from consumers against the Gordon Law Firm, the vast majority of which state that Defendants failed to provide the promised services. | Burge Decl. (SJ Ex. 26) ¶¶ 10, 11, Attach. A |
| 371. | From May 2010 until July 2012, the State Bar of California's Office of Intake received over 65 complaints against Gordon from consumers and government agencies, including the Washington State Department of Real Estate, Washington State Bar, North Carolina Department of Justice, and California Department of Real Estate | von Freymann Decl. (SJ Ex. 37) ¶ 3 |
| 372. | As of June 2012, the FTC Consumer Sentinel Database had approximately 151 relevant complaints from consumers against Gordon, the Gordon Law Firm, and Gordon Entities, complaining that Defendants failed to provide the promised services. | Van Dyke Decl. (SJ Ex. 36) ¶ 17 |
| 373. | The Commonwealth of Pennsylvania, Department of Consumer Services served a cease and decease order on Gordon relating to Gordon's selling of loan modification services for an advance fee. | Piesik Aff. (SJ Ex. 32) ¶¶ 4-9, 34-39, Ex. E |
| 374. | Gordon was investigated by the Florida Office of the Attorney General relating to his company, National Payment Modification, for charging an advance fee for loan modification and foreclosure rescue services. | Van Dyke Decl. (SJ Ex. 36) ¶ 23, Attach. M |

| | | |
|---|---|---|
| 375. | The Connecticut Statewide Grievance Committee issued a decision concluding that Gordon engaged in the unauthorized practice of law and was not diligent in his efforts to obtain a modification of the consumer's loan. | Van Dyke Decl. (SJ Ex. 36) ¶ 24, Attach. N |
| 376. | Gordon received a letter from the Attorney General of Washington stating that the website www.thegordonlawfirm.com contains several misrepresentations regarding the loan modification services being sold to financially distressed homeowners. | Van Dyke Decl. (SJ Ex. 36) ¶ 43, Attach. Y |
| 377. | The State of North Carolina Department of Justice sent Gordon a letter requesting that the Gordon Law Firm cease and desist from offering or providing illegal loan modification services to North Carolina consumers and from collecting any advance fees from North Carolina consumers for such services. | von Freymann Decl. (SJ Ex. 37) ¶¶ 3, 11, Attach. 4, at p. 2359 |
| 378. | Gordon received a letter from the Wisconsin Department of Financial Institutions stating that a consumer filed a complaint against Resource Law Center and that the Resource Law Center is not licensed to conduct "adjustment" services in Wisconsin, and demanding that Resource Law Center cease all unlawful activity involving Wisconsin residents. | Van Dyke Decl. (SJ Ex. 36) ¶ 44, Attach. Z |

| | | |
|---|---|---|
| 379. | For consumers that complained, Gordon instructed processors and sales representatives to send out a "Notice of Client's Right to Arbitrate" and to attach a form legal complaint with Chance E. Gordon, d.b.a. The Gordon Law Firm listed as plaintiff and the complaining client named as the defendant in the lawsuit. | Pessar Aff. I (SJ Ex. 30) ¶ 69, Ex. P |
| 380. | At Gordon's instruction, the operation's processing manager sent a notice and form legal complaint to several consumers that complained to the state bar. | Pessar Aff. I (SJ Ex. 30) ¶ 69, Ex. P |
| 381. | Gordon instructed that complaining consumers be told that if they rejected arbitration and went to the State Bar, they would be sued. | Pessar Aff. I (SJ Ex. 30) ¶ 69, Ex. P |
| 382. | Gordon was aware of the lawsuits filed by consumers against Gordon Law Firm. | Gordon RFA (SJ Ex. 6) Response 123 |
| 383. | Gordon was aware of the complaints made to the Southland Better Business Bureau by consumers. | Gordon RFA (SJ Ex. 6) Response 124; Gearries Dep. (SJ Ex. 22) 252:16-24, PX 64 |
| 384. | Gordon was aware of the complaints made to the State Bar of California by consumers. | Gordon RFA (SJ Ex. 6) Response 125 |
| 385. | Gordon rarely spoke to consumers and would typically only speak to consumers after they had complained to the State Bar of California. | Pessar Aff. I (SJ Ex. 30) ¶ 66 |
| 386. | Gordon had authority to issue refunds to consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 63, Ex. M (February 27, 2012 meeting recap) |
| 387. | On several occasions, Gordon promised refunds to consumers. | Pessar Aff. I (SJ Ex. 30) ¶ 70 |
| 388. | Gordon did not follow through on the refunds. | Pessar Aff. I (SJ Ex. 30) ¶ 70 |
| 389. | Pessar took responsibility for handling refunds. | Pessar Aff. I (SJ Ex. 30) ¶ 70 |

| | | |
|---|---|---|
| 390. | Pessar prepared refund checks, and Gordon would sign them. | Pessar Aff. I (SJ Ex. 30) ¶ 70 |
| 391. | In general, Defendants would try to provide as few refunds as possible. | Pessar Aff. I (SJ Ex. 30) ¶ 70 |
| 392. | Consumers who filed a complaint with the State Bar of California were more likely to receive a refund. | Pessar Aff. I (SJ Ex. 30) ¶ 70 |
| | **Consumer Injury** | |
| 393. | Many consumers failed to receive a refund from Defendants. | Garrido Decl. (SJ Ex. 9) ¶ 15; Hagy Decl. (SJ Ex. 10) ¶ 28; Johnson Decl. (SJ Ex. 11) ¶¶ 32, 34; Nuval Decl. (SJ Ex. 13) ¶ 29; Wesolowski Decl. (SJ Ex. 15) ¶ 18; Wobig Decl. (SJ Ex. 16) ¶ 15; J. Yoo (SJ Ex. 18) ¶ 15 |
| 394. | Consumers often ended up in a worse financial situation after hiring Defendants. | Hagy Decl. (SJ Ex. 10) ¶ 26 (home sold in short sale); Wesolowski Decl. (SJ Ex. 15) ¶ 14 (forced to sell property below market); Wobig Decl. (SJ Ex. 16) ¶ 14 (left in danger of losing home); Nuval Decl. (SJ Ex. 13) ¶ 21 |
| 395. | Consumers went into foreclosure after hiring Defendants. | **Consumer Declarations and Depos:** Johnson Decl. (SJ Ex. 11) ¶¶ 19, 33; Aull Dep. (SJ Ex. 19) 59:14-16<br><br>**Other Declarations and Depos:** Burge Decl. (SJ Ex. 26) ¶ 11, Attach. A, at pp. 1246 (consumers' house went into foreclosure), 1288 (same); Rec. Rep. I (SJ Ex. 2), at p. 136 (same) |

