KENT MARKUS, OH Bar #16005
Enforcement Director
LAURA SCHNEIDER, NY Bar #2715449
(Phone: (202) 435-7311)
(Email: Laura.Schneider@cfpb.gov)
CRYSTAL R. SUMNER, CA Bar #261435
(Phone: (202) 435-7549)
(Email: Crystal.Sumner@cfpb.gov)
JAMES MEADE, DC Bar #414732
(Phone: (202) 435-9202)
(Email: James.Meade@cfpb.gov)
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

ETHAN P. DAVIS, NY Bar Reg.#4731055
(Phone: (202) 514-9242)
(Email: ethan.p.davis@usdoj.gov)
BRADLEY H. COHEN, DC Bar #495145
(Phone: (202) 305-9855)
(Email: bradley.cohen@usdoj.gov)
BENJAMIN L. BERWICK, MA Bar #679207
(Phone: (202) 305-8573)
(Email: benjamin.l.berwick@usdoj.gov)
TAMRA T. MOORE, DC Bar #488392
(Phone: (202) 514-8095)
(Email: tamra.moore@usdoj.gov)
Federal Programs Branch
U.S. Department of Justice, Civil Division
P.O. Box 883
Washington, DC 20044
Fax: (202) 616-8470

KENT KAWAKAMI, CA Bar #149803 – Local Counsel
(Phone: (213) 894-4858)
(Email: Kent.Kawakami@usdoj.gov)
United States Attorney's Office
Central District of California - Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Fax: (213) 894-2380

Attorneys for Plaintiff
Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Consumer Financial Protection Bureau,

Plaintiff,

v.

Chance Edward Gordon, et al.,

Defendants.

Case No. CV12-6147-RSWL-MRW

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE SUMMARY ADJUDICATION OF THE ISSUES OF DEFENDANTS CHANCE EDWARD GORDON AND THE GORDON LAW FIRM, P.C.**

**Date: June 17, 2013**
**Time: 1:30 p.m.**
**Place: Courtroom 15**
**Hon. Percy Anderson**

## TABLE OF CONTENTS


I. Introduction ..... 1

II. The Gordon Defendants Are "Covered Persons" as Defined by the CFPA ..... 2

III. The Gordon Defendants Are Also Covered by Regulation O Because They Provided Mortgage Assistance Relief Services in Exchange for Consideration. ..... 5

IV. The Gordon Defendants' Additional Arguments Based on General Principles of Contract Law Are Wholly Inapplicable to Government Enforcement Actions. ..... 7

V. The Gordon Defendants' Additional Arguments Challenging Director Cordray's Authority Lack Merit. ..... 11

- A. The Gordon Defendants Have Waived Their Appointments Clause Challenge to This Enforcement Action. ..... 11
- B. The President May Make Recess Appointments During Intrasession Senate Recesses. ..... 12
  1. The Firmly Established Historical Understanding ..... 13
  2. The Text and the Original Understanding of the Recess Appointments Clause ..... 15
  3. The Purpose of the Recess Appointments Clause ..... 17
  4. *Noel Canning* and *New Vista* ..... 17

VI. Conclusion ..... 21

# TABLE OF AUTHORITIES

**Cases**

*Carlock v. Pillsbury Co.*, 719 F. Supp. 791 (D. Minn. 1989)..........9
*CFTC v. Commercial Hedge Services, Inc.*, 422 F. Supp. 2d 1057 (D. Neb. 2006)..........8
*City of Arlington, Tex. v. F.C.C.*, Nos. 11-1545, 11-1547, 2013 WL 2149789 (U.S. May 20, 2013)..........12
*Elmo Co. v. FTC*, 389 F.2d 550 (D.C. Cir. 1967)..........7
*Evans v. Stephens*, 387 F.3d 1220 (11th Cir. 2004) (*en banc*) ..........passim
*Freytag v. CIR*, 501 U.S. 868, 111 S. Ct. 2631, 115 L. Ed. 2d 764 (1991)..........12
*FTC v. Cyberspace.com*, No. C00-1806L, 2002 WL 32060289 (W.D. Wash. Jul. 10, 2002), aff'd 453 F.3d 1196 (9th Cir. 2006)..........10
*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999)..........10
*FTC v. Minuteman Press*, 53 F. Supp. 2d 248 (E.D.N.Y. 1998)..........9, 10
*FTC v. U.S. Oil & Gas*, No. 83-1702, 1987 U.S. Dist. LEXIS 16137 (S.D. Fla. July 10, 1987)..........8
*Gould v. United States*, 19 Ct. Cl. 593 (Ct. Cl. 1884)..........13
*Greenwood v. FAA*, 28 F.3d 971 (9th Cir. 1994)..........12
*Harron v. Town of Franklin*, 660 F.3d 531 (1st Cir. 2011) ..........11
*Herman v. South Carolina National Bank*, 140 F.3d 1413 (11th Cir. 1998) ..........8
*In re Marriage of Brooks*, 169 Cal. App. 4th 176, 86 Cal. Rptr. 3d 624 (2008)..........9
*Mistretta v. United States*, 488 U.S. 361 (1989) ..........13
*N.L.R.B. v. New Vista Nursing and Rehabilitation*, --- F.3d ---, 2013 WL 2099742 (3d Cir. May 16, 2013) ..........passim
*Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 239 F. Supp. 2d 1367 (C.I.T. 2002)13, 15, 20
*Noel Canning v. N.L.R.B.*, 705 F.3d 490 (D.C. Cir. 2013), *petition for cert. filed*, --- U.S.L.W. --- (U.S. Apr. 25, 2013) (No. 12-1281). ..........passim

*Rimes v. Noteware Dev. LLC*, Civ. No. 09-281 EMC, 2010 WL 1644693 (N.D. Cal. Apr. 21, 2010) ..... 11

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) ..... 4

*The Pocket Veto Case*, 279 U.S. 655, 49 S. Ct. 463, 73 L. Ed. 894 (1929) ..... 13, 18, 20

*United States v. $22,474.00 in Currency*, 246 F.3d 1212 (9th Cir. 2001) ..... 11

*United States v. Allocco*, 305 F.2d 704 (2d Cir. 1962) ..... 14

*United States v. Woodley*, 751 F.2d 1008 (9th Cir. 1985) (*en banc*) ..... 11, 12, 17, 18

*Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 120 S. Ct. 1858, 146 L. Ed. 2d 896 (2000) ..... 12

*Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 118 Cal. Rptr. 2d 770 (2002) ..... 8

