UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 12-6147 RSWL (MRWx) | Date | June 26, 2013 |
| Title | Consumer Financial Protection Bureau v. Chance Gordon, et al. | | |

| | |
|---|---|
| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE |

| | | |
|---|---|---|
| Paul Songco | Not Reported | N/A |
| Deputy Clerk | Court Reporter | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:** IN CHAMBERS — COURT ORDER

Before the Court are Motions for Summary Judgment filed by plaintiff Consumer Financial Protection Bureau ("CFPB") (Docket No. 144) and defendants Chance Gordon and the Gordon Law Firm (collectively "Gordon") (Docket No. 139). This matter has been referred to this Court due to the unavailability of the judge to whom the action is assigned. Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument.

I. <u>Factual Background and Procedural History</u>

The CFPB commenced this action on July 18, 2012. In its Complaint, the CFPB alleges that Gordon and affiliated companies and individuals operate an enterprise that provides mortgage assistance relief services. According to the CFPB, the affiliated companies and individuals constitute an enterprise that operates in a manner that violates provisions of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531(a), 5536(a), 5564, & 5565, and the Mortgage Assistance Relief Services Rule ("Regulation O"), 12 C.F.R. § 1015. Specifically, the Complaint alleges that defendants have engaged in unfair and deceptive practices by making false and misleading statements when marketing their services, falsely promising consumers that they would obtain mortgage loan modifications and avoid foreclosure, and by erroneously implying that defendants are affiliated with or endorsed by the Government. The Complaint further alleges that defendants violate Regulation O by receiving up-front payments for mortgage assistance relief services from consumers before consumers enter into loan modification agreements with their lenders, advising consumers to stop paying their mortgages despite Regulation O's requirements that mortgage assistance relief service providers warn consumers that they could lose their homes or damage their credit ratings if they stop paying their mortgages, and urging consumers not to communicate with their lenders.

The CFPB filed an Ex Parte Application for Temporary Restraining Order ("TRO") at the same time it filed its Complaint. Among other things, the TRO sought by the CFPB prohibited defendants from continuing to operate the enterprise in violation of the applicable laws and regulations and included the appointment of the Temporary Receiver and an asset freeze. The Court granted the CFPB's TRO without notice to defendants and, consistent with the TRO, ordered defendants to show cause why a

preliminary injunction should not issue. Pursuant to the TRO, the Temporary Receiver took over operation of the enterprise.

Following service of the TRO on defendants, the CFPB and Gordon entered into a stipulation establishing a briefing schedule on the Order to Show Cause why a Preliminary Injunction Should Not Issue ("Preliminary Injunction"). Pursuant to that stipulation, the TRO remained in effect pending the Court's ruling on the Preliminary Injunction. At the October 22, 2012 hearing on the Temporary Receiver's Motion for Approval of Interim Fees and Expenses, the Court stated that it would issue a Preliminary Injunction. The Court also indicated that based on the Temporary Receiver's reports, it did not appear that defendants' business entities could continue as going concerns. The Temporary Receiver agreed with that assessment. As a result, the Court instructed the Temporary Receiver and CFPB to prepare for the winding-down of the receivership. After determining that the CFPB was likely to prevail on the merits, the Court issued the Preliminary Injunction on November 16, 2012. In granting the Permanent Injunction, the Court stated that the Temporary Receiver's "primary task at this point should be to wind-down Defendants' operations in the most expeditious and cost-effective manner possible."

The parties have now filed cross-motions for summary judgment. In its Motion, the CFPB seeks summary judgment on each of the Complaint's seven claims for: (1) falsely representing that consumers will obtain mortgage loan modifications that substantially reduce consumers' mortgage payments or interest rates in violation of 12 U.S.C. §§ 5531, 5536; (2) falsely representing that consumers will obtain loan modifications that substantially reduce consumers' mortgage payments as a result of forensic audits conducted by defendants in violation of 12 U.S.C. §§ 5531, 5536; (3) falsely representing that defendants are affiliated with, endorsed, or approved by the United States government in violation of 12 U.S.C. §§ 5531, 5536; (4) receive up-front payments in violation of Regulation O; (5) fail to make disclosures required by Regulation O; (6) wrongly informing consumers not to contact lenders in violation of Regulation O; and (7) misrepresenting material aspects of their services in violation of Regulation O. The CFPB's Motion seeks an order of restitution requiring Gordon to pay to the clients of his mortgage assistance relief services $11,403,338.63 and injunctive relief.