| | | |
|---|---|---|
| 396. | Consumers lost their homes after hiring Defendants. | **Consumer Declarations and Depos:** Hagy Decl. (SJ Ex. 10) ¶ 26 (home sold in short sale); Wesolowski Decl. (SJ Ex. 15) ¶ 14 (forced to sell property below market)<br><br>**Other Declarations and Depos:** Burge Decl. (SJ Ex. 26) ¶ 11, Attach. A, at p. 1282 |
| **Final Judgments and Orders** | | |
| 397. | On February 1, 2013, Pessar, Division One Investment, Processing Division, and the Consumer Financial Protection Bureau entered into a Stipulated Final Judgment and Order for Permanent Injunction and Settlement of Claims. | Pessar Judgment (SJ Ex. 38) |

| DEFENDANT GORDON'S ADMISSIONS[6] | | |
|---|---|---|
| 398. | Between January 1, 2010 and July 19, 2012, Gordon was the sole owner and officer of The Gordon Law Firm, P.C. | Gordon RFA (SJ Ex. 6) Response 1 |
| 399. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name National Legal Source. | Gordon RFA (SJ Ex. 6) Response 2 |
| 400. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name Resource Law Center. | Gordon RFA (SJ Ex. 6) Response 2 |
| 401. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name Resource Law Group. | Gordon RFA (SJ Ex. 6) Response 2 |
| 402. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name Resource Legal Group. | Gordon RFA (SJ Ex. 6) Response 2 |
| 403. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name Gordon & Associates. | Gordon RFA (SJ Ex. 6) Response 2 |

[6] As set forth more fully in Declaration of Laura Schneider (SJ Ex. 34) at ¶¶ 1-12, Defendant Gordon's Response to the Bureau's April 3, 2013 Requests for Admission ("RFA") was served upon the Bureau one day late, with nine questions unanswered. By operation of Fed. R. Civ. P. 36(a)(3), the Bureau's RFAs should therefore be deemed automatically admitted for purposes of this litigation, unless and until the Court rules otherwise on a motion filed by Defendant Gordon pursuant to Fed. R. Civ. P. 36(b). *See, e.g., F.T.C. v. Medicor*, LLC, 217 F.Supp. 2d 1048, 1053 (C.D. Cal. 2002) (failure to respond to the RFA results in automatic admission, with no motion necessary, because Rule 36(a) is self-executing); *see also, U.S. v. Kennedy*, 133 F.3d 53, 59-60 (D.C. Cir. 1998); *Gore v. The RBA Group, Inc.*, No. 03-CV-9442, 2008 WL 857530, at *2 n. 2 (S.D.N.Y. Mar. 31, 2008). Although, as a matter of law, the Court may consider all of the RFAs as admitted, the Bureau has cited in its Memorandum only those Responses that were admitted by Gordon in the late-filed Gordon RFA Response.

| | | |
|---|---|---|
| 404. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name The Relief Network. | Gordon RFA (SJ Ex. 6) Response 2 |
| 405. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name The Relief Council. | Gordon RFA (SJ Ex. 6) Response 2 |
| 406. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name MyHUD.org. | Gordon RFA (SJ Ex. 6) Response 2 |
| 407. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name Homeowner United Defense. | Gordon RFA (SJ Ex. 6) Response 2 |
| 408. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name MyFHA.org. | Gordon RFA (SJ Ex. 6) Response 2 |
| 409. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name Foundation for Homeowner Advocacy. | Gordon RFA (SJ Ex. 6) Response 2 |
| 410. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name Gordon & Associates Legal Publishing Inc. | Gordon RFA (SJ Ex. 6) Response 2 |
| 411. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under the name King Legal Publishing Inc. | Gordon RFA (SJ Ex. 6) Response 2 |
| 412. | On or about October 6, 2010, Gordon registered the fictitious business name "The Law Offices of Chance E. Gordon" with the Registrar-Recorder/County Clerk of Los Angeles County. | Gordon RFA (SJ Ex. 6) Response 3 |

| | | |
|---|---|---|
| 413. | On or about October 6, 2010, Gordon registered the fictitious business name "The Law Offices of C. Edward Gordon" with Registrar-Recorder/County Clerk of Los Angeles County. | Gordon RFA (SJ Ex. 6) Response 4 |
| 414. | On or about October 6, 2010, Gordon registered the fictitious business name "The C.E.G. Law Firm" with the Registrar-Recorder/County Clerk of Los Angeles County. | Gordon RFA (SJ Ex. 6) Response 5 |
| 415. | On or about October 6, 2010, Gordon registered the fictitious business name "Gordon & Associates" with the Registrar-Recorder/County Clerk of Los Angeles County. | Gordon RFA (SJ Ex. 6) Response 6 |
| 416. | On or about October 7, 2011, Gordon registered the fictitious business name "National Legal Source" with the Registrar-Recorder/County Clerk of Los Angeles County. | Gordon RFA (SJ Ex. 6) Response 7 |
| 417. | On or about December 1, 2011, Gordon registered the fictitious business name "Resource Law Center" with Registrar-Recorder/County Clerk of Los Angeles County. | Gordon RFA (SJ Ex. 6) Response 8 |
| 418. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5455 Wilshire Boulevard, Suite 2122, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 419. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5455 Wilshire Boulevard, Suite 2012, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |

| | | |
|---|---|---|
| 420. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5455 Wilshire Boulevard, Suite 2025, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 421. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5455 Wilshire Boulevard, Suite 2005, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 422. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5455 Wilshire Boulevard, Suite 1814, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 423. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5455 Wilshire Boulevard, Suite 2117, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 424. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5455 Wilshire Boulevard, Suite 2010, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 425. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 5482 Wilshire Boulevard, Suite 1548, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 426. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 675 S. Cloverdale Ave, Los Angeles, CA 90036. | Gordon RFA (SJ Ex. 6) Response 9 |
| 427. | At various times between January 1, 2010 and July 19, 2012, Gordon operated his business under various names at 6494 Weathers Place #182, San Diego, CA 92121. | Gordon RFA (SJ Ex. 6) Response 9 |

| | | |
|---|---|---|
| 428. | Between January 1, 2010 and July 19, 2012, Gordon sent or directed others to send mail solicitations to financially distressed homeowners throughout the United States. | Gordon RFA (SJ Ex. 6) Response 10 |
| 429. | Gordon marketed his services through direct mail solicitations. | Gordon RFA (SJ Ex. 6) Response 11 |
| 430. | Gordon purchased or directed others to purchase mailing lists from lead generators that identified potentially distressed homeowners. | Gordon RFA (SJ Ex. 6) Response 12 |
| 431. | Ex. 19 to the Requests for Admission (RFAs) (PX-19) is a true and accurate copy (excluding the handwritten notation) of one of the mailers sent to consumers by Defendants. | Gordon RFA (SJ Ex. 6) Response 13, Ex. 19 |
| 432. | Gordon reviewed the mailer attached as Ex. 19 to the RFAs (PX-19) before it was sent to consumers. | Gordon RFA (SJ Ex. 6) Response 14, Ex. 19 |
| 433. | Gordon approved the use of the mailer attached as Ex. 19 to the RFAs (PX-19), to be sent to consumers. | Gordon RFA (SJ Ex. 6) Response 15, Ex. 19 |
| 434. | Gordon purchased or directed others to purchase the mailer attached as Ex. 19 to the RFAs (PX-19). | Gordon RFA (SJ Ex. 6) Response 16, Ex. 19 |
| 435. | Gordon mailed or directed others to mail the mailer attached as Ex. 19 to the RFAs (PX-19). | Gordon RFA (SJ Ex. 6) Response 17, Ex. 19 |
| 436. | Gordon has never had a business presence of any kind in Washington, D.C. | Gordon RFA (SJ Ex. 6) Response 18 |
| 437. | Gordon has never received mail addressed to the Washington, D.C. address that appears on the mailer attached as Ex. 19 to the RFAs (PX-19). | Gordon RFA (SJ Ex. 6) Response 19, Ex. 19 |

| | | |
|---|---|---|
| 438. | Gordon never made any arrangement to receive mail sent to the Washington, D.C. address that appears on the mailer attached as Ex. 19 to the RFAs (PX-19). | Gordon RFA (SJ Ex. 6) Response 20, Ex. 19 |
| 439. | Defendants solicited consumers using the mailer attached as Ex. 19 to the RFAs (PX-19) for approximately two years. | Gordon RFA (SJ Ex. 6) Response 21, Ex. 19 |
| 440. | PX-20 to the RFAs (PX-20) is a true and accurate copy of one of the mailers sent to consumers by Defendants. | Gordon RFA (SJ Ex. 6) Response 22, Ex. 20 |
| 441. | Gordon reviewed the mailer attached as Ex. 20 to the RFAs (PX-20), before it was sent to consumers. | Gordon RFA (SJ Ex. 6) Response 23 |
| 442. | Gordon approved the use of the mailer attached as Ex. 20 to the RFAs (PX-20) to be sent to consumers. | Gordon RFA (SJ Ex. 6) Response 24 |
| 443. | Gordon purchased or directed others to purchase the mailer attached as Ex. 20 to the RFAs (PX-20). | Gordon RFA (SJ Ex. 6) Response 25 |
| 444. | Gordon mailed or directed others to mail the mailer attached as Ex. 20 to the RFAs (PX-20). | Gordon RFA (SJ Ex. 6) Response 26 |
| 445. | At various times between January 1, 2010 and July 19, 2012, the following telephone number was used by Gordon's business: (877) 577-2656. | Gordon RFA (SJ Ex. 6) Response 27 |
| 446. | At various times between January 1, 2010 and July 19, 2012, the following fax number was used by Gordon's business: (877) 733-5557 (fax). | Gordon RFA (SJ Ex. 6) Response 27 |
| 447. | At various times between January 1, 2010 and July 19, 2012, the following telephone number was used by Gordon's business: (855) 213-4222. | Gordon RFA (SJ Ex. 6) Response 27 |
| 448. | At various times between January 1, 2010 and July 19, 2012, the following fax number was used by Gordon's business: (877) 835-2794. | Gordon RFA (SJ Ex. 6) Response 27 |

| | | |
|---|---|---|
| 449. | At various times between January 1, 2010 and July 19, 2012, the following telephone number was used by Gordon's business: (877) 799-8453. | Gordon RFA (SJ Ex. 6) Response 27 |
| 450. | At various times between January 1, 2010 and July 19, 2012, the following telephone number was used by Gordon's business: (866) 835-1162. | Gordon RFA (SJ Ex. 6) Response 27 |
| 451. | At various times between January 1, 2010 and July 19, 2012, the following telephone number was used by Gordon's business: (877) 499-2228. | Gordon RFA (SJ Ex. 6) Response 27 |
| 452. | At various times between January 1, 2010 and July 19, 2012, the following telephone number was used by Gordon's business: (877) 304-4222. | Gordon RFA (SJ Ex. 6) Response 27 |
| 453. | At various times between January 1, 2010 and July 19, 2012, the following telephone number was used by Gordon's business: (866) 904-1900. | Gordon RFA (SJ Ex. 6) Response 27 |
| 454. | Neither Gordon, any of his business entities or fictitious business names, or any other Defendant is associated with any governmental agency or the government. | Gordon RFA (SJ Ex. 6) Response 28 |
| 455. | Neither Gordon, any of his business entities or fictitious business names, or any other Defendant is affiliated with any governmental agency or the government. | Gordon RFA (SJ Ex. 6) Response 29 |
| 456. | Neither Gordon, any of his business entities or fictitious business names, or any other Defendant was approved or certified by the government to provide mortgage assistance relief services to consumers. | Gordon RFA (SJ Ex. 6) Response 30 |