**Constitutional Provisions**

Pa. Const. of 1776, § 20 ..... 16

U.S. Const. art. I, § 5, cl. 4 ..... 18

U.S. Const. art. II, § 2, cl. 3 ..... 2, 12, 19

U.S. Const. art. II, § 3 ..... 17

Vt. Const. of 1777, Ch. II, § XVIII ..... 16

**Statutes**

12 U.S.C. § 5481(15)(viii)(II) ..... 2, 3

12 U.S.C. § 5481(19) ..... 2

12 U.S.C. § 5481(6)(A) ..... 2

12 U.S.C. § 5531 ..... 1

12 U.S.C. § 5536 ..... 1

5 U.S.C. § 5503 ..... 15

Cal. Civ. Proc. Code § 1856(g) ..... 8

Cal. Evid. Code § 622 (West) ..... 9

**Regulations**

12 C.F.R. § 1015 ..... 1

12 C.F.R. § 1015.1 ..... 7

12 C.F.R. § 1015.8 .......... 9
16 C.F.R. § 322 .......... 1

**Other Authorities**

13 *Oxford English Dictionary* (2d ed. 1989) .......... 15, 16
157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011) .......... 15
2 *A Documentary History of The English Colonies in North America* 1346–48 (Peter Force, ed., 1839) .......... 16
2 Noah Webster, *An American Dictionary of the English Language* 51 .......... 15
2 Samuel Johnson, *Dictionary of the English Language* 1650 .......... 15
26 *J. Continental Cong. 1774–1789* (Gaillard Hunt ed., 1928) .......... 16
27 *J. Continental Cong. 1774–1789* (Gaillard Hunt ed., 1928) .......... 16
3 *Records of the Federal Convention* 76 (Max Farrand ed., rev. ed. 1937) .......... 16
33 H.L. Jour. 464 (Nov. 26 1772) .......... 16
8 Annals of Cong. 2197 (Dec. 19, 1798) .......... 16
*Appointments—Recess Appointments*, 28 Comp. Gen. 30 (1948) .......... 15
Articles of Confederation of 1781, art. V .......... 16
Dep't of Justice, Office of Legal Counsel, *Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions*, 2012 WL 168645 (Jan. 6, 2012) .......... 14
Dep't of Justice, Office of Legal Counsel, *President's Authority to Make a Recess Appointment to the National Labor Relations Board*, 2001 WL 34815745 (Aug. 31, 2001) .......... 14
*Executive Power—Recess Appointments*, 33 Op. Att'y Gen. 20 (1921). .......... 14
Henry B. Hogue, Cong. Research Serv., *Intrasession Recess Appointments* (Apr. 23, 2004) .......... 14
Henry B. Hogue, et al., Cong. Research Serv., *The Noel Canning Decision and Recess Appointments Made from 1981–2013*, (Feb. 4, 2013) .......... 14
Henry M. Robert, ROBERT'S RULES OF ORDER 148 (1st ed. 1876) .......... 12

*Intrasession Recess Appointments*, 13 Op. O.L.C. 271 (1989) .......................................14

Merriam-Webster's Dictionary and Thesaurus (2007 ed.) ...............................................4

Mortgage Assistance Relief Services Rule, Final Rule and Statement of Basis and Purpose, 75 Fed. Reg. 75092-01 (2010)..........................................................................6

N.J. Legis. Council Journal, 23rd Sess. 21-22 (1798-99).................................................16

*Recess Appointment Issues*, 6 Op. O.L.C. 585 (1982).......................................................14

*Recess Appointments During an Intrasession Recess*, 16 Op. O.L.C. 15 (1992).............14

*Recess Appointments*, 41 Op. Att'y Gen. 463 (1960) .......................................................14

*Recess Appointments—Compensation (5 U.S.C. § 5503)*, 3 Op. O.L.C. 314 (1979)........14

S. Rep. No. 4389, 58th Cong., 3d Sess. 1 (1905) .......................................................14, 17

*The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124 (1996) ..............................................................................................14

Thomas Jefferson, *A Manual of Parliamentary Practice*, § LI (2d ed. 1812) ..................16

## I. Introduction

Plaintiff, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") respectfully submits its Opposition to the Motion for Summary Judgment of Defendants Chance Edward Gordon and The Gordon Law Firm, P.C. (the "Gordon Defendants") and to their supporting Memorandum of Points and Authorities ("Defendants' Memorandum" or "Defs.' Mem."). As set forth in greater detail in Plaintiff's Memorandum of Points and Authorities in support of its Motion for Summary Judgment ("Bureau's Memorandum" or "Bureau's Mem."), this case concerns the Gordon Defendants' scheme to deceive financially distressed homeowners into paying thousands of dollars in advance fees by promising to help them avoid foreclosure. As the Bureau has demonstrated, the Gordon Defendants' deceptive acts and practices violated Sections 1031 and 1036 of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531, 5536, and the ban on advance fees and numerous other provisions of the Mortgage Assistance Relief Services Rule ("Regulation O"), 16 C.F.R. Part 322, recodified as 12 C.F.R. Part 1015. Moreover, the evidence cited by the Gordon Defendants does not controvert the material facts supporting the Bureau's motion for summary judgment, which the Court should grant, enjoining the Gordon Defendants from future violations of the law and ensuring that they do not profit from their illegal activities.

Rather than defend their conduct, the Gordon Defendants hope to convince the Court, by invoking a confusing matrix of "custom legal products," "pro bono" services offered for large fees, and cursory constitutional arguments, that they should be absolved of liability and allowed to resume a loan modification operation that extracted millions of dollars in illegal advance fees from homeowners struggling to afford their mortgage payments. The Court should deny the Gordon Defendants' Motion because they have misstated the facts and the law and have failed to demonstrate that they are entitled to summary judgment.

Similarly flawed is the Gordon Defendants' Recess Appointments Clause challenge. Relying on only a perfunctory summary of two out-of-circuit decisions, the Gordon Defendants ask this Court to hold that the Bureau lacks authority to protect consumers through this enforcement action because the President's recent appointment of Director Cordray under the Recess Appointments Clause, U.S. Const. art. II, § 2, cl. 3, is invalid. The Court should reject this argument for two reasons. First, the Gordon Defendants' failure to present a developed argument for this position renders this claim waived. Second, it is wrong on the merits. The Gordon Defendants ask this Court to reject the long-settled understanding of the Recess Appointments Clause that countenances both intra- and inter-session recess appointments—an interpretation that is consistent with the text, original understanding, and purpose of the clause and has been followed consistently for over a century. To hold otherwise would upset the longstanding balance of constitutional powers between the President and the Senate.