In his Motion for Summary Judgment, and in opposition to the CFPB's Motion, Gordon asserts that he is entitled to judgment because the CFPB lacks the authority to prosecute this action as a result of the Director of the CFPB's appointment to his post by the President in a manner that Gordon contends was in violation of the Recess Appointments Clause of the Constitution. Gordon alternatively argues that the CFPB cannot prevail on the merits because it was the entities operated by co-defendant Abraham Pessar (the "Pessar Entities")[1/] that were responsible for any misleading marketing of Gordon's services, the contracts signed by Gordon's clients cured any misrepresentations, and Gordon should not be considered to have provided mortgage assistance relief "services" because he sold "legal products" and

[1/] Mr. Pessar and the Pessar Entities entered into a Stipulated Final Judgment and Order for Permanent Injunction and Settlement that resolved the CFPB's claims against those defendants. (Docket No. 102.)

provided free legal services and therefore should not be considered to have charged up-front fees or otherwise to have provided "services" covered by Regulation O for consideration.

II. Analysis

The Court will address the merits of the CFPB's claims and Gordon's factual and statutory defenses before addressing the constitutional issues raised by the CFPB Director's intrasession recess appointment. See Polar Shipping Ltd. v. Oriental Shipping Corp., 680 F.2d 627, 630 (9th Cir. 1982) ("We should not pass upon a constitutional question, although properly presented by the record, if there is a nonconstitutional ground upon which the case may be decided.").

A. CFPA Deceptive Marketing Claims

The Complaint's first three claims allege that Gordon and the Pessar Entities engaged in deceptive marketing of Gordon's services in violation of the CFPA. The CFPA provides that "[i]t shall be unlawful for any covered person . . . to engage in any . . . deceptive . . . act or practice." 12 U.S.C. § 5536(a)(1)(B); see also 12 U.S.C. § 5531(a). A "covered person" means any person, including any individual, "that engages in offering or providing a consumer financial product or service." 12 U.S.C. § 5481(6)(A) and (19). Under the CFPA, financial advisory services, including services to assist consumers with modifying a mortgage and avoiding foreclosure, are consumer financial products and services. See 12 U.S.C. § 5481(15)(viii)(II).

The Court concludes that there is undisputed evidence that defendants violated the CFPA by: (1) falsely representing that consumers would obtain mortgage loan modifications that substantially reduced consumers' mortgage payments or interest rates; (2) falsely representing that consumers would obtain loan modifications that substantially reduced consumers' mortgage payments as a result of forensic audits conducted by defendants; and (3) falsely representing that defendants were affiliated with, endorsed, or approved by the United States government. Specifically, uncontroverted evidence consisting of consumer declarations and depositions, defendants' admissions, marketing materials, mailers, websites, company emails and documents, and the deposition testimony and declarations of insiders, all establish that defendants represented to consumers that they were likely to receive interest rate reductions to as low as 2%, substantial reductions in monthly mortgage payments, reductions in principal, and foreclosure prevention. The same uncontroverted evidence shows that in reality, rather than receiving a loan modification, many consumers who used defendants' services were left in worse financial condition, deprived not only of the fees paid to defendants, but sometimes pushed to the brink of foreclosure. Similar uncontroverted evidence demonstrates that defendants did not perform promised forensic audits, or obtain modifications for consumers as a result of forensic audits. Finally, the uncontroverted evidence demonstrates that the net impression created by defendants' nationwide marketing is that defendants had an association with or were endorsed by the United States government when no such affiliation, endorsement, or approval existed.