| | | |
|---|---|---|
| 457. | Neither Gordon, any of his business entities or fictitious business names, or any other Defendant is funded in whole or in part by any governmental agency or program of the government. | Gordon RFA (SJ Ex. 6) Response 31 |
| 458. | The marketing materials Gordon sent to consumers did not disclose clearly and prominently that Defendants are not associated with the government, nor approved by the government or consumer's lender. | Gordon RFA (SJ Ex. 6) Response 32 |
| 459. | The marketing materials Gordon sent to consumers did not disclose clearly and prominently that the consumer can stop doing business with Defendants and reject any offer obtained by Defendants. | Gordon RFA (SJ Ex. 6) Response 32 |
| 460. | The marketing materials Gordon sent to consumers did not disclose clearly and prominently that even if the consumer uses the Defendants' service the consumer's lender may not agree to modify the loan. | Gordon RFA (SJ Ex. 6) Response 32 |
| 461. | Gordon paid for the website Prelitlaw.com. | Gordon RFA (SJ Ex. 6) Response 33 |
| 462. | Gordon paid for the website nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 33 |
| 463. | Gordon paid for the website resourcelawgroup.com. | Gordon RFA (SJ Ex. 6) Response 33 |
| 464. | Gordon paid for the website resourcelegalgroup.com. | Gordon RFA (SJ Ex. 6) Response 33 |
| 465. | Gordon paid for the website resourcelawcenter.com. | Gordon RFA (SJ Ex. 6) Response 33 |
| 466. | Gordon paid for the website foundationforhomeowneradvocacy.org. | Gordon RFA (SJ Ex. 6) Response 33 |
| 467. | Gordon paid for the website MyHUD.org. | Gordon RFA (SJ Ex. 6) Response 33 |

| | | |
|---|---|---|
| 468. | Gordon reviewed the content for the website www.reliefcouncil.org before it was activated or a short time thereafter. | Gordon RFA (SJ Ex. 6) Response 34 |
| 469. | Gordon approved the content for the website www.reliefcouncil.org. | Gordon RFA (SJ Ex. 6) Response 35 |
| 470. | In fall 2011, Defendants changed the name of their operation from Gordon & Associates to National Legal Source. | Gordon RFA (SJ Ex. 6) Response 36 |
| 471. | Defendants changed their name from Gordon & Associates to National Legal Source to avoid negative Better Business Bureau complaints and to avoid negative comments relating to Defendant Gordon on the internet. | Gordon RFA (SJ Ex. 6) Response 37 |
| 472. | Gordon purchased the domain name www.nationallegalsource.com from GoDaddy.com LLC on or about April 2, 2011. | Gordon RFA (SJ Ex. 6) Response 38 |
| 473. | Gordon, individually or in conjunction with others, prepared the written content for the website www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 39 |
| 474. | John Gearries assisted Gordon in preparing the written content for the website www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 40 |
| 475. | Gordon reviewed the content for www.nationallegalsource.com before the website was activated or a short time thereafter. | Gordon RFA (SJ Ex. 6) Response 41 |
| 476. | Gordon approved the content for the website www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 42 |
| 477. | Gordon disseminated or directed others to disseminate information to the public through the website www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 43 |

| | | |
|---|---|---|
| 478. | Defendants changed their name from National Legal Source to Resource Law Center after the Better Business Bureau discovered that Gordon was associated with National Legal Source. | Gordon RFA (SJ Ex. 6) Response 44 |
| 479. | Gordon purchased the domain name www.resourcelawcenter.com from GoDaddy.com LLC on or about July 6, 2011. | Gordon RFA (SJ Ex. 6) Response 45 |
| 480. | Gordon, individually or in conjunction with others, created the written content for www.resourcelawcenter.com by using virtually the identical written content from www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 46 |
| 481. | Gordon reviewed the content for www.resourcelawcenter.com before the website was activated or a short time thereafter. | Gordon RFA (SJ Ex. 6) Response 47 |
| 482. | Gordon approved the content for the website www.resourcelawcenter.com. | Gordon RFA (SJ Ex. 6) Response 48 |
| 483. | Gordon disseminated or directed others to disseminate information to the public through the website www.resourcelawcenter.com. | Gordon RFA (SJ Ex. 6) Response 49 |
| 484. | Defendants began using the name Resource Law Center and the website www.resourcelawcenter.com in July 2011. | Gordon RFA (SJ Ex. 6) Response 50 |
| 485. | Gordon purchased the domain name www.resourcelawgroup.com from GoDaddy.com LLC on or about February 1, 2012. | Gordon RFA (SJ Ex. 6) Response 51 |
| 486. | Gordon, individually or in conjunction with others, created the written content for www.resourcelawgroup.com by using virtually the identical written content from www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 52 |