## II. <u>The Gordon Defendants Are "Covered Persons" as Defined by the CFPA</u>

The Gordon Defendants argue that they are not "covered persons," subject to the CFPA's ban on deceptive practices, because they did not offer or provide "a consumer financial product or service."[1] Defs.' Mem. at 7-11. In support of this argument, they quote the entire definition of "consumer financial product or service" (using more than three single-spaced pages of Defendants' Memorandum), followed by the assertion that the definition of "financial advisory services," one of the services that falls within the

[1] The Bureau addressed this point at pages 10-11 of the Bureau's Memorandum:

> [T]he Gordon Defendants are "covered person[s]" . . . . A "covered person" means any person, including any individual, that engages in "offering or providing a consumer financial product or service . . . ." 12 U.S.C. § 5481(6)(A) and (19). Under the CFPA, financial advisory services, including services to assist consumers with modifying a mortgage and avoiding foreclosure, are consumer financial products and services. 12 U.S.C. § 5481(15)(viii)(II).

category of a "consumer financial product or service," "does not mention providing custom legal products." *Id.* at 11. The Gordon Defendants also argue that the loan modification and foreclosure avoidance services they offered to consumers were not "financial advisory services" because, they allege, these services were offered free of charge. *Id*.

However, the CFPA clearly and unambiguously describes "financial advisory services" as, among other things, services that assist consumers with "debt settlement, modifying the terms of any extension of credit, or avoiding foreclosure." 12 U.S.C. § 5481(15)(viii)(II). The uncontroverted evidence shows that the Gordon Defendants offered to provide such services. As set forth more fully in Sections II.B.1., II.B.2., and II.B.3. of the Bureau's Memorandum, from 2010 until the Court's TRO halted their operation on July 19, 2012, Gordon's operation targeted financially distressed homeowners throughout the United States, promising that Defendants could help them reduce their mortgage payments and save their homes. The Gordon Defendants extracted thousands of dollars in illegal advance fees from these consumers, but provided little meaningful benefit. *AMF 26-32, 35, 37, 40-43, 51-55, 75-78.*[2]

In fact, the Gordon Defendants have admitted in their pleadings that they provided "loan modifications [and] workouts," and "loan modification work." *AMF 26*. The Gordon Defendants have also admitted that they provided services "to avoid foreclose" [sic]. *SUF 8.* It follows that under the plain and unambiguous terms of the law, the Gordon Defendants are "covered persons." *See, e.g., Satterfield v. Simon & Schuster,*

---

[2] The Bureau has supplemented the Gordon Defendants' Separate Statement of Uncontroverted Facts with additional material facts, which follow the Defendants' facts in sequentially numbered paragraphs as required by the Court's December 10, 2012 Scheduling Order (Docket Entry 82). Citations to the Gordon Defendants' statement of facts are abbreviated as "*SUF* [number]," and citations to the Bureau's additional material facts are referred to as "*AMF* [number]."

*Inc.*, 569 F.3d 946, 951 (9th Cir. 2009) (a court's inquiry begins and ends with the statutory text if the text is unambiguous).

Although the Gordon Defendants also claim that they did not provide financial advisory services because they allegedly provided services free of charge, they have cited no statutory language or case law to support their argument that the term "financial advisory services" applies exclusively to paid services, and the Bureau is aware of no such authority.[3] Thus, for purposes of the CFPA, it is irrelevant whether the Gordon Defendants charged a fee for loan modifications or foreclosure prevention, because the Act applies to "financial advisory services" regardless.

Nevertheless, the record clearly demonstrates the Gordon Defendants did charge substantial, illegal advance fees for precisely the type of services described in the CFPA's definition of financial advisory services. At Section II.B.4. of the Bureau's Memorandum, the Bureau cited undisputed evidence that the Defendants promised homeowners substantial reductions in their mortgage payments and interest rate in exchange for advance fees ranging from $2,500 to $4,500. Defendants told desperate consumers that they must pay the upfront fee, either in full or in installment payments, before any work could begin on their loan modification, and encouraged their sales agents to charge consumers the maximum fee possible by offering increasingly higher commissions based on the size of the fee paid by consumers. *AMF 27-32, 35, 37, 40-43,*

[3] The Gordon Defendants conclude their argument with the cryptic assertion that their services, "particularly the work to avoid foreclose [sic] -- was performed for the consumers and for free, so they would not fit within the meaning of 'financial **advisory** services . . . .'" Defs.' Mem. at 11; *SUF 8*. To the extent they mean to suggest, by emphasizing the word "advisory," that advisory services are necessarily performed for money, nothing in the plain meaning of the word supports that inference. "Advisory" means "having or exercising power to [give advice]," and "advice" is defined as "recommendation with regard to a course of action." Merriam-Webster's Dictionary and Thesaurus, p. 14 (2007 ed.).

*46-49*. Defendants' sales representatives were told, "the higher your fee, the higher your check" to encourage them to convince financially distressed consumers to pay higher fees. *See* Bureau's Mem. at Section II.B.4; *AMF 50*. These facts and others cited in the Bureau's Memorandum show that the Gordon Defendants offered financial advisory services to struggling homeowners and collected substantial fees for those services. Accordingly, even the imaginary element proposed by the Gordon Defendants—that a fee must be charged to bring a practice within the coverage of the CFPA—is established by uncontroverted evidence, and the Court should conclude that the Gordon Defendants are "covered persons" and deny their motion for summary judgment.

## III. The Gordon Defendants Are Also Covered by Regulation O Because They Provided Mortgage Assistance Relief Services in Exchange for Consideration.