Gordon asserts that he should not be liable for any deceptive practices undertaken by the Pessar Entities. "An individual will be liable for corporate violations of the FTC Act if (1) he participated directly in the deceptive acts or had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." FTC v. Stefanchik, 559 F.3d 924, 930 (9th Cir. 2009); see also Goodman v. FTC, 244 F.2d 584, 592-93 (9th Cir. 1957). Here, despite Gordon's self-serving declaration to the contrary, the undisputed facts establish that Gordon was personally involved in the marketing of his services by the Pessar Entities and had knowledge of the misrepresentations. Moreover, the undisputed facts establish that the "'pattern and frame-work of the whole enterprise'" consisting of Gordon, his law firm and the other entities controlled by Gordon, Pessar, and the Pessar Entities, compel the conclusion that Gordon is liable for the marketing practices. FTC v. J.K. Publ'ns, Inc., 99 F. Supp. 2d 1176, 1201-02 (C.D. Cal. 2000) (quoting Delaware Watch Co. v. FTC, 332 F.2d 745, 746 (2d Cir. 1964)).

Gordon additionally contends that the agreements his clients eventually signed corrected any deceptive practices the Pessar Entities may have engaged in because the written agreements accurately described the work Gordon would perform and any reliance on the deceptive marketing practices would be unreasonable. "An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'" FTC v. Gill, 265 F.3d 944, 950 (9th Cir. 2001) (quoting FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir. 1994)). That a contract may provide terms that correct deceptive claims made during the marketing of a product or service does not absolve a defendant from liability for making the deceptive claims in the first place. See Resort Car Rental Sys., Inc., 518 F.2d 962, 964 (9th Cir. 1975) ("[T]he public is not under any duty to make reasonable inquiry into the truth of advertising. The Federal Trade Act is violated if it induces the first contact through deception, even if the buyer later becomes fully informed before entering the contract. Advertising capable of being interpreted in a misleading way should be construed against the advertiser. Neither actual damage to the public nor actual deception need be shown.") (citations omitted).

For all of the foregoing reasons, the Court concludes that Gordon is liable for violations of the CFPA and that the CFPB is therefore entitled to summary judgment on the merits of its first through third claims for relief.

B. Regulation O Claims

The CFPB's fourth through seventh claims allege that Gordon violated Regulation O by receiving up-front payments, failing to make required disclosures, wrongly informing consumers not to contact lenders, and misrepresenting material aspects of defendants' services. Under Regulation O, a "Mortgage Assistance Relief Service Provider" is any person, including an individual or a business entity, "that provides, offers to provide, or arranges for others to provide, any mortgage assistance relief service." 12 C.F.R. § 1015.2. "Mortgage Assistance Relief Service" is "any service, plan, or program,

offered or provided to the consumer in exchange for consideration, that is represented, expressly or by implication, to assist or attempt to assist the consumer" with, among other things, stopping or delaying a foreclosure, negotiating, obtaining, or arranging a modification, extension, or forbearance of the consumer's home loan, or a short sale or deed-in-lieu-of foreclosure. Id.

Gordon argues that he is not subject to Regulation O based on his assertion that he did not provide services in exchange for consideration, but instead that the fees defendants charged consumers were exclusively for "custom legal products" and that the loan modification and other services defendants offered those same consumers were provided free of charge, as part of a "pro bono program." According to the undisputed facts, the "custom legal products" for which defendants charged consumers between $2,500 and $4,500, consisted of a qualified written request, demand letter, and draft complaint. These documents were form templates. Despite defendants' efforts to evade the requirements of Regulation O and similar state law limitations on charging fees for mortgage assistance relief services in advance of obtaining a loan modification, the Court concludes, consistent with the FTC's interpretation of the applicable regulation, that the structure of the "custom legal products" and "pro bono program" violated Regulation O because simply labeling something a "product" does not change the fact that defendants were in fact charging advance fees for mortgage assistance relief services. See 75 Fed. Reg. 75092-01 at 75102 n.137 (2010) ("Providers should be aware that merely including a product, such as a book, in conjunction with the sale of services will not remove the transaction from coverage by the Rule."); 75 Fed. Reg. 43569-01 (2011); see also Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 911 (1997) (finding an agency's interpretation of its own regulations to be "controlling" unless the interpretation is "plainly erroneous or inconsistent with the regulation"). Moreover, defendants' marketing practices make it readily apparent that they were selling mortgage assistance relief services to consumers.

For all of the foregoing reasons, the Court concludes that Gordon is liable for violations of Regulation O and that the CFPB is therefore entitled to summary judgment on the merits of its fourth through seventh claims for relief.