| | | |
|---|---|---|
| 487. | Gordon reviewed the content for www.resourcelawgroup.com before the website was activated or a short time thereafter. | Gordon RFA (SJ Ex. 6) Response 53 |
| 488. | Gordon approved the content for the website www.resourcelawgroup.com. | Gordon RFA (SJ Ex. 6) Response 54 |
| 489. | Gordon disseminated or directed others to disseminate information to the public through the website www.resourcelawgroup.com. | Gordon RFA (SJ Ex. 6) Response 55 |
| 490. | Defendants started using the name Resource Law Group and the website www.resourcelawgroup.com in March 2012. | Gordon RFA (SJ Ex. 6) Response 56 |
| 491. | Gordon purchased the domain name www.resourcelegalgroup from GoDaddy.com LLC on or about March 23, 2012. | Gordon RFA (SJ Ex. 6) Response 57 |
| 492. | Gordon, individually or in conjunction with others, created the written content for www.resourcelegalgroup.com by using virtually the identical written content from www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 58 |
| 493. | Gordon reviewed the content for www.resourcelegalgroup.com before the website was activated or a short time thereafter. | Gordon RFA (SJ Ex. 6) Response 59 |
| 494. | Gordon approved the content for the website www.resourcelegalgroup.com. | Gordon RFA (SJ Ex. 6) Response 60 |
| 495. | Gordon disseminated or directed others to disseminate information to the public through the website www.resourcelegalgroup.com. | Gordon RFA (SJ Ex. 6) Response 61 |
| 496. | Defendants started using the name Resource Legal Group and the website www.resourcelegalgroup.com in March 2012. | Gordon RFA (SJ Ex. 6) Response 62 |

| | | |
|---|---|---|
| 497. | The websites www.nationallegalsource.com, www.resourcelawcenter.com, www.resourcelawgroup.com, and www.resourcelegalgroup.com contained identical written content, including the exact same client testimonials, with only the name of the company changed. | Gordon RFA (SJ Ex. 6) Response 63 |
| 498. | Gordon purchased the domain name www.prelitlaw.com from GoDaddy LLC on or about October 7, 2010. | Gordon RFA (SJ Ex. 6) Response 64 |
| 499. | Gordon, individually or in conjunction with others, prepared the written content for the website www.prelitlaw.com. | Gordon RFA (SJ Ex. 6) Response 65 |
| 500. | John Gearries assisted Gordon in preparing the written content for the website www.prelitlaw.com. | Gordon RFA (SJ Ex. 6) Response 66 |
| 501. | Gordon reviewed the content for www.prelitlaw.com before the website was activated or a short time thereafter. | Gordon RFA (SJ Ex. 6) Response 67 |
| 502. | Gordon approved the content for the website www.prelitlaw.com. | Gordon RFA (SJ Ex. 6) Response 68 |
| 503. | Gordon disseminated or directed others to disseminate information to the public through the website www.prelitlaw.com. | Gordon RFA (SJ Ex. 6) Response 69 |
| 504. | Defendants started using the website www.prelitlaw.com in October 2010. | Gordon RFA (SJ Ex. 6) Response 70 |
| 505. | John Gearries created the content for www.thereliefnetwork.org. | Gordon RFA (SJ Ex. 6) Response 71 |
| 506. | Gordon reviewed the content for www.thereliefnetwork.org before the website was activated or a short time thereafter. | Gordon RFA (SJ Ex. 6) Response 72 |
| 507. | Gordon approved the use of the content for the website www.thereliefnetwork.org. | Gordon RFA (SJ Ex. 6) Response 73 |

| | | |
|---|---|---|
| 508. | Gordon disseminated or directed others to disseminate information to the public through the website www.thereliefnetwork.org. | Gordon RFA (SJ Ex. 6) Response 74 |
| 509. | Defendants started using the name the Relief Network and the website www.thereliefnetwork.org in October 2011. | Gordon RFA (SJ Ex. 6) Response 75 |
| 510. | Gordon came up with the idea to create a website titled myhud.org, in which the initials "HUD" stood for "Homeowners United Defense." | Gordon RFA (SJ Ex. 6) Response 76 |
| 511. | Gordon purchased the domain name myhud.org from GoDaddy.com LLC on or about February 3, 2011. | Gordon RFA (SJ Ex. 6) Response 77 |
| 512. | Gordon included the myhud.org logo and a reference to the website myhud.org on www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 78 |
| 513. | Gordon included the myhud.org logo and a reference to the website myhud.org on www.resourcelawcenter.com. | Gordon RFA (SJ Ex. 6) Response 78 |
| 514. | Gordon included the myhud.org logo and a reference to the website myhud.org on www.resourcelawgroup.com. | Gordon RFA (SJ Ex. 6) Response 78 |
| 515. | Gordon included the myhud.org logo and a reference to the website myhud.org on www.resourcelegalgroup.com | Gordon RFA (SJ Ex. 6) Response 78 |
| 516. | At various times between January 1, 2010 and July 19, 2012, Gordon used the Treasury's Making Home Affordable Program registered trademark, a true and correct copy is attached as Ex. 21 to the RFAs (PX-21), on www.prelitlaw.com until February 2012. | Gordon RFA (SJ Ex. 6) Response 79 |

| | | |
|---|---|---|
| 517. | At various times between January 1, 2010 and July 19, 2012 until February 2012, Gordon used the Treasury's Making Home Affordable Program registered trademark, a true and correct copy is attached as Ex. 21 to the RFAs (PX-21), on www.nationallegalsource.com. | Gordon RFA (SJ Ex. 6) Response 79 |
| 518. | At various times between January 1, 2010 and July 19, 2012 until February 2012, Gordon used the Treasury's Making Home Affordable Program registered trademark, a true and correct copy is attached as Ex. 21 to the RFAs (PX-21), on www.resourcelawcenter.com. | Gordon RFA (SJ Ex. 6) Response 79 |
| 519. | At various times between January 1, 2010 and July 19, 2012 until February 2012, Gordon used the Treasury's Making Home Affordable Program registered trademark, a true and correct copy is attached as Ex. 21 to the RFAs (PX-21), on www.thereliefenetwork.org. | Gordon RFA (SJ Ex. 6) Response 79 |
| 520. | At various times between January 1, 2010 and July 19, 2012, Gordon used the official seal of the Department of Housing and Urban Development, a true and correct copy is attached as Ex. 22 to the RFAs (PX-22), on the website www.thereliefenetwork.org. | Gordon RFA (SJ Ex. 6) Response 80 |
| 521. | At various times between January 1, 2010 and July 19, 2012, Gordon used the official "Your Door to Homeownership" registered mark of the Federal Housing Administration, a true and correct copy is attached as Ex. 23 to the RFAs (PX-23), on the website www.thereliefenetwork.org. | Gordon RFA (SJ Ex. 6) Response 81 |