The Gordon Defendants also argue that they are not subject to the advance fee prohibition of Regulation O because they provided loan modification services to consumers free of charge. Defs.' Mem. at 12. While the payment of fees is irrelevant to the applicability of the CFPA, Regulation O applies only to services that are provided "for consideration." As discussed above and in the Bureau's Memorandum at Section III.D.1., uncontroverted facts, including consumer declarations, internal correspondence, and the testimony of the operation's insiders, show that the Gordon Defendants' operation did in fact receive millions of dollars in fees for providing or offering to provide mortgage assistance relief services, as defined by Regulation O. *AMF 27-45, 83-84.* The evidence also shows that Gordon created a sham "pro bono program" to avoid the advance fee prohibition of Regulation O, offering "free" services that were only available to consumers who had paid large advance fees for "custom legal products." *See* Bureau's Mem. at Section III.D.1. *AMF 27-45, 58-59, 80*. The fact that no one received "pro bono" loan modification services unless they had already paid thousands of dollars for "products" consisting of generic, computer-generated documents further exposes the

pretextual nature of the Gordon Defendants' "pro bono" program, and the falseness of their argument that they did not receive any consideration for providing loan modification services. *AMF 44-45, 52, 54-55*. A number of consumers even wrote "loan modification" or "mortgage modification" on the checks they sent the Defendants. *AMF 42*. Additionally, the FTC's MARS Rule Statement makes it clear that Regulation O "prohibits MARS providers from collecting fees for piecemeal services" and that providers "should be aware that merely including a product, such as a book, in conjunction with the sale of services will not remove the transaction from coverage by the Rule." Mortgage Assistance Relief Services Rule, Final Rule and Statement of Basis and Purpose, 75 Fed. Reg. 75092-01 at 75122 and n. 137 (2010).

Morever, both Defendant Pessar and Defendants' office manager admitted that the value of the services sold to consumers was the loan modification with the promised terms, not the "custom legal products." *AMF 58-59.* See also *AMF 56-57, 61-66*. Revealingly, none of the Defendants' scripts or sales representatives ever mentioned that the modification would be provided "pro bono." *AMF 33-36, 38-39*. Thus, consumers would learn about any purported "pro bono service" only after they had paid their fees to Defendants for a loan modification. *AMF 33-36, 38-39, 45*.

The sham nature of the Gordon Defendants' "pro bono" program is further illustrated by the scornful attitude Defendant Gordon demonstrated toward consumers in his recent deposition. When asked to comment on the fact that Defendants' sales representatives were not explaining to consumers that some services were being provided "pro bono," Gordon commented, "I'm assuming if [consumers] have an IQ higher than Forrest Gump, then they can figure out that when they sign a contract that requires a sixth grade education to understand, that they would also understand that they're bound by this contract." *AMF 81*. Gordon also stated, "maybe [consumers]didn't know what ["pro bono"] meant, but then that's why Google exists." *AMF 82.*

## IV. The Gordon Defendants' Additional Arguments Based on General Principles of Contract Law Are Wholly Inapplicable to Government Enforcement Actions.

The Gordon Defendants have asserted that two clauses in one of the contracts they presented to consumers conclusively establish that they did not receive consideration for the loan modification and foreclosure avoidance services they provided, and that they are therefore exempt from Regulation O. Defs.' Mem. at 14-15. They are mistaken.

First, they assert that consumers signed an initial contract, agreeing to pay the Gordon Defendants a fee for "products." Defs.' Mem. at 15. Consumers were then allegedly asked to sign a second contract, whereby the Gordon Defendants agreed to perform "pro bono" loan modification services. Defs.' Mem. at 15. Next, they argue that the first contract contained an integration clause, which recited that the contract incorporated the entire agreement between "the parties," and that the parol evidence rule bars "the parties" from offering extrinsic evidence that contradicts the terms and conditions of the first contract. Thus, they argue, it has been "conclusively" established that all the fees paid by consumers were for "products," not loan modification services. *See* Defs.' Mem. at 13-16.

This is wholly unfounded. In the first place, the Bureau is a law enforcement agency, not a party to the Gordon Defendants' contracts. *See Elmo Co. v. FTC*, 389 F.2d 550, 552 (D.C. Cir. 1967) (noting that the FTC "is not a private party, but a body charged with the protection of the public interest.").[4] The terms of the Gordon Defendants' contracts with consumers do not prevent the Bureau from initiating and pursuing an enforcement action against them for violations of Federal consumer financial laws, nor can the Gordon Defendants limit the evidence offered against them in an enforcement action by citing the terms of contracts they imposed on consumers. *See, e.g., CFTC v.*

---

[4] The FTC and the Bureau both enforce Regulation O. *See* 12 C.F.R. § 1015.1

*Commercial Hedge Services, Inc.*, 422 F. Supp. 2d 1057, 1060 (D. Neb. 2006) (settlement agreements between financial advisor and fraud victims did not bar agency from bringing related enforcement actions); *FTC v. U.S. Oil & Gas,* No. 83-1702, 1987 U.S. Dist. LEXIS 16137, *77 (S.D. Fla. July 10, 1987) (settlements and releases by private parties did not prevent FTC from pursuing enforcement action against company that obtained releases).

In essence, the Gordon Defendants are seeking to use a private, contractual defense in the context of a government law enforcement action to protect the public interest. However, it is a well-established principle that "the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests." *Herman v. South Carolina National Bank*, 140 F.3d 1413, 1425 (11th Cir. 1998) (despite the private parties' settlement agreement, the Secretary of Labor could pursue ERISA action and seek equitable relief including restitution).

Thus, the Gordon Defendants' reliance on the parol evidence rule, as codified by California law, is misplaced. *See, e.g., Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 870, 118 Cal. Rptr. 2d 770 (2002) ("permitting a parol evidence bar or defense [to California's Consumers Legal Remedies Act] would be tantamount to construing the written contract as constituting essentially a waiver of the protections of the act, which waiver is contrary to public policy.").[5] Here, the Gordon Defendants' effort to use the parol evidence rule to exempt themselves from Regulation O is not only contrary to

---

[5] The California Court of Appeal also noted that applying the parol evidence rule to bar enforcement of a consumer protection law would be contrary to the exception to the rule codified at section 1856(g) of the California Code of Civil Procedure, "which expressly permits [parol] evidence 'to establish illegality or fraud.'" *Wang v. Massey Chevrolet*, 97 Cal. App. 4th at 870 (quoting Cal. Civ. Proc. Code § 1856(g)).

public policy, but is also inconsistent with the express terms of Regulation O, which states that it is "a violation of this rule for any person to obtain, or attempt to obtain, a waiver from any consumer of any protection provided by or any right of the consumer under this rule." 12 C.F.R. § 1015.8.

Similarly, the doctrine of estoppel by contract has no relevance to the Bureau's enforcement action. The Gordon Defendants cite section 622 of the California Code of Evidence, which codifies that common law rule and which states that "facts recited in a written instrument are conclusively presumed to be true *as between the parties thereto* . . . ." Cal. Evid. Code § 622 (West) (emphasis added). It is beyond dispute, both under common law and under the plain terms of section 622, that the rule cannot apply to this action, for the simple reason that the Bureau is not a party to the contracts in question. *See, e.g., In re Marriage of Brooks*, 169 Cal. App. 4th 176, 184, 86 Cal. Rptr. 3d 624, 630 (2008).