C. Constitutional Challenge to CFPB Director's Appointment

Richard Cordray was appointed by the President as the CFPB's Director on January 4, 2012. In appointing Director Cordray, the President invoked the Recess Appointments Clause, which provides that "[t]he President shall have Power to full up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session." U.S. Const., art. II, § 2, cl. 3. At the time of Director Cordray's appointment, the Senate was on an "intrasession" recess and conducting pro forma sessions.

Recently, decisions from the Court of Appeals for the District of Columbia and the Third Circuit have called into question the President's authority to make recess appointments during intrasession recesses of the Senate. See Noel Canning v. NLRB, 705 F.3d 490 (D.C. Cir. 2013); NLRB v. New Vista

Nursing & Rehab., Nos. 11 3440 & 12-1936, 2013 WL 2099742 (3rd Cir. May 16, 2013). Specifically, in Noel Canning and New Vista, the courts invalidated the President's recess appointments made to the National Labor Relations Board ("NLRB") on the same day that Director Cordray was appointed. According to those courts, because the Recess Appointments Clause only applies to intersession recesses of the Senate, the recess appointees made to the NLRB on January 4, 2012, were invalid and, as a result, the NLRB lacked a quorum to act. Accordingly, the D.C. Circuit and Third Circuit vacated the actions taken by the NLRB as void ab initio.

Gordon contends that for the same reasons the NLRB was without authority to act, the CFPB similarly is without authority to prosecute its claims against him. Unlike the NLRB, which consists of a board through which may act only when it has a quorum, the CFPB is an agency with a director and no quorum requirement. Gordon has engaged in no analysis of the relevant statutes concerning the powers granted to the CFPB and what, if any, authority the CFPB could exercise even if Director Cordray's appointment is deemed invalid. Instead, Gordon cites to an Inspector General's report issued five months before Director Cordray's appointment. That report, which has no precedential value, stated that "CFPB has newly-established federal consumer regulatory authorities. The Treasury Secretary is not permitted to perform certain newly-established CFPB authorities if there is no Director by the designated transfer date."

The Court concludes that Gordon's citation to the Inspector General's report falls well short of providing the Court with a reasoned and supported argument concerning the CFPB's authority to prosecute this action. The Court has no occasion to pass on the constitutionality on Director Cordray's appointment because Gordon has provided insufficient argument concerning the potential ramifications of invalidating that appointment. Specifically, even assuming that Director Cordray's appointment exceeded the President's powers under the Recess Appointments Clause, Gordon has not argued how, under the relevant statutes, that determination would prevent the CFPB from taking the actions it has in this instance. By failing to explain how, in the absence of a properly appointed or confirmed director, CFPB is unable to prosecute this action, Gordon has waived the argument that the CFPB lacks the authority to pursue its claims against him even if Director Cordray's appointment was unconstitutional. See Broad v. Sealaska Corp., 85 F.3d 422, 430 (9th Cir. 1996) ("To have been properly raised . . . 'the argument must be raised sufficiently for the trial court to rule on it.'") (quoting In re E.R. Fegert, Inc., 887 F.2d 955, 957 (9th Cir. 1989)); see also Greenwood v. FAA, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review.").

Because Gordon has waived the argument that, even without a properly appointed or confirmed Director, the CFPB lacks the authority to pursue its claims against him, the Court has no need to address the constitutionality of Director Cordray's appointment because any such holding would not resolve the issue of the CFPB's authority to prosecute this action. The Court therefore declines to reach the merits of Gordon's attack on the constitutionality of Director Cordray's appointment. Instead, the Court concludes that Gordon has waived the argument that the CFPB may not act in the absence of a properly

installed Director. Gordon's arguments concerning the constitutionality of Director Cordray's appointment are therefore an insufficient basis to deny the CFPB's Motion for Summary Judgment or to grant Gordon's Motion for Summary Judgment.

D. Remedies

The CFPB seeks both a permanent injunction and $11,403,338.63 in disgorgement and restitution against Gordon, which the CFPB contends is the amount Gordon, Pessar, and the Pessar Entities collected from consumers from January 2010 through July 2012. See 12 U.S.C. § 5565(a) (authorizing courts to "grant any appropriate legal or equitable relief with respect to a violation of Federal consumer financial law" including restitution, disgorgement, and "limits on the activities or functions of the person"). . "Disgorgement is measured by the amount of profits causally connected to the violation. The purpose of disgorgement is not to redress consumer injuries but to deprive wrongdoers of ill-gotten gains." FTC v. Commerce Planet, Inc., 878 F. Supp. 2d 1048, 1088 (C.D. Cal. 2012). "Restitution may be measured by the 'full amount lost by consumers rather than limiting damages to a defendant's profits.'" Id. (quoting FTC v. Stefanchik, 559 F.3d 924, 931 (9th Cir. 2009)).