| | | |
|---|---|---|
| 522. | At various times between January 1, 2010 and July 19, 2012, Gordon used the official registered mark of Fannie Mae, a true and correct copy is attached as Ex. 24 to the RFAs (PX-24), on the website www.thereliefenetwork.org. | Gordon RFA (SJ Ex. 6) Response 82 |
| 523. | At various times between January 1, 2010 and July 19, 2012, Gordon used the official registered mark of Freddie Mac, a true and correct copy is attached as Ex. 25 to the RFAs (PX-215), on the website www.thereliefenetwork.org. | Gordon RFA (SJ Ex. 6) Response 83 |
| 524. | The communications in the websites used by Defendants, including Prelitlaw.com, nationallegalsource.com, resourcelawgroup.com, resourcelegalgroup.com, and resourcelawcenter.com, did not disclose in a clear and prominent manner that Defendants are not associated with the government, nor approved by the government or consumer's lender. | Gordon RFA (SJ Ex. 6) Response 84 |
| 525. | The communications in the websites used by Defendants, including Prelitlaw.com, nationallegalsource.com, resourcelawgroup.com, resourcelegalgroup.com, and resourcelawcenter.com, did not disclose in a clear and prominent manner that even if the consumer uses the entity's service, the consumer's lender may not agree to modify the loan. | Gordon RFA (SJ Ex. 6) Response 84 |

| | | |
|---|---|---|
| 526. | At various times between January 1, 2010 and July 19, 2012, Gordon reviewed all marketing materials used by his business. | Gordon RFA (SJ Ex. 6) Response 85 |
| 527. | At various times between January 1, 2010 and July 19, 2012, Gordon approved all marketing materials used by his business. | Gordon RFA (SJ Ex. 6) Response 86 |
| 528. | At various times between January 1, 2010 and July 19, 2012, Gordon disseminated or directed others to dissemination the marketing materials used by his business. | Gordon RFA (SJ Ex. 6) Response 87 |
| 529. | Between January 1, 2010 and July 19, 2012, Defendants made telemarketing calls for the purpose offering to provide consumers with a service, plan, or program to assist consumers with stopping, preventing, or postponing a mortgage or deed of trust foreclosure sale for the consumer's dwelling. | Gordon RFA (SJ Ex. 6) Response 88 |
| 530. | Between January 1, 2010 and July 19, 2012, Gordon provided, offered to provide, or arranged for others to provide consumers with a service, plan, or program to assist consumers with stopping, preventing, or postponing a mortgage or deed of trust foreclosure sale for the consumer's dwelling. | Gordon RFA (SJ Ex. 6) Response 89 |
| 531. | Between January 1, 2010 and July 19, 2012, Gordon provided, offered to provide, or arranged for others to provide consumers with a service, plan, or program to assist consumers in saving their dwellings from foreclosure or repossession. | Gordon RFA (SJ Ex. 6) Response 90 |

| | | |
|---|---|---|
| 532. | Between January 1, 2010 and July 19, 2012, Gordon provided, offered to provide, or arranged for others to provide consumers with a service, plan, or program to assist consumers in negotiating, obtaining, or arranging a modification of any term of their dwelling loans, including a reduction in the amount of interest, principal balance, monthly payments, or fees. | Gordon RFA (SJ Ex. 6) Response 91 |
| 533. | Gordon reviewed scripts used by Defendants' sales representatives in soliciting clients and potential clients. | Gordon RFA (SJ Ex. 6) Response 92 |
| 534. | At various times between January 1, 2010 and January 19, 2012, Gordon edited scripts used by Defendants' sales representatives in soliciting clients and potential clients. | Gordon RFA (SJ Ex. 6) Response 93 |
| 535. | At various times between January 1, 2010 and January 19, 2012, Gordon approved the scripts that were used by Defendants' sales representatives and processors. | Gordon RFA (SJ Ex. 6) Response 94 |
| 536. | At various times between January 1, 2010 and January 19, 2012, Gordon directed Defendants' sales representatives to use the sales scripts to solicit consumers. | Gordon RFA (SJ Ex. 6) Response 95 |
| 537. | Defendants' sales representatives used sales scripts when soliciting potential clients. | Gordon RFA (SJ Ex. 6) Response 96 |
| 538. | During some telemarketing calls, Defendants told consumers that if they had to choose between making mortgage payments to their lenders and paying for the services Defendants were offering, they should pay for the offered services. | Gordon RFA (SJ Ex. 6) Response 97 |

| | | |
|---|---|---|
| 539. | During some telemarketing calls, Defendants instructed consumers not to contact or communicate with their lender. | Gordon RFA (SJ Ex. 6) Response 98 |
| 540. | During some telemarketing calls, Defendants did not disclose to consumers that by failing to make their mortgage payments, they could lose their homes and damage their credit ratings. | Gordon RFA (SJ Ex. 6) Response 99 |
| 541. | Gordon charged consumers a fee ranging from $2000 to $4500 for what he has described as the “Pre-Litigation Monetary Claims Program.” | Gordon RFA (SJ Ex. 6) Response 100 |
| 542. | Only the consumers who paid for “Pre-Litigation Monetary Claims Program” received “pro-bono” loan modification services. | Gordon RFA (SJ Ex. 6) Response 101 |
| 543. | “Pro bono” loan modification services were not offered to consumers who did not purchase the “Pre-Litigation Monetary Claims Program.” | Gordon RFA (SJ Ex. 6) Response 102 |
| 544. | Gordon limited the duration of the “pro bono” loan modification services he provided to any individual consumer to six months. | Gordon RFA (SJ Ex. 6) Response 103 |
| 545. | Between January 1, 2010 and July 19, 2012, the money that clients paid to Gordon’s business was not deposited or held in a client trust account. | Gordon RFA (SJ Ex. 6) Response 104 |
| 546. | Gordon had authority to issue refunds to consumers of the fees they paid to him. | Gordon RFA (SJ Ex. 6) Response 105 |
| 547. | Gordon drafted the contracts that Defendants sent to consumers. | Gordon RFA (SJ Ex. 6) Response 106 |