And in fact, courts have consistently refused to allow the terms of contracts between private parties to limit or interfere with public enforcement actions. For example, in *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-263 (E.D.N.Y. 1998), the court noted that although written disclaimers would have barred evidence of inconsistent oral representations in a private lawsuit, the Federal Trade Commission could use that evidence in an enforcement action. In so ruling, the district court distinguished the lead case relied upon by the defendants, *Carlock v. Pillsbury Co.*, 719 F. Supp. 791, 829 (D. Minn. 1989), in which the parol evidence rule was held to bar extrinsic evidence of terms not found in an integrated, written contract. The *Minuteman Press* court explained its reasoning as follows:

> If the present plaintiff were an aggrieved . . . franchisee instead of the FTC, *Carlock* would be of aid to defendants. But such is not the case. The previously delineated elements of proof [in an FTC] enforcement proceeding are markedly different than in a fraud action between private litigants. Thus, *e.g.*, a conflict

> between a specific disclaimer and a contrary oral representation—typically fatal to a reasonable reliance argument in a purely private suit—is, as discussed previously, *ipso facto,* actionable by the FTC . . . .

*FTC v. Minuteman Press*, 53 F. Supp. 2d at 262. *See also, e.g., FTC v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999) (court rejected claim that disclaimer cured misleading statements because (i) "the disclaimer is not included in the representations" but rather "found on the contract that consumers eventually sign with the defendant," and (ii) "a disclaimer does not automatically exonerate deceptive activities."); *FTC v. Cyberspace.com*, No. C00-1806L, 2002 WL 32060289 at *2-4 (W.D. Wash. Jul. 10, 2002) (cannot escape liability through "fine print disclosures" after creating a false impression), *aff'd* 453 F.3d 1196 (9th Cir. 2006).

Thus, the Gordon Defendants assume, wrongly, that their contracts with consumers preclude the Court from considering the Bureau's uncontroverted evidence that the Gordon Defendants charged fees for mortgage assistance relief services. The Gordon Defendants also take for granted that the Court must accept the recitations in their documents as "conclusively" established. However, the law does not support those assumptions.

The simple reality is that the Gordon Defendants created their "custom legal products" and pretextual pro bono program to avoid the advance fee prohibitions of California Senate Bill 94 and Regulation O. *AMF 80*. Arguments derived from inapplicable principles of contract law do not controvert the clear evidence that the Gordon Defendants charged consumers advance fees for loan modification services, in violation of Regulation O, and that they engaged in deceptive practices in violation of the CFPA.

## V. The Gordon Defendants' Additional Arguments Challenging Director Cordray's Authority Lack Merit.

### A. The Gordon Defendants Have Waived Their Appointments Clause Challenge to This Enforcement Action.

The Gordon Defendants, relying only on a cursory summary of two out-of-circuit decisions concerning the President's recess appointments power, ask this Court to hold that the President's appointment of Director Cordray was unlawful and that, as a result, every action taken by the Bureau under his authority, including in this case, is invalid. *See* Defs.' Mem. at 6-7. The Court should decline this invitation.

Arguments raised in a perfunctory manner, unaccompanied by any developed argument, are deemed waived. *United States v. $22,474.00 in Currency*, 246 F.3d 1212, 1218 (9th Cir. 2001); *see also Rimes v. Noteware Dev. LLC*, Civ. No. 09-281 EMC, 2010 WL 1644693, at *2 (N.D. Cal. Apr. 21, 2010) (finding that motion to dismiss argument that was "wholly conclusory" and raised in a perfunctory manner was waived); *Harron v. Town of Franklin*, 660 F.3d 531, 535 n.2 (1st Cir. 2011) (refusing to consider arguments raised in a perfunctory manner). The Gordon Defendants attempt to support their constitutional challenge to the Bureau's enforcement action with a brief description of two out-of-circuit decisions, but do not provide any explanation or developed argument. Nor do they mention the Ninth Circuit's decision in *United States v. Woodley*, 751 F.2d 1008 (9th Cir. 1985) (*en banc*) which upheld the constitutionality of a recess appointment and rejected one of the two rationales for the D.C. Circuit's decision in *Noel Canning v. N.L.R.B.*, 705 F.3d 490 (D.C. Cir. 2013), *petition for cert. filed*, --- U.S.L.W. --- (U.S. Apr. 25, 2013) (No. 12-1281). The Court should "not manufacture arguments for [Defendants], and a bare assertion does not preserve a [constitutional] claim." *Greenwood*

*v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).[6]

### B. The President May Make Recess Appointments During Intrasession Senate Recesses.

Not only have Defendants waived their Appointments Clause challenge, but they are wrong on its merits.

The Recess Appointments Clause empowers the President "to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const. art. II, § 2, cl. 3. This power enables the President to appoint officers during a "recess" between two Senate sessions (an "*inter*session recess") and during a "recess" within one Senate session (an "*intra*session recess."). In common parlance, an *inter*session recess occurs when the Senate adjourns "*sine die*"—literally, "without [a] day" specified for reconvening—which is the parliamentary mechanism for ending a session. Henry M. Robert, ROBERT'S RULES OF ORDER 148, 155 (1st ed. 1876). When a legislature adjourns to a particular day, instead of *sine die*, the adjournment does not end the session, and the resulting break is an *intra*session recess.

---

[6] Relying upon *N.L.R.B. v. New Vista Nursing and Rehabilitation*, --- F.3d ---, 2013 WL 2099742, at *3-6 (3d Cir. May 16, 2013), the Gordon Defendants assert that their challenge to Director Cordray's exercise of his authority under the statute is "jurisdictional," *see* Defs.' Mem. at 6-7. However, the Supreme Court recently admonished that challenges to an agency's statutory authority, even constitutional ones, are not "jurisdictional" questions. *See City of Arlington, Tex. v. F.C.C.*, Nos. 11-1545, 11-1547, 2013 WL 2149789, at *5-6 (U.S. May 20, 2013) (distinguishing "jurisdictional" questions, *i.e.*, whether a court has the power to decide a case, from claims that an agency has strayed outside the bounds of its statutory authority). Moreover, any suggestion that *Woodley* would support Defendants' position, *see Woodley*, 751 F.2d at 1009 n.2, has also been addressed and rejected by the Supreme Court. *See Freytag v. CIR*, 501 U.S. 868, 878, 111 S. Ct. 2631, 115 L. Ed. 2d 764 (1991) (appointment challenges are "nonjurisdictional")*; see also Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 778 n.8, 120 S. Ct. 1858, 146 L. Ed. 2d 896 (2000).