District courts have broad equity powers in determining the appropriate measure of equitable relief. FTC v. Neovi, Inc., 604 F.3d 1150, 1159 (9th Cir. 2010) (citing SEC v. JT Wallenbrock & Assocs., 440 F.3d 1109, 1113 (9th Cir. 2006). To determine the appropriate amount of equitable monetary relief in such cases:

> [C]ourts apply a burden-shifting scheme. First, the [CFPB] must provide the court with a reasonable approximation of damages. Both gross receipts and net customer loss are appropriate measures. Once a reasonable approximation of damages has been provided, the defendant has an opportunity to demonstrate that the figures are inaccurate. Any fuzzy figures due to a defendant's uncertain bookkeeping cannot carry a defendant's burden to show inaccuracy.

FTC v. Direct Marketing Concepts, Inc., 624 F.3d 1, 15 (1st Cir. 2010); see also Commerce Planet, Inc., 878 F. Supp. 2d at 1088.

Here, Gordon does not dispute that the defendants collected $11,403,338.63 from consumers. Gordon does, however, assert, that many of his clients were satisfied with his services and that an unknown number of dissatisfied customers received refunds from him. That some of Gordon's clients may have been satisfied with his services or obtained loan modifications does not alter the fact that Gordon violated the CFPA and Regulation O. Nor has Gordon supported his request for credit for certain expenses and refunds with admissible evidence. The Court therefore concludes that the CFPB has met its burden to establish entitlement to an award of equitable monetary relief in the amount of $11,403,338.63.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-6147 RSWL (MRWx) | Date | June 26, 2013 |
|---|---|---|---|
| Title | Consumer Financial Protection Bureau v. Chance Gordon, et al. | | |

The CFPB also seeks the issuance of a permanent injunction. Gordon, claiming that he has no interest in ever again offering mortgage assistant relief services, objects to the CFPB's proposed injunctive relief. The Court has reviewed the 23-page proposed permanent injunction submitted by the CFPB and concludes that although it is inclined to issue limited injunctive relief in this instance because it believes that the CFPB has met its burden that Gordon presents an ongoing risk to consumers, the injunction proposed by the CFPB is much broader and restrictive than necessary to ensure Gordon's future compliance with the CFPA and Regulation O. Moreover, some of the requirements, including reporting requirements that would continue for 15 years, unnecessarily burden Gordon without any corresponding benefit to consumers. The Court is not inclined to grant such broad injunctive relief that does little more than present a significant risk of future contempt proceedings for minor violations. Nor should the injunction unduly limit Gordon's ability to engage in lawful employment.

The Court therefore orders the parties to meet and confer concerning mutually-agreeable terms for a permanent injunction. The parties shall, no later than July 12, 2013, submit a Joint Report in which the parties shall discuss their efforts to fashion an appropriate permanent injunction. By that date, the parties shall also file a proposed permanent injunction if the parties can come to an agreement, or, if they are unable to resolve their disputes, each party shall file its own proposed injunction.

CONCLUSION

For all of the foregoing reasons, the Court grants the CFPB's Motion for Summary Judgment and denies Gordon's Motion for Summary Judgment. The Court also grants the CFPB's request for an award of $11,403,338.63 in equitable monetary relief against Gordon, for which Gordon is jointly and severally liable. Finally, although the Court is inclined to issue a limited permanent injunction, the proposed permanent injunction submitted by the CFPB is too broad. The Court therefore orders the parties to meet and confer concerning an appropriate permanent injunction. Once the Court finalizes the language of the permanent injunction, it will issue a Judgment and Permanent Injunction consistent with this Order. Except for the last day to conduct a settlement conference, which must occur within 10 days of the date of this Order, the Court vacates all remaining pretrial and trial dates.

IT IS SO ORDERED.