| | | |
|---|---|---|
| 548. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with stopping, preventing, or postponing any mortgage or deed of trust foreclosure sale for the consumer's dwelling, any repossession of the consumer's dwelling, or otherwise saving the consumer's dwelling from foreclosure or repossession. | Gordon RFA (SJ Ex. 6) Response 107 |
| 549. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining, or arranging a modification of any term of a dwelling loan, including a reduction in the amount of interest, principal balance, monthly payments, or fees. | Gordon RFA (SJ Ex. 6) Response 107 |
| 550. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with obtaining any forbearance or modification in the timing of payments from any dwelling loan holder or servicer on any dwelling loan. | Gordon RFA (SJ Ex. 6) Response 107 |

| | | |
|---|---|---|
| 551. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining, or arranging any extension of the period of time within which the consumer may cure his or her default on a dwelling loan. | Gordon RFA (SJ Ex. 6) Response 107 |
| 552. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining, or arranging any extension of the period of time within which the consumer may reinstate his or her dwelling loan. | Gordon RFA (SJ Ex. 6) Response 107 |
| 553. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining, or arranging any extension of the period of time within which the consumer may redeem a dwelling. | Gordon RFA (SJ Ex. 6) Response 107 |
| 554. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining, or arranging any extension of the period of time within which the consumer may exercise any right to reinstate a dwelling loan or redeem a dwelling. | Gordon RFA (SJ Ex. 6) Response 107 |

| | | |
|---|---|---|
| 555. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining, or arranging any extension of the period of time within which the consumer may exercise any right to reinstate a dwelling loan or redeem a dwelling. | Gordon RFA (SJ Ex. 6) Response 107 |
| 556. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with obtaining any waiver of an acceleration clause or balloon payment contained in any promissory note or contract secured by any dwelling. | Gordon RFA (SJ Ex. 6) Response 107 |
| 557. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining or arranging a short sale of a dwelling. | Gordon RFA (SJ Ex. 6) Response 107 |
| 558. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining or arranging a deed-in-lieu of foreclosure. | Gordon RFA (SJ Ex. 6) Response 107 |

| | | |
|---|---|---|
| 559. | Pursuant to what Gordon has described as his "Pro Bono Legal Services Agreement," or "Pro Bono Legal Services Program," Gordon offered to assist or attempt to assist consumers with negotiating, obtaining or arranging any other disposition of a dwelling other than a sale to a third party who is not the dwelling loan holder. | Gordon RFA (SJ Ex. 6) Response 107 |
| 560. | Between January 1, 2010 and July 19, 2012, Gordon was licensed to practice law in California, and no other state. | Gordon RFA (SJ Ex. 6) Response 108 |
| 561. | The document attached as Ex. 26 to the RFAs (PX-26) is a true and correct copy of the Gordon & Associates Policy and Procedures Manual used by Gordon's business. | Gordon RFA (SJ Ex. 6) Response 109 |
| 562. | Page 5 of the of the Gordon & Associates Policy and Procedures Manual attached as Ex. 26 to the RFAs (PX-26) is an accurate organization chart for Gordon & Associates. | Gordon RFA (SJ Ex. 6) Response 110 |
| 563. | Michael Pessar was part of the management team for Gordon & Associates. | Gordon RFA (SJ Ex. 6) Response 111 |
| 564. | Michael Pessar was the Marketing & Business Development manager for Gordon & Associates. | Gordon RFA (SJ Ex. 6) Response 112 |
| 565. | Rick Barazza was part of the management team for Gordon & Associates. | Gordon RFA (SJ Ex. 6) Response 113 |
| 566. | Rick Barazza was the Legal Support Supervisor for Gordon & Associates. | Gordon RFA (SJ Ex. 6) Response 114 |
| 567. | Gordon provided all employees, contractors, associates, or anyone else supervised by him with a copy of the Gordon & Associates Policy and Procedures Manual attached as Ex. 26 to the RFAs (PX-26). | Gordon RFA (SJ Ex. 6) Response 115 |

| | | |
|---|---|---|
| 568. | Gordon and Division One used the services of the same accountant. | Gordon RFA (SJ Ex. 6) Response 116 |
| 569. | Between January 1, 2010 and July 19, 2012, Gordon used the email address bydand71@gmail.com to send and receive email communications. | Gordon RFA (SJ Ex. 6) Response 117 |
| 570. | Gordon has exclusive control over the email account bydand71@gmail.com. | Gordon RFA (SJ Ex. 6) Response 118 |
| 571. | Between January 1, 2010 and July 19, 2012, Gordon used the email address gordonlawfirm@yahoo.com to send and receive email communications. | Gordon RFA (SJ Ex. 6) Response 119 |
| 572. | Gordon has exclusive control over the email account gordonlawfirm@yahoo.com. | Gordon RFA (SJ Ex. 6) Response 120 |
| 573. | Gordon created what he has described as the "Pro Bono Legal Services Agreement" and the "Pro Bono Loan Modification Program" in order to avoid the advance fee prohibitions of California Senate Bill 94 and Regulation O. | Gordon RFA (SJ Ex. 6) Response 121 |
| 574. | Gordon read and replied to emails from consumers complaining that they had not received the promised services and that they had not yet received their loan modifications. | Gordon RFA (SJ Ex. 6) Response 122 |
| 575. | Gordon was aware of the lawsuits filed against the Gordon Law firm by consumers. | Gordon RFA (SJ Ex. 6) Response 123 |
| 576. | Gordon was aware of complaints from consumers made to the Better Business Bureau. | Gordon RFA (SJ Ex. 6) Response 124 |
| 577. | Gordon was aware of complaints from consumers made to the State Bar of California. | Gordon RFA (SJ Ex. 6) Response 125 |
| 578. | Gordon supervised the individuals listed on the document attached as Ex. 27 to the RFAs (PX-27). | Gordon RFA (SJ Ex. 6) Response 126 |