Defendants argue that the President can make recess appointments only during intersession recesses and that this Court should therefore invalidate Director Cordray's intrasession appointment. *See* Defs.' Mem. at 4-7. As explained below, however, longstanding historical practice, the text of the Recess Appointments Clause, and the Clause's basic purpose of enabling the President to fill vacant offices when the Senate is closed for business, all establish that intrasession recess appointments are permissible. *See Evans v. Stephens*, 387 F.3d 1220, 1224-26 (11th Cir. 2004) (*en banc*) (upholding intrasession recess appointment); *Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 239 F. Supp. 2d 1367, 1375 n.13 (C.I.T. 2002) (same); *Gould v. United States*, 19 Ct. Cl. 593, 595-96 (Ct. Cl. 1884) (same).

**1. The Firmly Established Historical Understanding**

The Supreme Court has recognized that "traditional ways of conducting government give meaning to the Constitution." *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (citation and alterations omitted). Indeed, "a practice of at least twenty years duration on the part of the executive department, acquiesced in by the legislative department, while not absolutely binding on the judicial department, is entitled to great regard in determining the true construction of a constitutional provision the phraseology of which is in any respect of doubtful meaning." *The Pocket Veto Case*, 279 U.S. 655, 690, 49 S. Ct. 463, 73 L. Ed. 894 (1929) (citation and quotation marks omitted).

Since the nineteenth century, Presidents have made over 500 recess appointments during intrasession recesses, including appointments of three cabinet secretaries, five court of appeals judges, ten district court judges, a CIA Director, a Federal Reserve Chairman, numerous members of multi-member boards, and holders of a variety of other critical government posts.[7] In fact, intrasession recess appointments were made as early

[7] *See* Henry B. Hogue, Cong. Research Serv., *Intrasession Recess Appointments* 3-4, 5-22 (Apr. 23, 2004) (identifying 177 intrasession recess appointments before January 20,

as 1867, by President Johnson, and by most Presidents since 1900, *see* Hogue, *Intrasession Recess Appointments*, *supra*, 5-22.

This well-established executive practice is backed by the longstanding position of the Senate, which charged its Judiciary Committee with determining "[w]hat constitutes a 'recess of the Senate.'" S. Rep. No. 4389, 58th Cong., 3d Sess. 1 (1905). The committee adopted a functional definition that turns on whether the Senate is in session, not on whether the recess is intersession or intrasession, concluding that "recess" means "the period of time when the Senate is *not sitting in regular or extraordinary session as a branch of the Congress* . . . ; when its members owe no duty of attendance; when its Chamber is empty; when, because of its absence, it can not receive communications from the President or participate as a body in making appointments." *Id.* at 2.

For over 90 years, the Executive Branch, whose judgment merits significant respect, *see United States v. Allocco*, 305 F.2d 704, 714 (2d Cir. 1962), has relied on this report and followed the same considerations to determine when the Senate is in recess for purposes of the Recess Appointments Clause. *See Executive Power—Recess Appointments*, 33 Op. Att'y Gen. 20, 24-25 (1921).[8] In sum, the "long history" of

---

1981); Henry B. Hogue, et al., Cong. Research Serv., *The Noel Canning Decision and Recess Appointments Made from 1981–2013*, 4, 22-28 (Feb. 4, 2013) (identifying 329 since January 20, 1981).

[8] *See, e.g.*, Dep't of Justice, Office of Legal Counsel, *Lawfulness of Recess Appointments During a Recess of the Senate Notwithstanding Periodic Pro Forma Sessions* ("2012 O.L.C. Opinion"), 2012 WL 168645, at *4-7 (Jan. 6, 2012); Dep't of Justice, Office of Legal Counsel, *President's Authority to Make a Recess Appointment to the National Labor Relations Board*, 2001 WL 34815745 (Aug. 31, 2001); *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 161 (1996); *Recess Appointments During an Intrasession Recess*, 16 Op. O.L.C. 15, 15-16 (1992); *Intrasession Recess Appointments*, 13 Op. O.L.C. 271, 272 (1989); *Recess Appointment Issues*, 6 Op. O.L.C. 585, 586, 588 (1982); *Recess Appointments—Compensation (5 U.S.C. § 5503)*, 3 Op. O.L.C. 314, 316 (1979); *Recess Appointments*, 41 Op. Att'y Gen. 463, 466-69 (1960).

intrasession recess appointments "without serious objection by the Senate . . . demonstrates the legitimacy of these appointments." *Nippon Steel*, 239 F. Supp. 2d at 1375 n.13. This Court should not disrupt such long held and shared understandings.[9]

**2. The Text and the Original Understanding of the Recess Appointments Clause**

The Executive and Legislative Branches' longstanding view of intrasession recess appointments is hardly surprising because the text of the Recess Appointments Clause "does not differentiate expressly between inter- and intrasession recesses." *Evans*, 387 F.3d at 1224. As understood both at the time of the Framing and today, a "recess" is a "period of cessation from usual work." 13 *Oxford English Dictionary* 322-23 (2d ed. 1989) ("*OED*") (citing seventeenth- and eighteenth-century sources); *see also* 2 Noah Webster, *An American Dictionary of the English Language* 51 (1828) (defining "recess" as a "[r]emission or suspension of business or procedure"); 2 Samuel Johnson, *Dictionary of the English Language* 1650 (1755) (similar); *Evans*, 387 F.3d at 1224-25. Because there is an equal "suspension of business" in the Senate during intersession and intrasession recesses, the dictionaries suggest that the plain meaning of the word "recess" covers both. Consistent with this understanding, the Senate *itself* specifically and repeatedly described the intrasession period during which Director Cordray was appointed as a "recess," one in which there would be "no business conducted." *See* 157 Cong. Rec. S8783 (daily ed. Dec. 17, 2011).

---

[9] Legislative officers have also embraced the Attorney General's interpretation of "recess." In 1948, the Comptroller General—a legislative officer—adopted the 1921 opinion of the Attorney General and concluded that the Pay Act, 5 U.S.C. § 5503, permits payment to all recess appointees who are appointed "during periods when the Senate is not actually sitting and is not available to give its advice and consent in respect to the appointment, irrespective of whether the recess of the Senate is attributable to a final adjournment *sine die* or to an adjournment to a specified date." *Appointments—Recess Appointments*, 28 Comp. Gen. 30, 37 (1948).