| | | |
|---|---|---|
| 579. | Gordon had regular communication with the individuals listed on the document attached as Ex. 27 to the RFAs (PX-27). | Gordon RFA (SJ Ex. 6) Response 127 |
| 580. | Gordon was familiar with the services offered by Defendants' sales representatives to consumers. | Gordon RFA (SJ Ex. 6) Response 128 |
| 581. | Gordon provided directions and instructions to Defendants' sales representatives. | Gordon RFA (SJ Ex. 6) Response 129 |
| 582. | Defendants' sales representatives would seek legal guidance from Gordon relating to the selling of his services. | Gordon RFA (SJ Ex. 6) Response 130 |

**CONCLUSIONS OF LAW**

1. This is an action by the Bureau instituted under Sections 1031(a), 1036(a), 1054, and 1055 of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a), 5564, and 5565; and Regulation O, 16 C.F.R. Part 322, recodified as 12 C.F.R. Part 1015. The Complaint seeks permanent injunctive relief and monetary relief for the Gordon Defendants' acts or practices in violation of the CFPA and Regulation O. The Bureau has the authority under the CFPA and Regulation O to seek the relief it has requested.

2. The Complaint states a claim upon which relief can be granted against the Gordon Defendants.

3. This Court has jurisdiction over the subject matter of this case and has jurisdiction over the Gordon Defendants. Venue in the Central District of California is proper.

4. There is no genuine issue as to any material fact concerning the liability of the Gordon Defendants for the illegal practices charged in the Complaint, or the amount of consumer losses and ill-gotten gains resulting from the Gordon Defendants' unlawful practices.

5. Uncontroverted facts show that the Gordon Defendants are "covered persons" as that term is defined the CFPA, 12 U.S.C. § 5481(6)(A) and (19).

6. Uncontroverted facts show that in the course of offering or providing mortgage assistance relief services, the Gordon Defendants, either acting alone or in concert with others, have made false and misleading representations, directly or indirectly, expressly or by implication, that consumers will or likely will obtain mortgage loan modifications that substantially reduce consumers' mortgage payments or interest rates, or help consumers avoid foreclosure.

7. Uncontroverted facts show that in the course of offering or providing mortgage assistance relief services, the Gordon Defendants, either acting alone or in concert with others, have made false and misleading representations, directly or

indirectly, expressly or by implication, that consumers will or likely will obtain mortgage loan modifications that substantially reduce consumers' mortgage payments or interest rates, as a result of a forensic audit provided by Defendants.

8. Uncontroverted facts show that in the course of offering or providing mortgage assistance relief services, the Gordon Defendants, either acting alone or in concert with others, have made false and misleading representations, directly or indirectly, expressly or by implication that they are an agency of the United States government or are affiliated with, endorsed or approved by, or otherwise associated with the United States government.

9. Uncontroverted facts show that the Gordon Defendants, either acting alone or in concert with others, are "mortgage assistance relief provider[s]" engaged in the provision of "mortgage assistance relief services" as those terms are defined in Regulation O.

10. Uncontroverted facts show that in the course of offering or providing mortgage assistance relief services, the Gordon Defendants, either acting alone or in concert with others, asked for and received their payment before consumers had executed a written agreement between the consumer and the loan holder or servicer that incorporates the offer obtained by the Gordon Defendants.

11. Uncontroverted facts show that in the course of offering or providing mortgage assistance relief services, the Gordon Defendants, either acting alone or in concert with others, failed to make disclosures required by Regulation O.

12. Uncontroverted facts show that in the course of offering or providing mortgage assistance relief services, the Gordon Defendants, either acting alone or in concert with others, have misrepresented that a consumer should not contact or communicate with his or her lender or servicer.

13. Uncontroverted facts show that the Gordon Defendants have caused consumers to suffer substantial injury, and the Gordon Defendants have been unjustly enriched as a result of their violations of the CFPA and Regulation O.

14. As no material facts are in dispute, the Bureau is entitled to judgment as a matter of law pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

15. Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, empower this Court to order injunctive and other equitable relief against the Gordon Defendants for violations of the CFPA and Regulation O, including restitution and disgorgement of ill-gotten gains resulting from the Gordon Defendant's unlawful practices.

16. The Bureau is entitled to a judgment for equitable monetary relief in the amount of $11,403,338.63 against the Gordon Defendants, for which the Gordon Defendants are jointly and severally liable.

17. This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

18. Entry of this Order is in the public interest.

Dated: May 20, 2013

Respectfully Submitted,

Kent Markus
Enforcement Director

x Laura Schneider .
Laura Schneider
(Phone: 202-435-7311)
(Email: Laura.Schneider@cfpb.gov)
Crystal R. Sumner
(Phone: 202-435-7549)
(Email: Crystal.Sumner@cfpb.gov)
James Meade
(Phone: 202-435-9202)
(Email: James.Meade@cfpb.gov)
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: 202-435-7722

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2013, **Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law** was filed electronically and served upon the parties and/or counsel via e-mail to all parties by operation of the court's electronic filing system, including:

| | |
|---|---|
| Gary Kurtz, Esq. | gary@garykurtzlaw.com |
| Kent A. Kawakami | kent.kawakami@usdoj.gov |
| Gary O. Caris | gcaris@mckennalong.com |
| Crystal Renee Sumner | crystal.sumner@cfpb.gov |
| James Meade | james.meade@cfpb.gov |

I declare upon the penalty that the foregoing is true and correct.

Executed on May 20, 2013, at Washington, D.C.

x Laura Schneider .
Laura Schneider