The term "recess" was understood at the time of the Framing to encompass intrasession recesses. The British Parliament, whose practices formed the basis for American legislative practice, used the word "recess" to encompass intrasession breaks.[10] In 1784, the Continental Congress, empowered by Articles IX and X of the Articles of Confederation to convene the Committee of the States "in the recess of Congress," did so during a scheduled intrasession recess.[11] In 1787, when the Constitutional Convention adjourned for what amounted to a short intrasession recess, delegates referred to that adjournment as "the recess."[12] Likewise, during this era numerous States (including New York, Pennsylvania, and Vermont) used "the recess" to refer to intersession and intrasession recesses of their legislatures.[13] In short, an intrasession recess "fits the definition of 'recess' in use when the Constitution was ratified." *Evans*, 387 F.3d at 1224.

---

[10] *See, e.g.*, 13 *OED* 323 (citing examples from the House of Commons); 33 H.L. Jour. 464 (Nov. 26 1772); Thomas Jefferson, *A Manual of Parliamentary Practice*, § LI (2d ed. 1812).

[11] *See* 26 *J. Continental Cong. 1774–1789*, at 295-96 (Gaillard Hunt ed., 1928); 27 *id.* at 555-56. The scheduled recess was intrasession because new congressional terms began annually in November, *see* Articles of Confederation of 1781, art. V, but Congress had scheduled its adjournment to end on October 30, 1784.

[12] *E.g.*, 3 *Records of the Federal Convention* 76 (Max Farrand ed., rev. ed. 1937) (letter from George Washington to John Jay); *id.* at 191 (speech by Luther Martin); *see also* 2 *id.* at 128 (noting the adjournment).

[13] For example, in July 1775, the New York legislature appointed a "Committee of Safety," and directed it to act "during the recess" of the legislature; the relevant break was a 14-day intrasession recess. *See* 2 *A Documentary History of The English Colonies in North America* 1346–48 (Peter Force, ed., 1839). The Pennsylvania and Vermont Constitutions authorized executive officers to issue trade embargoes "in the recess" of the legislature. *See* Pa. Const. of 1776, § 20; Vt. Const. of 1777, Ch. II, § XVIII. Both provisions were invoked in the 1770s and 1780s during intrasession recesses. *See also* N.J. Legis. Council Journal, 23rd Sess. 21-22 (1798-99); 8 Annals of Cong. 2197 (Dec. 19, 1798) (Governor appointed, and U.S. Senate accepted new commission of, a Senator during intrasession recess under Senate Vacancies Clause, U.S. Const. art. I, § 3, cl. 2).

### 3. The Purpose of the Recess Appointments Clause

In its seminal 1905 report, the Senate Judiciary Committee explained that the Recess Appointments Clause's "sole purpose was to render it certain that at all times there should be, whether the Senate was in session or not, an officer for every office, entitled to discharge the duties thereof." S. Rep. No. 58-4389, at 2. Because the Senate takes more intrasession recesses than intersession recesses, and because it has taken "intrasession recesses lasting months," *Evans*, 387 F.3d at 1226 n.10, the fundamental purpose of the Recess Appointments Clause would be frustrated if the President could not fill vacant offices during intrasession recesses.

Limiting the Recess Appointments Clause to intersession recess appointments also threatens the separation of powers because it would mean that the Senate could interfere with the President's constitutional duty to faithfully execute the laws by taking intrasession recesses for months at a time while critical executive offices lie vacant. *See* U.S. Const. art. II, § 3; *N.L.R.B. v. New Vista Nursing and Rehabilitation*, --- F.3d ---, 2013 WL 2099742, at *38-39 (3d Cir. May 16, 2013) (Greenaway, J., dissenting). Thus, "[t]he main purpose of the Recess Appointments Clause—to enable the President to fill vacancies to assure the proper functioning of our government—supports reading both intrasession recesses and intersession recesses as within the correct scope of the Clause." *Evans*, 387 F.3d at 1226.

### 4. *Noel Canning* and *New Vista*

Rather than actually articulating an argument for challenging the recess appointment, the Gordon Defendants instead merely cite to two out-of-circuit cases. In so doing, they completely ignore the *en banc* Ninth Circuit's decision in *Woodley*, which directly rejects one basis for the D.C. Circuit's decision in *Noel Canning*. The D.C. Circuit held that the recess appointments were invalid because the NLRB vacancies did not "happen" during the recess, but the Ninth Circuit held that the Recess Appointments Clause empowers the President "to fill all vacancies that exist during a recess of the

Senate," not merely those that occur during a recess of the Senate. *United States v. Woodley*, 751 F.2d 1008, 1013 (9th Cir. 1985) (*en banc*) (emphasis added). They also fail to cite the *en banc* Eleventh Circuit's decision in *Evans*, which also is directly contrary to the two out-of-circuit decisions referenced by the Gordon Defendants. *Evans*, 387 F.3d at 1224-25.

In any event, *Noel Canning* and *New Vista* are unpersuasive. In *Noel Canning v. N.L.R.B.*, 705 F.3d 490 (D.C. Cir. 2013), the D.C. Circuit made little effort to review the usage of "recess" during the period of the Framing, and the few historical materials it cited do not support its conclusions. Rather than giving "great weight" to the longstanding practice of Presidents making intrasession recess appointments and to the Senate's acquiescence, *The Pocket Veto Case*, 279 U.S. at 689, the court reasoned instead that the phrase "the Recess of the Senate" uses the definite article "the" before "Recess" rather than the indefinite "a." *Noel Canning*, 705 F.3d at 500. This flawed grammatical focus led the court to conclude that "the Framers intended something specific by the term 'the Recess,' and that it was something different than a generic break in proceedings"; namely, the Framers meant "the Recess" to refer to the recess between two sessions of Congress, rather than to the multiple recesses that could occur within a given session. *Id.*

Yet this very argument was roundly rejected by the *en banc* Eleventh Circuit, which pointed out that "the" can refer generically to a particular *class* of things, *e.g.*, "the pen is mightier than the sword," rather than to a *particular* thing, *e.g.*, "the pen is on the table." *See Evans*, 387 F.3d at 1224. Indeed, even *New Vista* found the D.C. Circuit's emphasis on the word "the" to be "uninformative," in part because "the" can refer to "a specific class of something" and in part "because the Constitution uses 'the' in several manners." *New Vista*, 2013 WL 2099742, at *17 . For example, the Constitution directs the Senate to choose a temporary President of the Senate "in *the Absence* of the Vice President," U.S. Const. art. I, § 5, cl. 4 (emphasis added), a directive that necessarily applies to all Vice Presidential absences rather than any specific absence.

Although the Third Circuit, in *New Vista*, ultimately reached the same conclusion as *Noel Canning*, it explicitly disagreed with most of the reasoning in *Noel Canning*. Unlike the D.C. Circuit, the Third Circuit found that the text and original understanding of the phrase "the Recess of the Senate" does not resolve whether the Clause authorizes intrasession appointments. *New Vista*, 2013 WL 2099742, at *13-17. Instead, the court focused on the "durational provision" of the Recess Appointments Clause, which specifies that recess appointments "'shall expire at the End of [the Senate's] next Session,'" which it viewed as giving the Senate a "single opportunity" to provide its advice and consent for confirmation of a recess appointee under the main Appointments Clause. *Id.* at *22 (quoting U.S. Const. art. II, § 2, cl. 3). But there is no textual or historical basis for concluding that the durational provision was designed to give the Senate one shot—and one shot only—at acting on a recess appointee. And even assuming that this was the provision's purpose, intrasession recess appointments are consistent with this design. Intrasession recesses can extend almost to the end of a session of Congress. Because the Framers could not know how much time would remain in a session of Congress when the President made a recess appointment, it was sensible to select the end of the next session as the termination date, as only that date would ensure the Senate had "one opportunity to undergo the ordinary process" with late-session recess appointments.

Second, in interpreting what it acknowledged to be an ambiguous constitutional provision, the court gave no credence to the considered judgments of the Executive and Legislative Branches because it held that, in separation-of-powers cases, "[g]iving deference to either branch is inconsistent with th[e] concern . . . [of] stopping one branch from aggrandizing its power at the expense of another branch, or ensuring that the carefully defined limits on the power of each Branch are not eroded." *Id.* at *27 (citations and quotation marks omitted). This ruling cannot be reconciled with *The Pocket Veto Cases*, a separation-of-powers case in which the Supreme Court held that "a practice of at least twenty years duration on the part of the executive department, acquiesced in by the

legislative department" is "entitled to great regard." 279 U.S. at 690 (citations and quotation marks omitted). Moreover, the concern that the views of the political Branches would be tainted by self-interest in a separation-of-powers case is not present when—as here—the Branches have a uniform interpretation and the power at issue concerns only the Executive and Legislative Branches (*i.e.*, no judicial power is involved).

Finally, as explained above, it was the common understanding at the Framing that the phrase "the recess" encompasses multiple recesses, including intrasession recesses. To the extent there is any doubt on the meaning of "the Recess" in the Constitution, it is resolved by the firmly established historical practice of the Executive Branch—a practice that the Legislative Branch has embraced, that judicial decisions such as *Evans* have approved, and that is necessary to fulfill the Clause's purpose of ensuring that the President can fill all vacancies when the Senate is not conducting business and is unavailable to provide advice and consent. Both *Noel Canning* and *New Vista* were wrong to conclude otherwise.[14]

---

[14] The Gordon Defendants' motion could be construed as suggesting that even if Director Cordray's recess appointment is constitutional, his authority is somehow circumscribed because he was not confirmed by the Senate. *See* Defs.' Mem. at 5. To the extent this argument has been raised, it should be rejected out of hand. Although the Dodd-Frank Act provides that the Director is to be "appointed by the President, by and with the advice and consent of the Senate," 12 U.S.C. § 5491(b)(2), this is standard language with respect to the appointment of judges or principal officers of the Executive Branch, and the law is settled that this boilerplate does not override the principle that a recess appointee is on the same constitutional footing as a confirmed appointee. *See* Congressional Research Service, President Obama's January 4, 2012, Recess Appointments: Legal Issues, CRS Report R42323, at 28 n.160 (Jan. 23, 2012) (citing statutes); *Swan v. Clinton*, 100 F.3d 973, 986 (D.C. Cir. 1996) (courts should be "unwilling to infer that [an act of Congress] precludes the President from exercising a constitutionally granted power absent clear evidence that this was Congress' intent."); *see also Nippon Steel*, 239 F. Supp. 2d at 1379-80. The Court should also avoid interpreting the statute to limit the President's constitutionally-granted authority because to do so would be to raise serious constitutional issues. *See Swan*, 100 F.3d at 986-88.

## VI. <u>Conclusion</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Gordon Defendants' Motion for Summary Judgment in its entirety.

Dated: June 3, 2013

Respectfully Submitted,

Kent Markus
Enforcement Director

<u>s/ *James Meade*</u>
Laura Schneider
Crystal R. Sumner
James Meade
Attorneys for Plaintiff
Consumer Financial Protection Bureau

STUART M. DELERY
Acting Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

ANDRÉ BIROTTE
United States Attorney

SUSAN K. RUDY
Assistant Director
Federal Programs Branch

<u>s/ *Ethan P. Davis*</u>
ETHAN P. DAVIS
BRADLEY H. COHEN
BENJAMIN L. BERWICK
TAMRA T. MOORE
BRIGHAM J. BOWEN
STEPHEN J. BUCKINGHAM
JONATHAN G. COOPER

Trial Attorneys
Federal Programs Branch
U.S. Department of Justice, Civil Division
P.O. Box 883
Washington, DC 20044
Telephone: (202) 514-9242
Fax: (202) 616-8470
Email: ethan.p.davis@usdoj.gov

*Counsel for Plaintiff*[15]

---

[15] The Department of Justice appears solely for the purpose of defending the constitutionality of the President's appointment of Director Cordray as set forth in Section V of the Brief.

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2013, the Plaintiff's **Opposition to the Gordon Defendants' Motion for Summary Judgment or in the Alternative for Adjudication of Claims and Memorandum of Points and Authorities in Support Thereof** was filed electronically and served upon the parties and/or counsel via e-mail to all parties by operation of the court's electronic filing system, including:

| | |
|---|---|
| Gary Kurtz, Esq. | gary@garykurtzlaw.com |
| Kent A. Kawakami | kent.kawakami@usdoj.gov |
| Gary O. Caris | gcaris@mckennalong.com |
| Crystal Renee Sumner | crystal.sumner@cfpb.gov |
| James Meade | james.meade@cfpb.gov |

I declare upon the penalty that the foregoing is true and correct.

Executed on June 3, 2013, at Washington, D.C.

s/ *Laura Schneider*
Laura Schneider